No. 23-35507

_____

_____

IN THE UNITED STATES CIRCUIT COURT OF APPEALS

FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA, EX REL. BNSF RAILWAY COMPANY,

Plaintiff – Appellee,

v.

CENTER FOR ASBESTOS RELATED DISEASE, INC.,

Defendant – Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA

_____

**APPELLANT'S OPENING BRIEF**

_____

Timothy Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
406-721-1435
tim@bechtoldlaw.net
*Attorney for Defendant – Appellant CARD*

## CORPORATE DISCLOSURE STATEMENT

The Center for Asbestos Related Disease, Inc. is a Montana non-profit corporation. It is not a subsidiary of any other corporate entity.

DATED this 29th day of November, 2023.


_/s/ Timothy M. Bechtold_____
BECHTOLD LAW FIRM, PLLC
*Attorney for Defendant – Appellant CARD*

ii

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE ................................................................. ii

TABLE OF AUTHORITIES ................................................................vi

LIST OF ACRONYMS ........................................................................x

INTRODUCTION ...............................................................................1

JURISDICTIONAL STATEMENT ........................................................4

ISSUES PRESENTED.........................................................................4

STATEMENT REGARDING THE ADDENDUM ...................................5

STATEMENT OF THE CASE...............................................................5

STATEMENT OF ARGUMENT .........................................................12

ARGUMENT ...................................................................................15

    I.     The District Court erred by not granting CARD's motion for summary judgment and Rule 50 motion. ...............................................15

          A.  The District Court erred in denying CARD's motion for summary judgment and/or Rule 50 motion regarding the FCA elements.............................................................................16

              (1) CARD proved at summary judgment it did not submit any False statements. ........................................................16

              (2) CARD proved at summary judgment it did not have the requisite scienter. .....................................................18

              (3) CARD proved at summary judgment the claims made were not material. .............................................................19

          B.  The statute of limitations bars, or at least limits, BNSF's claims..21

II.    The District Court erroneously instructed the jury, based on its own post-hoc statutory interpretation, that the conditions of 'asbestosis, pleural plaques, or pleural thickening" cannot be "established by interpretation by a 'B-Reader' qualified physician" and that claims submitted on that basis constitute *per se* false claims. ............................22

    A.  A plain reading of the ACA dictates that the "conditions of asbestosis, pleural plaques, and pleural thickening are "established by" an "interpretation" of a chest x-ray by a "B-Reader." ...................................................................................22

    B.  The ACA's definition of Environmental Health Condition should be interpreted with deference to the administering federal agency. ..............................................................................27

    C.  Congressional intent to qualify Libby asbestos exposed individuals for Medicare and Pilot Program benefits is evident from the identical definition of qualifying medical conditions in each of the Medicare coverage, Pilot Program, and Early Detection Screening provisions of the ACA, and the purpose to enhance coverage for appropriate care and follow-up for individuals who had conditions placing them at risk for the development of disabling asbestosis, lung cancer, or mesothelioma……………………………..36

    D.  The District Court erred in imposing a heightened eligibility requirement based on medical society guidelines, as this was not intended by Congress and the District Court misapplied its own heightened interpretation of the ACA. …………………………39

III.   Instruction F-23, together with F-24, is erroneous because it compelled the jury to find, regardless of CARD's scienter, that whenever CARD certified a person eligible for Medicare based solely on an outside B Reader's radiological interpretations, it was a "false claim." .................42

IV.    The District Court erroneously precluded the jury from considering key evidence of CARD's scienter at the time it submitted the EHH checklists which further supports CARD's reasonable interpretation of the ACA. ............................................................................................46

A. CARD's subjective beliefs are the critical determination for CARD's scienter at issue here. .....................................................46

B. In determining CARD's scienter, the Court improperly required the jury to consider legal interpretations that CARD did not have reason to believe at the time they submitted the EHH forms, specifically legal interpretations imposed by the Court after-the-fact during the trial and beyond the requirements contained in the ACA. .............................................................................................47

C. The Court instructed the jury in F-20 to disregard CARD's subjective belief and reasonable interpretation if it was based on ATSDR's express intent and direction for how and when EHH checklists should be completed...................................................48

D. The District Court improperly precluded highly relevant and probative testimony about CARD's intent and reasonable interpretation of the ACA…………………………………………53

CONCLUSION ............................................................................................57

STATEMENT OF RELATED CASES ........................................................58

CERTIFICATE OF COMPLIANCE ...........................................................59

CERTIFICATE OF SERVICE ....................................................................60

ADDENDUM ..............................................................................................61

<u>**TABLE OF AUTHORITIES**</u>

**CASES**

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002)................................24

*BNSF Ry. Co. v. Asbestos Claims Court of the State of Montana*, 2020 MT 59, 459 P.3d 857................................................................................5

*Caballero v. City of Concord*, 956 F.2d 204 (9th Cir. 1992) ...........................45, 52

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507 (2019) ..22

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)..........
....................................................................................*passim*

*Conahan v. Sebelius*, 659 F.3d 1246 (9th Cir. 2011) ..............................29

*Dupree v. Younger*, 598 U.S. 729 (2023). .............................................15

*Drayden v. White*, 232 F.3d 704 (9th Cir. 2000) ....................................54

*Fernandez v. Montgomery*, 182 F.Supp.3d 991 (N.D. Cal. 2016) ...................54

*Fournier v. Sebelius*, 718 U.S. 1110 (9th Cir. 2013)................................29

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93 (2016) ...................47

*Holzer v. Davita, Inc.*, 2022 WL 726929 (9th Cir. March 10, 2022) ................ 17-18

*Hunter v. County of Sacramento*, 652 F.3d 1225 (9th Cir. 2011). ........................12

*United States v. Crosby*, 75 F.3d 1343 (9th Cir. 1996) ...........................57

*United States v. Hankey*, 203 F. 3d 1160 (9th Cir. 2000)........................53

*United States v. Mills*, 704 F.2d 1153 (11th Cir. 1983).........................53

*United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997).........................57

*United States v. Pub. Utilities Comm'n of Cal.*, 345 U.S. 295 (1953) .............36, 37

*United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890 (9th Cir. 2017)....... .........................................................................................................*Passim*

*United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173 (4th Cir. 2022) ...........................................................................................................43

*United States ex rel. Heath v. Wisconsin Bell, Inc.*, 593 F.Supp.3d 855 (E.D. Wis. 2022) ...................................................................................................................43

*United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457 (9th Cir. 1999)................ ...........................................................................................................*passim*

*United States ex rel. Rose v. Stephens Institute*, 909 F.3d 1012 (9th Cir. 2018)......... ...................................................................................................... 19-20

*United States ex. rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391 (2023)....46, 47, 53

*Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016) .......................................................................................................6, 18, 19, 20

*Walters v. McCormick*, 122 F.3d 1172 (9th Cir. 1997) ..........................................54

*Washington v. Texas*, 388 U.S. 14 (1967) ...................................................... 53-54

*Winter ex rel. United States v. Gardens Reg'l Hosp. and Med. Ctr.*, 953 F.3d 1108 (9th Circ. 2020). .......................................................................................16, 18, 20

## STATUTES

28 U.S.C. § 1291 ....................................................................................................15

28 U.S.C. § 1331 ......................................................................................................4

28 U.S.C. § 1453 ......................................................................................................4

31 U.S.C. § 3729 ...............................................................................................12, 21

31 U.S.C. § 3729(a)(1)(B) .....................................................................................12

31 U.S.C. § 3729(b)(1)...................................................................12

31 U.S.C. § 3729(b)(1)(A)(ii)-(iii)...............................................46

31 U.S.C. § 3729(b)(4)...................................................................19

31 U.S.C. § 3731(b).................................................................21, 23

31 U.S.C. § 3732(a).........................................................................4

42 U.S.C. § 1881A......................................................................1, 2

42 U.S.C. § 1881A(b).......................................................................1

42 U.S.C. § 1881A(b)(1)..................................................................2

42 U.S.C. § 1881A(b)(2)(A)...........................................................37

42 U.S.C. § 1881A(e)......................................................................24

42 U.S.C. § 1881A(e)(2)(B)......................................................*passim*

42 U.S.C. § 1881A(e)(2)(ii).......................................................8, 40

42 U.S.C. § 1397h(c)(3)............................................................2, 4, 37

42 U.S.C. § 10323....................................................................7, 36, 38

42 U.S.C. § 18001...................................................................7, 10, 13

## REGULATIONS

Fed. R. App. P. 28-2.7.....................................................................5

## OTHER AUTHORITIES

American Thoracic Society, *Diagnosis and Initial Management of Nonmalignant Disease Related to Asbestos* (2004).............................................. 2, 41-42

viii

EPA, *EPA Announces Public Health Emergency in Libby, Montana; EPA to Move Aggressively on Cleanup and HHS to Assist Area Residents with Medical Care* (June 17, 2009) EPA Newsroom, https://www.epa.gov/archive/epapages/ newsroom_archive/newsreleases/0d16234d252c98f9852575d8005e63ac.htm. ....... 7

Restatement (Second) of Torts § 526 (1976)............................................................46

Restatement (Third) of Torts: Liability for Economic Harm § 10 (2018).........46, 47

# <u>LIST OF ACRONYMS</u>

**ACA – Affordable Care Act**

**ARD – Asbestos Related Disease**

**ATS – American Thoracic Society**

**ATSDR – Agency for Toxic Substances and Disease Registry**

**BNSF – Burlington Northern Santa Fe Railway Co.**

**CARD – Center for Asbestos Related Disease**

**DHHS – Department of Health and Human Services**

**EHH – Environmental Health Hazards**

**EPA – Environmental Protection Agency**

**FCA – False Claims Act**

**ILO – International Labour Organization**

**NOFO – Notice of Funding Opportunity**

**INTRODUCTION**

Libby, Montana, was the site of a vermiculite mining and processing operation from the 1920s through 1990. While in operation, Libby was the world's largest source of vermiculite. Libby vermiculite is contaminated with a highly toxic amphibole asbestos. This has resulted in substantial asbestos-related illness and death not only in vermiculite workers, but family members, and Libby-area residents with no occupational exposure.

In 1999, reports of pervasive asbestos-related disease in Libby prompted a concerted response by the federal government, a large component of which was community-based screening by the Agency for Toxic Substances and Disease Registry (ATSDR). Following the EPA's first and only declaration of a public health emergency, in 2010, Congress included language in the Affordable Care Act (ACA), Public Law 111-148 (codified at 42 U.S.C § 1881A), to make early detection screening available to persons with potential exposure to vermiculite in the Libby area. The ACA further required the Secretary of Health and Human Services to establish a "Pilot Program" granting to "Environmental Exposure Affected Individuals" in Libby eligibility for Medicare coverage of health care services not otherwise covered by Medicare. 42 U.S.C. §1881A(b). The Early Detection Screening and Pilot Program coverage under the ACA applies to all

1

individuals who (a) lived in Libby area for at least 6 months, and (b) had a statutorily defined "Environmental Health Condition." 42 U.S.C. § 1397h(c)(3)).[1]

Individuals with definitive markers of asbestos-related disease such as plaques or scarring of the pleura means the patient is "at risk" to develop lung cancer. ER-163;  *see also* American Thoracic Society, Diagnosis and Initial Management of Nonmalignant Diseases Related to Asbestos, 2004, at 705, "The presence of plaques is associated with a greater risk of mesothelioma and of lung cancer ... Therefore, the presence of pleural plaques should be interpreted as a marker for elevated malignancy, which may be higher than the occupation history alone might suggest."). The purpose of the Pilot Program was—and still is—to give exceptional Medicare coverage to individuals with these conditions for "innovative approaches to furnishing comprehensive, coordinated and cost-effective care," such as Medicare coverage for regular checkups for timely detection of the lung cancers for which they are at risk, and smoking cessation programs. § 1881A(b)(1).

In 2011, ATSDR awarded a four-year grant to CARD to conduct screening activities under the ACA. ATSDR awarded two subsequent grants to CARD,

---

[1] The ACA's definitions of "conditions" constituting an "Environmental Health Condition" in § 1397h(3)(c) and the Medicare/Pilot Program coverage "conditions" qualifying an individual for Pilot Program/Medicare coverage in § 1881A are identical.

essentially extensions of the 2011 grant, for the periods 2015-19 and 2019-24. As part of compliance with the terms of the grants, CARD has submitted annual reports and budget justifications to ATSDR; submitted quarterly reports to ATSDR; and CARD staff has worked closely with ATSDR to ensure compliance with the terms of the grants. *See, e.g.* ER-51; ER-238. Almost all of CARD's funding comes from the ATSDR screening grants. ER-87.

Screening initially consists of a one-page application and proof of presence to determine if a person has sufficient exposure history and latency period to qualify for screening under the ATSDR grant, an interview, exposure history and medical history questionnaires, spirometer test, posterior-anterior chest x-ray, and a visit with a CARD medical provider. ER-238. If determined appropriate by CARD medical providers, the patient is scheduled for a CT scan, which is then read by a radiologist, typically located where the CT scan is performed. Under the terms of the grants, all x-rays and CT scans are also sent to outside readers who review the x-rays and CT scans for structural radiographic abnormalities.

If CARD physicians determine that a patient has an asbestos-related abnormality and the patient requests it, CARD staff fill out an Environmental Health Hazards (EHH) checklist for signature by a CARD physician. CARD forwards the EHH checklist to the Social Security Administration (SSA). CARD also fills out EHH checklists for patients whom outside readers determine have an

3

asbestos-related abnormality. Patients who CARD physicians <u>or</u> outside readers determine have an asbestos-related abnormality as noted on the EHH checklist are eligible for Medicare benefits under the Affordable Care Act.

## JURISDICTIONAL STATEMENT

Subject matter jurisdiction over this action arises under to 31 U.S.C. § 3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question). This Court has jurisdiction to hear this appeal of the District Court's judgment pursuant to 28 U.S.C. § 1453.

## ISSUES PRESENTED

1. Whether the Court erroneously failed to grant CARD's motion for summary judgment and CARD's Rule 50 motion for judgment as a matter of law.

2. Whether the District Court erroneously instructed the jury that, under the Affordable Care Act (ACA) § 2009(c)(3); ACA § 1881A(e)(2)(B), a B-reader "interpretation" of radiological images does not "establish" "asbestosis, pleural plaques, or pleural thickening" for Medicare eligibility unless there was an additional "clinical diagnosis" not contained in the ACA but imposed by the Court in this case.

3. Whether the District Court's jury instructions erroneously precluded the jury from considering CARD's scienter when it stated that submission of a

person for Medicare based upon a B-reader interpretation only was a "false claim."

4. Whether the District Court's jury instructions erroneously precluded the jury from considering evidence of CARD's reasonable interpretation of the ACA and its scienter, including direction from and reasonable reliance on the federal agency administering the applicable portions of the ACA and CARD's understanding of the ACA requirements based on its involvement in drafting the language contained in the ACA.

## STATEMENT REGARDING THE ADDENDUM

Pursuant to Ninth Circuit Fed. R. App. P. 28-2.7, an addendum is attached to this brief.

## STATEMENT OF THE CASE

BNSF,[2] as Relator on behalf of the United States, filed this lawsuit alleging that CARD violated the False Claims Act ("FCA") during CARD's implementation of the ACA.  The essential elements of FCA liability are:

---

[2]  BNSF is also a defendant in hundreds of claims brought by individuals exposed to asbestos in Libby.  The Montana Supreme Court has concluded, "it is undisputed that BNSF's properties in Libby contained extensive asbestos contamination," and that "BNSF's handling of asbestos [in Libby] constitutes an abnormally dangerous activity for which BNSF is strictly liable."  *BNSF Ry. Co. v. Asbestos Claims Court of the State of Montana*, 2020 MT 59, ¶¶ 25, 39, 459 P.3d 857.

5

(1) a false statement or fraudulent course of conduct, (2) made with the scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due.

*United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 902 (9th Cir. 2017). The FCA "is not 'an all-purpose anti-fraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs., Inc., v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016) (internal citations omitted). As described more fully below, a defendant who relies on "a good faith interpretation of a regulation is not subject to liability" under the FCA. *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 464 (9th Cir. 1999).

BNSF alleges CARD's implementation of the ACA resulted in "false claims." More specifically, CARD believes[3] the jury verdict on appeal arises from CARD's submission of Environmental Health Hazard checklists based upon asbestos conditions established by interpretation by a B-Reader or an outside qualified physician when CARD's providers did not make a finding of an asbestos condition. CARD submitted the checklists pursuant to the terms of the ACA for over a decade and with the affirmation and direction from federal agencies that such practice was lawful and appropriate. However, here the District Court

---

[3] The verdict form did not specify the bases of the jury's FCA violation determinations.

6

instructed the jury incorrectly regarding the requirements of the ACA and inserted its own additional requirements for establishing those medical conditions.

It is undisputed that the ACA includes specific language granting Medicare coverage to Libby victims of the asbestos related Public Health Emergency[4] declared by the EPA.  *See* 42 U.S.C. § 10323.  These ACA provisions extend eligibility for the following asbestos-related conditions:

> " . . . asbestosis, pleural thickening, or pleural plaques as established by (I) interpretation by a 'B Reader' qualified physician of a plain chest x-ray or interpretation of a computed tomographic radiograph of the chest by a qualified physician, as determined by the Secretary; or (II) such other diagnostic standards as the Secretary specifies."

42 U.S.C. §§ 18001, 1881A(e)(2)(B).

A B Reader is a specially qualified physician certified by the Industrial Labour Organization (ILO) in applying very specific criteria in the interpretation of chest x-rays to identify the presence or absence of "pneumoconiosis" (the dust caused lung diseases of asbestosis and silicosis).  The plain language of the ACA states that any of the three eligible conditions—asbestosis, pleural thickening, or pleural plaques—can be "established by (I) interpretation by a B Reader qualified physician of a plain chest x-ray" or by a qualified physician's interpretation of a

---

[4]  EPA, *EPA Announces Public Health Emergency in Libby, Montana; EPA to Move Aggressively on Cleanup and HHS to Assist Area Residents with Medical Care* (June 17, 2009) EPA Newsroom, https://www.epa.gov/archive/epapages/ newsroom_archive/newsreleases/0d16234d252c98f9852575d8005e63ac.htm.

7

chest CT scan. [5]  *Id.*  This language was generated in part through the direct involvement of Montana Senator Max Baucus and his office consulting with CARD staff during drafting and passage of the ACA.[6]

Following passage of the ACA and as contemplated after the EPA's declaration of Public Health Emergency, CARD applied for and received federal grant funding from the ATSDR[7] to screen thousands of Libby residents for these statutorily defined conditions and other asbestos related conditions. ER-87. ATSDR's Notice of Funding Opportunity ("NOFO"), ER-30, stated how ATSDR would implement the intended screening defined "specifications" which "should be followed" by CARD.  ER-31–37.  These specifications included the same statutory definition prescribing the manner in which an ARD is established: "by . . . interpretation by a B Reader…"  ER-34.

Pursuant to ATSDR's express direction, CARD reported findings and the statutory medical conditions by way of an "Environmental Health Hazards

---

[5]  Additional qualifications related to a patient's <u>exposure</u> are set forth in the ACA, *see* ACA sec 1881A (e)(2)(ii) (to be eligible for screening, individuals must have "been present for an aggregate of 6 months in the geographic area subject to an emergency declaration … not less than 10 years prior to such diagnosis"), but no additional medical or diagnostic requirements are stated in the ACA.

[6]  *See generally*, Argument III.D below addressing the Court's error in excluding evidence reflecting Senator Baucus's personal knowledge of and relationship with CARD, its contemporaneous practices relative to the ACA, and specifically the ACA's Libby-specific language which CARD assisted Senator Baucus in drafting.

[7]  The ATSDR (Agency for Toxic Substances and Disease Registry) is a federal agency operating within the U.S. Dep't of Health and Human Services.

Checklist." ER-89. The EHH checklist specifically directed CARD through a 'check-the-box' document that the "Minimum Medical Evidence Required" for certain conditions—and thus also Medicare eligibility—could be established solely by interpretation by a B Reader of an x-ray or a qualified physician's interpretation of a CT scan, just as indicated in the ACA's terms and the ATSDR's NOFO. CARD, ATSDR, and DHHS operated openly and cooperatively through multiple grant cycles wherein the ACA's asbestos-related conditions were established by x-ray interpretation by a B Reader or CT interpretation by a qualified physician and reported by CARD, including CARD's handwritten inclusion of the word "only" and CARD's underlining when "only" B Read or outside CT read interpretation supported the condition. *See, e.g.,* ER-161–162; ER-149.

In addition to many other allegations of "false claims,"[8] BNSF asserted that submission of an EHH checklist for asbestos induced conditions established by interpretation by a B Reader or outside reader were "false claims" despite (a) the

---

[8] Notably, the jury rejected the bulk of the arguments made by BNSF as to what should constitute a false claim: 1) that CARD is not a qualified physician to read CT scans so any submission of an EHH form based thereon was a false claim (Exhibit 269-8 (ER-26) (category 4 (882 false claims)); 2) that whenever a CARD diagnosis was made there must also be a positive outside B read supporting that diagnosis so any submission of an EHH form without that second positive outside radiologic read was a false claim (Exhibit 269-8 (ER-26) (category 5; (1,099 false claims)); 3) that submitting an EHH form based on a CARD diagnosis but before an outside B read was received constituted a false claim (Exhibit 269-8 (ER-26) (category 7 (791 false claims)).

9

clear language of the applicable terms of the ACA, (b) the terms of all its implementing components (e.g., EHH, NOFO, etc.) involved with the Libby screening, and (c) the clear practice of the various government actors. BNSF argued that <u>additional</u> clinical signs and symptoms were required. Specifically, BNSF sought inclusion into the ACA requirements a clinical diagnostic definition and guidelines from an outside medical society, the American Thoracic Society ("ATS"), that is altogether absent from the actual terms of ACA and the elements used by ATSDR, DHHS, or CARD to implement the ACA.

CARD moved for summary judgment, arguing that the materiality and scienter elements of the False Claims Act could not be shown. The District Court denied CARD's summary judgment motion and set the case for trial.

Following the presentation of evidence, the District Court approved jury instructions. The Court's jury instructions:

(1)     Altered the plain language of the ACA (42 U.S.C. §§ 18001, 1881A(e)(2)(B)), and injected BNSF's proposed requirement of an additional "clinical diagnosis" based upon guidelines from the ATS, effectively disregarding the plain language of the statute that "established" various asbestos conditions solely by "interpretation by a B Reader"; *see* Jury Instruction F-24. ER-102;

10

(2)     Instructed the jury, irrespective of CARD's scienter, that it "is a false claim" under the FCA to submit an EHH form for asbestosis, pleural plaques, or pleural thickening based on a B Read only; *see* Jury Instruction F-23. ER-101; and

(3)     Prevented the jury from fairly considering CARD's reasonable interpretation of the ACA and subjective knowledge and intent—critical elements of an FCA action—by precluding the jury from weighing the conduct and directions of ATSDR as the administering agency, *See* Jury Instruction F-20. ER-99 ("In evaluating [CARD's] knowledge, you . . . may not rely on the conduct of Government agents contrary to the law."), and precluding evidence of CARD's interpretation of the statute based on its involvement with Senator Baucus in drafting the statute.

The impact of these erroneous instructions is seen from BNSF's closing argument, wherein BNSF's counsel highlighted F-24, ER-102, and its flawed insertion of ATS guidelines and "clinical diagnosis" criteria into the ACA, and then argued that *per se* "false claims" existed, based in part upon what CARD "knew," or more importantly what the jury was told it could not consider as part of CARD's subjective knowledge.  *See* ER-173 (Transcript p.2962:17-24).

The jury did as they were told and as required by the District Court's instructions in finding false claims for at least 253 EHH checklist reports based on

11

B-reads only listed on Exhibit 269-8, ER-26, (category 2 (145) plus category 6 (108)), and perhaps all of the 377 "false reports" found by the jury.

## SUMMARY OF THE ARGUMENT

The False Claims Act, 31 U.S.C. § 3729, creates liability where the reporting person "makes, uses, or causes to be made or used, <u>a false record or statement material to a false claim</u>" (31 U.S.C. § 3729(a)(1)(B)) where the reporting person knows or acts in deliberate or reckless disregard of the truth or falsity of the reported information (31 U.S.C. § 3729(b)(1)).  Here, the District Court should have granted CARD's motion for summary judgment. CARD was acting in compliance of its understanding of the Libby provisions of the ACA, the specific language of which CARD had helped to develop in conjunction with Senator Max Baucus for inclusion in the ACA.

"Jury instructions must fairly and adequately cover the issues presented, <u>must correctly state the law</u>, and must not be misleading." *Hunter v. County of Sacramento*, 652 F.3d 1225, 1232 (9th Cir. 2011) (emphasis added).[9]  The District Court committed the following critical errors while instructing the jury in this FCA action.

First, the District Court erred when it approved jury instructions and allowed the jury to decide this case based upon BNSF's erroneous descriptions of ACA's

---

[9]  Unless otherwise noted, all emphasis hereinafter is added.

requirements. The plain terms of the ACA make clear that the asbestos-related conditions identified in the statute may be "established by (I) interpretation by a 'B Reader' qualified physician of a plain chest x-ray or interpretation of a computed tomographic radiograph of the chest by a qualified physician." §§ 18001, 1881A(e)(2)(B). The Court nonetheless accepted BNSF's proposed Jury Instruction F-24, ER-102, that added both a general dictionary definition of a term not even in the ACA ('diagnosis'), ATS guidelines, and a "clinical diagnosis" requirement as necessary elements <u>in addition to</u> the terms of the ACA. For purposes of both implementing the ACA and this FCA action, CARD, ATSDR, and DHHS have no obligation to apply the non-statutory requirements added by the District Court, and therefore such standards cannot be part of a jury's assessment of a false claim. As a simple matter of statutory construction, the Court's approval of a statement adding additional requirements to CARD's obligations under the ACA reflects an erroneous statement of law and reversible error.

Second, this appeal is necessary because the District Court erred when it approved jury instructions and allowed the jury to decide CARD's potential liability under the FCA without proper consideration of CARD's scienter when CARD submitted the claims at issue. Jury Instruction F-23, ER-101, compelled a "false claim" finding through the erroneous statement of law introduced in Jury

Instruction F-24, ER-102. However, liability under the FCA demands *inter alia* that a claim be made with specific "scienter." *See Campie*, 862 F.3d at 899. The Court's instructions to the jury through F-23, ER-101, and F-24, ER-102, removed that standard related to CARD's scienter. They instead compelled the jury to identify the existence of "false claims" strictly if submission of a claim did not meet BNSF's and the Court's definition of "diagnosis," rather than the applicable and appropriate ACA and FCA standards.

Finally, and likewise, Jury Instruction F-20, ER-99, improperly stated the law and restricted the jury from fairly considering the essential components in an FCA action of CARD's reasonable belief of the ACA and CARD's scienter. It is undisputed that CARD worked closely with and relied upon ATSDR as the administering agency regarding what specifications should be followed in CARD's submissions. *See, e.g.*, Testimony of ATSDR's Theodore Larson, ER-150–152; ER-161–162. The District Court here foreclosed CARD's defense that ATSDR's determinations and guidance served to establish CARD's subjective beliefs and lack of intent to submit false claims under the FCA. As a matter of law, *Chevron* requires Court deference to the administering agency when interpreting statutes, and importantly, what the ACA requires, and CARD's obligations thereunder, were essential elements of BNSF's burden of proof in this FCA action. Jury Instruction F-20, ER-99, expressly—and erroneously pursuant to *Chevron*—

14

adopted BNSF's statement that, "In evaluating [CARD's] knowledge, you . . . may not rely on the conduct of Government agents contrary to the law." When offered in conjunction with Instructions F-23, ER-101, and F-24, ER-102, which imposed post hoc heightened "clinical diagnosis" requirements and instructed that claims not meeting those requirements were "false claims," Instruction F-20, ER-99, erroneously prohibited the jury from considering ATSDR's specifically stated interpretation that Medicare eligibility under the ACA could be "established by" B Read. *See, e.g.*, Testimony of Theodore Larson, ER-154–155.

## ARGUMENT

## I.   <u>The District Court erred by not granting CARD's motion for summary judgment and Rule 50 motion.</u>

Orders denying summary judgment are generally not reviewable after trial pursuant to 28 U.S.C. § 1291. However, an appellate court may review "purely legal issues—that is, issues that can be resolved without reference to any disputed facts." *Dupree v. Younger*, 598 U.S. 729, 735 (2023). Here, CARD moved as a matter of law that the scienter and materiality elements of the False Claims Act could not be met, since CARD openly followed the directives of the ATSDR in implementing the Libby provisions of the ACA. This Court may review the legal claims now on appeal and find that the District Court incorrectly denied judgment in CARD's favor. In its motions, CARD argued that the FCA elements could not be met and also that the claims were time-barred.

15

*A. The District Court erred in denying CARD's motion for summary judgment and/or Rule 50 motion regarding the FCA elements.*

Claims under the False Claims Act require a showing of "(1) a false statement or fraudulent course of conduct, (2) made with the scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Campie,* 862 F.3d at 902.

**(1) CARD proved at summary judgment it did not submit any False statements.**

A physician's medical opinion can be considered "false" within the meaning of the FCA under some circumstances, such as where the opinion is not honestly held by the doctor. *Winter ex rel. United States v. Gardens Reg'l Hosp. and Med. Ctr.*, 953 F.3d 1108, 1117-18 (9th Cir. 2020). Notably, "The FCA requires the knowing presentation of what is known to be false and that the phrase known to be false does not mean 'scientifically untrue,' it means 'a lie.' The Act is concerned with ferreting out 'wrongdoing,' not scientific errors." *Id.* (citations omitted).

Here, the CARD medical providers' diagnoses for asbestos-related diseases are based on the American Thoracic Society 2004 Guidelines. ER-260. Further, CARD providers' diagnoses of patients with asbestos-related diseases are based on over two decades of familiarity with the presentation of Libby amphibole disease in patients. *See* ER-237–238. Simply stated, the diagnostic opinions of the CARD providers are "honestly held," therefore cannot be false statements under the FCA.

16

Far from demonstrating fraudulent asbestos-related disease diagnoses by CARD, the facts underlying BNSF's claims instead show no more than the noted discrepancies in clinical judgment between CARD providers and outside readers. CARD providers present honestly held opinions regarding the presence or absence of asbestos-related disease based on a disease presentation documented in decades of peer-reviewed medical literature, including literature co-authored by CARD providers. ER-243–246. Several of these peer reviewed studies and publications specifically discuss the radiographic presentation of pleural disease among the Libby cohort and the difficulties presented in uniform classification from a radiographic standpoint. ER-243–246. Beyond Libby, inter-reader variability is a recognized phenomenon often leading to differing opinions of the presence, absence, or degree of radiographic findings among different readers reviewing the same image. ER-238. As such, it is not surprising, and certainly not fraudulent, that there is some variability in reads and diagnoses of CARD providers and other readers. *See, e.g., Holzner v. Davita, Inc.,* 2022 WL 726929 at *1 (9th Cir. March 10, 2022) (mere disagreement in clinical judgement is insufficient evidence to establish that medical diagnoses or certifications are false or fraudulent).

### (2) CARD proved at summary judgment it did not have the requisite scienter.

The scienter requirements of the FCA are "rigorous." *Escobar*, 579 U.S. at 192. In *Winter*, this Court considered whether providing false certifications of

17

medical necessity for hospital admissions decisions for Medicare patients was actionable under the FCA. This Court stated that, "Defendants act with the required scienter if they know the treatment was not medically necessary, or act in deliberate ignorance or reckless disregard of whether the treatment was medically necessary." *Winter*, 953 F.3d at 1114. Notably, this Court stated that, "falsity is a necessary, but not sufficient, requirement for FCA liability—after alleging a false statement, a plaintiff must still establish scienter. … a 'scientifically untrue' statement is 'false'—even if it may not be actionable because it was not made with the requisite intent. And an opinion with no basis in fact can be fraudulent if expressed with scienter." *Id*. at 1118.

Here, the diagnostic opinions of the CARD providers here are "honestly held" and soundly based on the decades of extensive medical research and peer reviewed literature on the subject of Libby asbestos-related disease. *See, e.g.,* ER-243–246. Moreover, CARD's statements in its grant reports are known by CARD to be true. The scienter requirement cannot be met here.

### (3) CARD proved at summary judgment the claims made were not material.

Under the FCA, "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The materiality standard is both "rigorous" and "demanding" because the FCA is not "an all-purpose antifraud statute, or a vehicle

18

for punishing garden-variety breaches of contract or regulatory violations."
*Escobar*, 579 U.S at 192, 194 (citations omitted). "Under any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," meaning the government. *Id*. at 193 (citations omitted).

In *United States ex rel. Rose v. Stephens Institute*, this Court explained three materiality scenarios from *Escobar*:

> First, 'proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement.' Second, the Court explained that, 'if the Government pays a particular claim in full despite its *actual knowledge* that certain requirements were violated, that is very strong evidence that those requirements are not material.' Third, "if the Government regularly pays a particular type of claim in full despite *actual knowledge* that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.' The Court further noted that materiality 'cannot be found where noncompliance is minor or insubstantial.'

*United States ex rel. Rose v. Stephens Institute*, 909 F.3d 1012, 1019 (9th Cir. 2018) (internal citations omitted). For a false statement to be material, the statutory violations must be "so central" to the claims that the government "would not have paid these claims had it known of these violations." *Winter*, 953 F.3d at 1121 (*quoting Escobar*, 579 U.S at 196).

The provisions of the ACA were crafted to ensure that CARD providers would be considered qualified to diagnose asbestos related diseases. ER-250. After passage of the ACA, the ATSDR sent out a Notice of Funding Opportunity that specifically included provisions acknowledging that CARD providers are considered qualified to diagnose asbestos related diseases. *See* ER-34. Throughout the years of all ATSDR grants to CARD, CARD has submitted quarterly reports, annual reports, and budget justifications to ATSDR. *See, e.g.,* ER-51. On each of these reports, CARD staff has worked closely with ATSDR staff. ER-254. ATSDR is aware of CARD providers' diagnostic rates and rates of dissension with outside readers, yet ATSDR has continued funding the grants to CARD. ER-255–256. Moreover, even after Office of Inspector General of the Department of Health and Human Services (HHS OIG) conducted an investigation of CARD in 2019 in response to this lawsuit, and even after BNSF has chosen to prosecute this case after the government chose not to intervene, in 2021 ATSDR awarded CARD a $1 million supplemental grant to expand the screening program. ER-270.

Materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation, here ATSDR. Whatever allegations that BNSF attempts to posit here, it is clear from the actions of ATSDR continuing to fund CARD, and even providing CARD with supplemental funding during the pendency of BNSF's litigation, that any alleged false statements are not material,

20

and certainly cannot withstand the "rigorous" and "demanding" materiality requirements demanded by the FCA. ATSDR grant funding has never been withheld by ATSDR, and in 2021 ATSDR awarded CARD a $1 million supplemental grant to expand the screening program. ER-256; ER-270.

### B. The statute of limitations bars, or at least limits, BNSF's claims.

Under 31 U.S.C. §3731(b)(1) & (2), the statute of limitations for FCA claims is six years after the date of the alleged violation of § 3729, or three years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, whichever occurs last. The three-year statute applies even in cases in which the government declines to intervene. *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507 (2019). The three-year statute of limitations applies here.

In 2015, complaints were filed with the Office of Inspector General of the Department of Health and Human Services (HHS OIG), alleging that Dr. Black was "over diagnosing patients with asbestos" thereby triggering the statute of limitations. ER-261–269. Accordingly, BNSF's claims filed more than three years later are time-barred. Alternatively, at the least many of BNSF's specific allegations of false statements are time-barred because the "official of the United States charged with responsibility to act in the circumstances" the HHS OIG, was

aware of the "facts material to the right of action" at least as of its 2015 investigation yet did not bring any claims. Thus, BNSF would have had to bring its claims under the FCA by late 2018 or January of 2019 at the latest, s*ee* ER-261–269, but BNSF brought it claims in March 2019.

In the final alternative, BNSF's specific allegations are time-barred under §3731(b)(1), and any alleged FCA acts prior to March 6, 2013—dating from the time period six years prior to BNSF filing its lawsuit—must be time-barred from prosecution under the FCA. The District Court did not differentiate any alleged acts of FCA liability that occurred prior to March 6, 2013, in its charges to the jury.

**II. The District Court erroneously instructed the jury, based on its own post-hoc statutory interpretation, that the conditions of "asbestosis, pleural plaques, or pleural thickening" cannot be "established by interpretation by a 'B-Reader' qualified physician" and that claims submitted on that basis constitute *per se* false claims.**

*A. A plain reading of the ACA dictates that the "conditions" of asbestosis, pleural plaques, and pleural thickening are "established by" an "interpretation" of a chest x-ray by a "B-reader."*

This appeal is a result of the District Court improperly instructing the jury that CARD's submission of claims under the ACA for the conditions of asbestosis, pleural thickening, or pleural plaques, as established by interpretations of B Reader qualified physicians, were false claims. A plain reading of the operant statutory language demonstrates that these asbestos-induced "conditions" are explicitly "established by" B Read interpretation and, therefore, CARD's practice of

submitting such claims was reasonable and based on the <u>most</u> reasonable

interpretation of the language of the Act:

> (1) IN GENERAL.—For purposes of this section, the term "environmental exposure affected individual" means—
>> (A) an individual … who … <u>is diagnosed</u> with 1 or more conditions described in subparagraph (B); …
>> (B) CONDITIONS DESCRIBED- For purposes of subparagraph (A), the following conditions are described in this subparagraph:
>>> (i) Asbestosis, pleural thickening, or pleural plaques **as established by** -
>>>> (I) <u>interpretation by a 'B Reader' qualified physician of a plain chest x-ray</u> **or** interpretation of a computed tomographic radiograph of the chest by a qualified physician, as determined by the Secretary; …

Section 1881A(e) (emphasis added). The plain and unambiguous meaning of the

phrase "as established by <u>interpretation by a 'B Reader' qualified physician of a</u>

<u>plain chest x-ray</u>" should control the outcome of this appeal. *Barnhart v. Sigmon*

*Coal Co*., 534 U.S. 438, 450 (2002) ("The inquiry ceases if the statutory language

is unambiguous and the statutory scheme is coherent and consistent").

Rather than applying the clear statutory language of this controlling

provision of the ACA, which on its face allows qualification via B Reader or

qualified outside reader, the Court instructed the jury that a heightened "clinical

diagnosis" standard is also required, and any non-conforming claims constitute

"false claims." ER-101; ER-102. The District Court's post hoc novel interpretation

of the ACA at Instruction No. F-24, ER-102, was based on numerous outside

sources including a dictionary definition of the term "diagnosis," guidelines of the

ATS non-governmental medical society[10], and testimony elicited by BNSF at trial. *See* ER-138–148; ER-165–166); ER-168–172. Ultimately, Instruction No. F-24 flatly instructed the jury that a condition <u>cannot</u> be "established by <u>interpretation</u> <u>by a 'B Reader qualified physician of a plain chest x-ray</u>" and imposed the requirement of a "clinical diagnosis" despite the complete absence of any such language in the ACA and despite the lack of any legal, or medical, basis for such a requirement:

### INSTRUCTION NO. F-24

For purposes of the Affordable Care Act, <u>there is no distinction</u> <u>between a "diagnosis" and a "**clinical diagnosis**</u>." A "diagnosis" is a determination of the nature of a disease, injury, or congenital defect from its signs and symptoms. <u>A diagnosis under the ACA requires a</u> <u>diagnosis by a qualified physician</u>. <u>An abnormality noted on a chest</u> <u>x-ray by a "B Reader" qualified physician or on a computed</u> <u>tomographic radiograph of the chest by a qualified physician</u> **is not,** **by itself, a diagnosis**. In accordance with the American Thoracic Society Guidelines and the ACA, a diagnosis of asbestosis, pleural thickening, or pleural plaques requires:

1. evidence of structural pathology consistent with asbestos related disease as established by:

   a. an interpretation of a plain chest x-ray by a "B Reader" qualified physician; or

---

[10] The testimony of the administrating officer of the ATSDR at trial contradicts the Court's imposition of ATS standards into the diagnostic requirements of the ACA. *See, e.g.,* Testimony of Theodore Larson, ER-139 ("So I have read those guidelines. I'm not intimately familiar with them. I, I do believe there are many elements in the ATS guidelines that CARD employs, but they are not specified in the NOFO or the Affordable Care Act statute.")

     b. interpretation of a computed tomographic radiograph of the chest by a qualified physician;

2. evidence of exposure to asbestos; and

3. exclusion of other plausible conditions.

     The Secretary of the Department of Health and Human Services determines whether a physician is a "qualified physician" under the ACA.

(emphasis added). The meaning of "Environmental Health Conditions" in the ACA was a hotly contested dispute at trial with conflicting expert opinions over what constitutes a "diagnosis," resulting in an evidentiary ruling precluding a witness's reference to "radiologic diagnosis" ER-164, and an argument over the central jury instruction, F-24, in which BNSF urged "there is no such thing as a radiological diagnosis." ER-167.

     CARD offered an instruction, proposed instruction C18, using the plain language of the statute:

> Diagnosis of asbestosis, pleural thickening, or pleural plaques is established by interpretation by a "B Reader" qualified physician of a plain chest x-ray or interpretation of a computed tomographic radiograph of the chest by a qualified physician, as determined by the Secretary.

ER-218. The Court instead gave Instruction F-24. ER-101.

     As explained below in Section II.D., for a benign radiographically identified structural abnormality like a pleural plaque, BNSF's "*clinical* diagnosis" contention is demonstrably deceptive since there are often no other signs or

25

symptoms to be clinically evaluated with pleural plaques.  The Court's instruction not only _factually_ endorsed BNSF's contention, it resolved this core dispute by a peremptory ruling that, as a matter of _law_, a pleural plaque could _not_ be established by a radiological interpretation identifying this structural abnormality, without a "_clinical_ diagnosis."

At Instruction No. F-23, ER-101, the Court further instructed the jury that claims that do not meet that heightened and indeed erroneous additional "clinical diagnosis" requirement of Instruction No. F-24, ER-102, constitute "false claims":

### INSTRUCTION NO. F-23

To be eligible for Medicare as an Environmental Exposure Affected Individual, a person must satisfy both of the following requirements:

1. be diagnosed with one or more of the following impairments:

    1. Asbestosis;

    2. pleural thickening;

    3. pleural plaques;

    4. Mesothelioma; or

    E. Malignancies of the lung, colon, rectum, larynx, stomach, esophagus, pharynx, or ovary;

AND

2. Demonstrate presence in Lincoln County, Montana, for a total of at least 6 months during a period ending not less than 10 years prior to his or her diagnosis.

<u>Certification of a person as eligible for Medicare coverage under the Environmental Health Hazard provision of the Affordable Care Act for a person who does not satisfy these requirements</u> **is a false claim**.

In so doing, the District Court erroneously foreclosed for the jury both of the key and necessary determinations in this case: (1) whether CARD's interpretation and implementation of the clear statutory language of the ACA was reasonable; <u>and</u> (2) whether CARD's submission of claims based on conditions "established by <u>interpretation by a 'B Reader' qualified physician of a plain chest x-ray</u>" constituted "false claims." This was a clear error of law pursuant to the statutory language directing that asbestos induced conditions <u>are</u> "established by" B-Read interpretation.

> B. *The ACA's definition of Environmental Health Condition should be interpreted with deference to the administering federal agency.*

CARD maintains that the statutory language regarding B-Reader qualification is clear and was administered by CARD appropriately. However, the District Court went beyond the plain language of the statute to outside sources and created requirements not present in the ACA to develop its own interpretation of the diagnostic requirements of the ACA at Instruction No. F-24. ER-102. Resorting to outside resources to define the terms in the ACA establishes that the District Court itself recognized ambiguity in the statutory provisions at issue. CARD contends this effort by BNSF and the District Court was unnecessary and

erroneous, but once engaged, as a matter of law it obliged the District Court to consider and defer to the delegated agency's interpretation and implementation of the statutory language.

When a statute is ambiguous or unclear, Federal Courts are compelled to defer to the delegated agency's interpretation of the statute pursuant to the principle of *Chevron* deference. Where the statute is ambiguous, *Chevron* dictates that "a court may not substitute its own construction of [the] statutory provision for a reasonable interpretation made by . . . an agency." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837, 843–844 (1984). The correct interpretation of the statutory provision directing <u>how</u> an asbestos-related condition is "established" under the ACA should have been made with *Chevron* deference to the administering agency, the HHS/ATSDR. *Chevron,* 467 U.S. 837, 842 (1984). The Ninth Circuit has applied the *Chevron* rule where the U.S. Department of Health and Human Services has interpreted a Medicare statute it administers. *Fournier v. Sebelius*, 718 F.3d 1110, 1119 (9th Cir. 2013) ("there are fair arguments on both sides of the issue and conclude that the statute is ambiguous. Accordingly, we turn to the second step of *Chevron*"); *see also Conahan v. Sebelius*, 659 F.3d 1246, 1252 (9th Cir. 2011) ("we defer to the agency's reasonable determination").

28

Rather than turning to outside sources lacking any legal authority in interpreting how asbestos related "conditions" are diagnosed <u>under the distinct and express terms of the ACA</u>, the District Court should have relied upon, and further permitted the jury to consider, the interpretation and application of the statute by the delegated agency, the HHS/ATSDR. Instead, the District Court did the opposite and erred repeatedly by instructing the jury that: (a) the ACA requires a "clinical diagnosis" and that a condition established by B Reader qualified physician "is not, by itself, a diagnosis" ER-102, (b) certification for Medicare coverage in the absence of the erroneous heightened "clinical diagnosis" "requirements is a false claim" ER-101, and (c) the jury may not consider CARD's reliance "on the conduct of Government agents [to the] contrary" ER-99. This impermissibly stripped the jury of the necessary opportunity to consider the extensive evidence presented regarding the ATSDR's interpretation of the statute, some of which is referenced below.

The Notice of Funding Opportunity (NOFO), ER-30, by which the ATSDR agency of the U.S. Department of Health and Human Services implemented the Early Detection Screening, set the "specifications" which "should be followed" by CARD:

I. FUNDING OPPORTUNITY DESCRIPTION
Statutory Authority
Affordable Care Act (ACA) Section 10323(b) amends Title XX of the Social Security Act (42 U.S.C. 1397 et seq.) to establish a "Program for

<u>Early Detection of Certain Medical Conditions</u> Related to Environmental Health Hazards."

\*\*\*

<u>Persons with **positive screening results** may be eligible for Medicare benefits</u>.

\*\*\*

Some specifications for carrying out activities under this grant, <u>which are described in the ACA legislation</u> (http://www.gpo.gov/fdsys/pkg/PLAW111publ148/pdf/PLAW-111publ148.pdf) <u>are summarized below, and should be followed</u> to ensure consistency of the program:

\*\*\*

e. **<u>Positive screening result definition</u>**: <u>The screening candidate will be deemed positive if one of the following conditions is present</u>:

    i. <u>Asbestosis, pleural thickening, or pleural plaques **as established by**</u>

        1. <u>Interpretation by a single 'B Reader' qualified physician of a plain chest x-ray **or**</u>

        2. Interpretation of a computed tomography of the chest by a qualified physician (a physician with board certification in radiology or pulmonary medicine or an interpretation provided by the Center for Asbestos-Related Diseases (CARD) Clinic, for patients in the Libby area).

Note: This clause shall not apply to pleural thickening or pleural plaques unless there are symptoms or conditions requiring medical treatment as a result of these diagnoses.

These specifications make clear that those "<u>with positive screening results</u> **<u>may be eligible</u>** <u>for Medicare benefits</u>" and that a "screening candidate will be deemed to have positive" screening results if they have "asbestosis, pleural thickening <u>or</u> pleural plaques <u>as **established by** interpretation by a single 'B-Reader' qualified physician of a plain chest x-ray</u>." The ATSDR's provision includes the same statutory definition prescribing the manner in which an asbestos-related condition is established and clearly sets B Reader interpretation apart as its

own, <u>and alternative ("or")</u>, numbered element. *Compare* (1) addressing "single 'B Reader,'" *with* (2), regarding CARD or other treating physician "clinical" type diagnoses and diagnoses based on CT scan. ATSDR expressly instructs, in full and consistent similarity with the same terms in the ACA, that either screening interpretation is sufficient alone to <u>establish</u> a "positive screening result" and qualify a screening candidate "for Medicare benefits."

The ATSDR program's administrator testified unequivocally that the agency's interpretation of the statute <u>required</u> CARD to report as an Environmental Health Condition any asbestos-related condition of asbestosis, pleural plaque or pleural thickening "established by" a B-Reader <u>regardless</u> of whether the B Read agreed with any diagnosis CARD may have made:

> Q  "What is a B-reader?
> A  "A B-reader is a physician with special training to look at chest radiographs, chest X-rays, and pick out structures that are consistent with asbestosis, pleural thickening, or pleural plaques.
> Q  "So a positive screening result could be a single B-reader interpreting a chest X-ray?
> A  "Yes.
>                       ***
> Q  "Okay. And what's ATSDR's understanding of <u>eligibility for Medicare benefits</u> through this screening grant?
> MR. DUERK: "Objection. Foundation. Form.
> "Go ahead.
> THE WITNESS: "So as specified in the NOFO, <u>a person could get a positive diagnosis several ways</u>. One is to have a qualified physician at CARD detect something on a CT scan. <u>Another way would be to have an outside B-reader or an outside radiologist find one of the structures that we talked about earlier, asbestosis or pleural plaque</u>. One

would not necessarily need both, concurrence for the same result from both the qualified physician at CARD and the outside reader.

So one -- I think what this is implying is that some, some people are getting an outside reading, a positive result on an outside reading that was not detected by the qualified physician but they still qualified for Medicare benefits.

BY MR. BECHTOLD:

Q  "Because of that outside read?

A  "Yes.

***

Q   "So if -- either a diagnosis by CARD or a B-reader's positive interpretation would qualify a person for Medicare benefits?

MR. DUERK: "Objection. Form. Foundation. THE WITNESS: "Yes.

BY MR. BECHTOLD:

Q  "And how do you know that?

A  "Again, it's specified in the NOFO and in the statute.

***

Q  "How long have you known that CARD submits EHH forms to the Social Security Administration based solely upon a positive outside read?

A  "So I would say since the grant was initially stood up. I mean, those are criteria that are in the original NOFO.

Q  "So that is something that the ATSDR intended CARD to do from the beginning?

A  "Yes.

Theodore Larson testimony, ER-153; ER-154–155; ER-158–159; ER-161–162.

In addition, the ATSDR's Environmental Health Hazards Checklist ("EHH"), which constituted the actual ACA implementation form, clearly directed that asbestos induced condition diagnoses established by "interpretation by a B reader qualified physician of a plain chest x-ray" were sufficient under the HHS/ATSDR interpretation of the ACA. The highlighted fields below directed CARD to "identify the asbestos-related condition(s) and its date of diagnosis," to

"check the box next to the diagnosed impairment(s)," and then under the section

for "<u>Minimum Medical Evidence Required</u>" included fields to document diagnoses

of either "Asbestosis," "Pleural thickening," or "Pleural plaques" based on

"<u>Interpretation by a B reader qualified physician of a plain chest x-ray or</u>

<u>interpretation of computed tomographic radiograph of the chest by a qualified</u>

<u>physician</u>":

## Environmental Health Hazards Checklist

Medicare Coverage for Individuals Exposed to Environmental Health Hazards

**Step 1: Identify the individual.**
(Completed by the field office.)

First Name – Middle Initial – Last Name: Cathie A. Sullivan

Social Security Number: _____  Date of Birth: ___/54

**Step 2: Identify the asbestos-related condition(s) and its date of diagnosis.**
(Completed by the provider.)

Check the box next to the diagnosed impairment(s) and print the date of diagnosis.

| | Impairment | Diagnosis Code | Minimum Medical Evidence Required |
|---|---|---|---|
| ☐ | Asbestosis | 5010 | Interpretation by a B reader qualified physician of a plain chest x-ray or interpretation of computed tomographic radiograph of the chest by a qualified physician |
| ☒ | Pleural thickening Pleural plaques | 5010 | Interpretation by a B reader qualified physician of a plain chest x-ray or interpretation of computed tomographic radiograph of the chest by a qualified physician |
| ☐ | Mesothelioma | 1630 | Established by pathologic examination of biopsy tissue or cytology from bronchioalveolar lavage or bronchoscopy report |
| ☐ | Malignancy of the lung | 1620 | Established by pathologic examination of biopsy tissue, cytology from bronchioalveolar lavage or bronchoscopy report |
| ☐ | Malignancy of the colon | 1530 | Established by pathologic examination of biopsy tissue or cytology from bronchioalveolar lavage |
| ☐ | Malignancy of the rectum | 1530 | Established by pathologic examination of biopsy tissue or cytology from bronchioalveolar lavage |
| ☐ | Malignancy of the larynx | 1960 | Established by pathologic examination of biopsy tissue or cytology from bronchioalveolar lavage |
| ☐ | Malignancy of the stomach | 1510 | Established by pathologic examination of biopsy tissue or cytology from bronchioalveolar lavage |
| ☐ | Malignancy of the esophagus | 1500 | Established by pathologic examination of biopsy tissue or cytology from bronchioalveolar lavage |
| ☐ | Malignancy of the pharynx | 1950 | Established by pathologic examination of biopsy tissue or cytology from bronchioalveolar lavage |
| ☐ | Malignancy of the ovary | 1830 | Established by pathologic examination of biopsy tissue or cytology from bronchioalveolar lavage |
| ☐ | Individual does not have an impairment listed above | | |

Date of Diagnosis: _____

**Step 3: Identify presence in Lincoln County, Montana.**
(Completed by the provider.)

This individual was present in Lincoln County, Montana, during the following time period(s): 1998 To Present

Do your records dated prior to March 23, 2010, indicate the individual was present in Lincoln County, Montana, for a total of at least 6 months during a period ending 10 years or more before the date of his or her diagnosis of the impairment(s) checked above? ☒ Yes ☐ No (SSA will develop presence.)

Printed Name: Brad Black MD  Physician's Signature: Brad Black, MD  Date: 07/02/13

ER-17 (Ex. 2A-17) (Highlighting added). The HHS/ATSDR left no ambiguity in the implementing form that "interpretation by a B reader" "or" interpretation of a CT scan by a qualified physician independently fulfilled the "Minimum Medical Evidence Required." This form/interpretation is completely in line with the directives of the NOFO, the sworn testimony of the ATSDR program's

34

administrator, and the plain language of the statute itself. Moreover, dispelling any confusion regarding CARD's good faith interpretation and implementation of the ACA and ATSDR's directives, CARD consistently underlined the "interpretation by a B reader qualified physician" field or the interpretation of a CT by a qualified physician field and wrote "only" on the EHH forms in which the submission was based on an outside read only. ER-16; ER-149. There can be no justification for the District Court to foreclose this possible interpretation regarding the sufficiency of a B Reader or outside qualified physician interpretation from the jury.

The District Court should have deferred to the DHHS/ATSDR interpretation—and of course the plain language of the ACA—especially since it is consistent with the agency's and statute's intent to (a) identify, through the Early Detection Screening, individuals with benign conditions, and (b) qualifying such individuals for the exceptional and innovative Pilot program to monitor these at risk individuals for development of cancer or disabling progression of the ARD.

Rather than properly deferring to the DPHHS/ATSDR's interpretation and clear implementation guidance provided to CARD, the District Court instead relied upon multiple outside sources without legal authority in instructing the jury that qualification under the ACA based on B-Read or outside qualified physician interpretations were false claims, ER-101 & ER-102, and then further and blatantly compounded that error by affirmatively instructing jurors that they may not

consider "conduct of Government agents" to the contrary. ER-99. The impact of this error reached not just the jury's determination of what constitutes a "false claim," but also the jury's assessment of CARD's scienter. *See* Argument III. *infra.*

> C. *Congressional intent to qualify Libby asbestos exposed individuals for Medicare and Pilot Program benefits is evident from the identical definition of qualifying medical conditions in each of the Medicare coverage, Pilot Program, and Early Detection Screening provisions of the ACA, and the purpose to enhance coverage for appropriate care and follow-up for individuals who had conditions placing them at risk for the development of disabling asbestosis, lung cancer, or mesothelioma.*

A statute's terms should be construed in accordance with "congressional purpose." *See United States v. Pub. Utilities Comm'n of Cal.*, 345 U.S. 295, 315 (1953). The intent of Congress and purpose of the ACA § 10323 - Medicare coverage for individuals exposed to environmental health hazards - was to identify, through the Early Detection Screening, individuals with "exposure" and "conditions" that would qualify for the innovative and preventative services of the Pilot Program and Medicare coverage for such care as regular checkups to identify the cancers for which these individuals were at risk. Indeed, the ACA expressly states that the conditions of asbestosis, pleural thickening, or pleural plaques only

36

qualify these conditions for "requir[ed] medical treatment," such as cancer detection and preventive care. § 1881A(e)(2)(B)(i).[11]

In contrast, the District Court's interpretation of the ACA, which required a "clinical diagnosis" of asymptomatic conditions, is "completely at variance with the purpose of the statute" to expand coverage for individuals who, by reason of typically benign structural abnormalities were <u>at risk</u> to develop disabling disease progression, cancer or mesothelioma. *Pub. Utilities Comm'n,* 345 U.S. at 315.

While the EHH checklist reports at issue in this appeal were sent by CARD to the Social Security Administration, it is important to recognize that the forms were designed to identify "Environmental Health Conditions" under the <u>identical definition</u> for "conditions" qualifying a screened individual for Medicare coverage and Pilot program services. *Compare* § 42 U.S.C. 1397h(c)(3) "Environmental Health Condition," *with* § 1881A(b)(2)(A) "environmental exposure affected individual described in subsection (e)(2)," and § 1881A(e)(B) "CONDITIONS

---

[11]   During the trial, BNSF made repeated reference to the presumption that the EHH checklist reports by CARD qualified an individual for Medicare coverage for every condition and treatment—asbestos related or not. But nothing in the CARD's EHH checklist reports states what treatment—preventative care for asbestos disease for which the patients were at risk or otherwise—should be covered by the patient's Medicare qualification. CARD did not state what "requir[ed] medical treatment" should be paid for by Medicare for individuals with benign pleural conditions. Further, CARD was not tasked in its ATSDR screening with implementing the limitations in ACA Section 1881A(e)(2)(B)(i).

DESCRIBED." This statutory architecture of screening and Medicare coverage for innovative and preventative care is evident in the trifold identical definitions of the "conditions" to be identified and addressed. Together, these provisions implement the express Congressional purpose to "finally follow through on the Federal Government's responsibility to provide screening and medical care to residents at Superfund public health emergency sites." ER-192 (emphasis added).

Indeed, Congress recognized the need to enact § 10323 of the ACA because the EPA's declaration of a public health emergency at Libby "require[d] that the Secretary of Health and Human Services (HHS) provide screening and medical care services to people who have been exposed." ER-192 (emphasis added). Section 10323's evident purpose is to enact how such screening and medical services should be provided by HHS.

Under the direction of the ATSDR, CARD simply reported the "Environmental Health Conditions" meeting the uniform statutory definition in each of the screening, coverage, and pilot program provisions of ACA Section 10323. CARD's screening and reporting of such eligible "conditions" was exactly what ACA section 10323 contemplates and was a reasonable implementation of the ACA based on its plain language. The District Court's instruction to the jury at Instructions No. F-20, F-23, and F-24 stripped the jury of any consideration of the congressional purpose of the ACA. In conjunction with its own insertion of

unsupported non-statutory considerations for the jury, the District Court's

instructional errors are plainly apparent.

> D. *The District Court erred in imposing a heightened eligibility requirement based on medical society guidelines, as this was not intended by Congress and the District Court misapplied its own heightened interpretation of the ACA.*

Based on CARD's statement that it applies ATS guidelines standard in

making its own clinical diagnoses at its clinic in Libby and BNSF's experts'

testimony invoking a "clinical criteria," the District Court imposed those medical

society's guidelines into the B Reader eligibility criteria of the ACA despite the

complete absence of any reference to ATS guidelines in the statute itself or within

any of the implementing documents. ER-168–172. The administrating officer of

the ATSDR's ACA-mandated Early Detection Screening program testified at trial

as to the ATSDR's position that ATS guidelines were not part of the ACA or

CARD's requirements in administering its provisions:

> Q   "Do CARD physicians apply American Thoracic Society guidelines in clinically diagnosing asbestos-related disease?
> A   "So I have read those guidelines. I'm not intimately familiar with them. I, I do believe there are many elements in the ATS guidelines that CARD employs, but they are not specified in the NOFO or the Affordable Care Act statute.
> ***
> Q     "So is ATSDR's funding of CARD predicated upon CARD following American Thoracic Society guidelines in diagnosing patients?
> A   "No.

Theodore Larson testimony, ER-156; ER-157.

Moreover, even assuming, arguendo, that the Court's imposition of a medical society's (ATS) guidelines at Instruction No. F-24 into the already clear statutory language of the ACA—thereby imposing an-after-the fact heightened eligibility requirement—does not constitute reversible error, CARD's submission of claims based on B Read interpretation or qualified physician interpretation nonetheless conformed with those ATS guidelines. Thus, Instruction No. F-24's direction that an "an abnormality noted on a chest x-ray by a 'B Reader' qualified physician is not, by itself, a diagnosis" is both an incorrect statement of the plain language of the ACA and also an incorrect statement of the very ATS guidelines the District Court inserted into its Instruction No. F-24.

Prior to screening candidates even becoming eligible for screening, the candidates need to establish through documentation that they satisfy element two of the ATS guidelines (evidence of exposure to asbestos) and that the requisite latency period has elapsed with proof of being present for at least "6 months in the geographic area subject to an emergency declaration … not less than 10 years prior to such diagnosis." ACA § 1881A(e)(2)(ii).Moreover, the ILO B Reading process is specifically designed to determine the issues raised by both element one of the ATS guidelines (evidence of structural pathology consistent with asbestos related disease) and element two (exclusion of other plausible causes) by having certified physicians apply precise radiographic parameters to identify parenchymal and

pleural abnormalities "consistent with pneumoconiosis" (asbestosis and silicosis) and concurrently documenting "other abnormalities" or conditions that could be responsible for any radiographic changes noted.

The outside B Reader interpretations, *see, e.g.,* ER-17–18, of pleural plaques apply the stringent differential criteria to establish that the x-ray demonstrates "pleural plaques" that (a) meet the ATS and ILO[12] differential radiological criteria (size, shape, and appearance), (b) have the characteristics of a "pleural pneumoconiosis" (lung diseases caused by asbestos or silica exposure), and include specific fields and abbreviations to note the presence or absence of other plausible conditions that could be the causes of any lung "abnormalities" (e.g., extra-pleural fat (FP), fractured rib (FR), tuberculosis (TB), other disease (OD), etc.) as well as an "other comments" section where the B-Reader is directed to note any other issues not covered by specific abbreviated codes. They are interpretations finding the radiological characteristics by which the ATS standard states ARD pleural plaques are "easily identified on plain films." (American Thoracic Society, Diagnosis and Initial Management of Nonmalignant Diseases Related to Asbestos, 2004, p.704).

---

[12] The unrefuted testimony is that the ILO radiographic report of a B Reader is an interpretation under "exactly specific rules . . . [if] it's pleural thickening, this is how thick it needs to be. If you're saying this, this is how much. And it's, it's very, very specific" ER-147.

In short, these radiographic reports are, as a matter of law, exactly the "interpretations" "by" which plaques are "established" under the ACA definition of "Environmental Health Conditions" and when performed in the context of the HHS/ATSDR screening process, which requires documentation of asbestos exposure and requisite latency period, readily satisfy the ATS guidelines imposed by the District Court. Accordingly, even under the District Court's improper heightened qualification standard, it was further reversible error for the District Cout to instruct the jury, at Instruction No. F-24, that "an abnormality noted on a chest x-ray by a "B Reader" qualified physician … is not, by itself, a diagnosis."

**III.** **Instruction F-23, together with F-24, is erroneous because it compelled the jury to find, regardless of CARD's scienter, that whenever CARD certified a person eligible for Medicare based solely on an outside B Reader's radiological interpretations, it was a "false claim."**

In this matter, BNSF had the burden to prove by a preponderance of the evidence the following:

> A claim under the False Claims Act requires a showing of (1) a false statement or fraudulent course of conduct, (2) made with the scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due.

*Campie*, 862 F.3d at 899; *accord United States. ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 179 (4th Cir. 2022); *see United States ex rel. Heath v. Wisconsin Bell, Inc.*, 593 F.Supp.3d 855, 859 (E.D. Wis. 2022) (evidentiary standard).

Despite those clear four elements required to prove a false claim, the District

Court erroneously issued Instruction No. F-23, which provides:

## INSTRUCTION NO. F-23

To be eligible for Medicare as an Environmental Exposure Affected Individual, a person must satisfy both of the following requirements:

1.      be diagnosed with one or more of the following impairments:

   A.    Asbestosis;

   B.    pleural thickening;

   C.    pleural plaques;

   D.    Mesothelioma; or

   E.    Malignancies of the lung, colon, rectum, larynx, stomach, esophagus, pharynx, or ovary;

AND

2.      Demonstrate presence in Lincoln County, Montana, for a total of at least 6 months during a period ending not less than 10 years prior to his or her diagnosis.

Certification of a person as eligible for Medicare coverage under the Environmental Health Hazard provision of the Affordable Care Act for a person who does not satisfy these requirements is a false claim.

ER-101.  By directing the jury that "[c]ertification of a person as eligible for

Medicare . . . who does not satisfy these requirements **is** a false claim," the District

Court read obsolete the requirement BNSF prove any fraudulent statement or

course of conduct regarding CARD's completion of EHH checklists was made with the required "scienter."

Additionally, as stated above, Instruction No. F-23, read together with the District Court's additional requirement for a "clinical diagnosis" as found in Instruction No. F-24, ordered the jury to find that any EHH certification made by CARD based on a B read only or on an outside qualified physician read only was *per se* a false claim, again, regardless of CARD's scienter. The District Court erred by (a) injecting diagnostic requirements into the ACA, specifically a "clinical diagnosis" following ATS criteria, despite the fact that term or criteria never appear in the ACA; and (b) incorrectly and after-the-fact requiring of CARD in F-24 those new and additional requirements be met for purposes of the ACA, otherwise it was a false claim. Important to the B read only issues here, F-24 expressly states:

> An abnormality noted on a chest x-ray by a "B Reader" qualified physician or on a computed tomographic radiograph of the chest by a qualified physician <u>is not, by itself, a diagnosis</u>.

ER-102.

BNSF used these two instructions in its closing argument to implore the jury to find B-read only submissions as *per se* false claims:

```
17          The jury instructions in this case are very clear.
18  In order to have a diagnosis, in Jury Instruction 24, you need
19  to be diagnosed by the American Thoracic Society standards.
20  That didn't happen with a single patient in Table 3.  The
21  instructions are also very clear:  A B-read does not equal a
22  diagnosis.  These are false claims because even CARD knew that
23  they were submitting patients without any kind of diagnosis at
24  all.
```

ER-173.

The jury did as they were told and as required by the District Court's instructions in finding false claims for at least 253 EHH checklist reports based on B-reads only listed on Exhibit 269-8 (category 2 (145) plus category 6 (108)), and, perhaps all of the 377 "false reports" found by the jury. ER-28.

The erroneous instructions F-24 and F-23 were therefore critical and require reversal:

> An error in instructing the jury in a civil case requires reversal unless the error is more probably than not harmless. *Coursen v. A.H. Robins* Co., Inc., 764 F.2d 1329, 1337 (9th Cir.1985). …
> In reviewing a civil jury instruction for harmless error, the prevailing party is not entitled to have disputed factual questions resolved in his favor because the jury's verdict may have resulted from a misapprehension of law rather than from factual determinations in favor of the prevailing party.

*Caballero v. City of Concord*, 956 F.2d 204, 206–07 (9th Cir. 1992).

45

IV.   **The District Court erroneously precluded the jury from considering key evidence of CARD's scienter at the time it submitted the EHH checklists which further supports CARD's reasonable interpretation of the ACA.**

   A. *CARD's subjective beliefs are the critical determination for CARD's scienter at issue here.*

Under the FCA, Relator must prove by a preponderance of the evidence the scienter element.  A defendant who relies on "a good faith interpretation of a regulation is not subject to liability" under the FCA. *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 464 (9th Cir. 1999). This is true even if that interpretation was incorrect or unreasonable, "because the good faith nature of his or her action *forecloses the possibility* that the scienter requirement is met." *Id*.

In the recently decided *United States ex rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391 (2023), the Supreme Court discussed the required proof of the element of scienter: "The FCA's scienter element refers to respondents' knowledge and *subjective* beliefs—not to what an objectively reasonable person may have known or believed." *Id.*, 143 S. Ct. at 1399. Relator is required to prove CARD's actions were knowingly by either having "actual knowledge," acting with "deliberate ignorance of the truth of falsity of the information," or acting "in reckless disregard of the truth or falsity of the information." § 3729(b)(1)(A)(ii)-(iii). This three-part test "largely tracks the traditional common-law scienter requirement for claims for fraud." *Schutte*, 143 S. Ct. at 1399 (citing Restatement (Second) of Torts §526 (1976); Restatement (Third) of Torts: Liability for Economic Harm § 10 (2018)).

46

Deliberate ignorance requires proof that CARD "shut [its] eyes to the facts, or purposely abstained from inquiring into them." *Id.*

> B. *In determining CARD's scienter, the Court improperly required the jury to consider legal interpretations that CARD did not have reason to believe at the time they submitted the EHH forms, specifically legal interpretations imposed by the Court after-the-fact during the trial and beyond the requirements contained in the ACA.*

The Supreme Court clarified that the FCA requires proof of "what the defendant thought when submitting the false claim—not what the defendant may have thought *after* submitting it." *Schutte,* 143 S. Ct. at 1401 (emphasis in original) ("the term 'knowingly' thus modifies present-tense verbs like 'presents.'"). Therefore, the focus of Relator's burden of proof cannot be on "*post hoc* interpretations" but what CARD knew at the time it presented the claim. *Id.* (citing *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93, 105 (2016) ("[C]ulpability is generally measured against the knowledge of the actor at the time of the challenged conduct")). Similarly, the Court should not look to "legal interpretations that [CARD] did not believe or have reason to believe at the time they submitted their claims." *Id.* 143 S. Ct at 1403.

Here, the District Court found that the meaning of the operative terms and phrase in the statute ("diagnose," "established by") was a question of first impression for the courts, leading the District Court to construe the statute based on "dictionary definitions," outside medical society guidelines (ATS), and

conflicting opinions first expressed at trial. ER-168–172. As a result, the District Court injected those additional elements into the ACA. *See* ER-102. Critical here, the very fact that the Court first construed the statute in this manner demonstrates the statute did not apprise CARD (or the administering agency) that, in addition to the definitive radiologic establishment of an asbestos-related pleural abnormality, there should be a clinical diagnosis as well.  As such, CARD could not have had the required scienter to establish a false claim. Instead, at the time of the submissions at issue, CARD had before it the plain language of the statute, the interpretation and implementation guidance provided to it by the DHHS/ATSDR through the NOFO and the EHH checklists, and its own experience garnered during the legislative development of the operant statute, all of which indicated that "conditions" could be "established by" B-read or qualified physician interpretation, and none of which were reflected in the jury instructions at issue and much of which was excluded by the District Court.

C. *The Court instructed the jury in F-20 to disregard CARD's subjective belief and reasonable interpretation if it was based on ATSDR's express intent and direction for how and when EHH checklists should be completed.*

CARD relied on the interpretation of the DHHS, specifically its sub-agency ATSDR, which was tasked with administering the provisions of the ACA relevant to CARD's work. A defendant who relies on "a good faith interpretation of a regulation is not subject to liability" under the FCA. *Oliver*, 195 F.3d at 464. This

is true even if that interpretation was incorrect or unreasonable, "because the good faith nature of his or her action *forecloses the possibility* that the scienter requirement is met." *Id*.

While the jury was empowered by the instructions to consider the reasonableness of CARD's statutory interpretation, Instruction F-20 directed the jury that CARD could not "rely" on the agency construction of statute or the directions the agency gave to CARD:

> In evaluating a defendant's knowledge, you may consider that parties who seek public funds are expected to know the law and may not rely on the conduct of Government agents contrary to law.

ER-99.

As argued above, CARD asserts error with BNSF's and the District Court's addition of "clinical" diagnostic requirements into the otherwise clear language of the ACA. As explained above, ATSDR's NOFO does not impose any such additional requirements. Instead, the NOFO further confirms a B-read only as a "positive screening result" pursuant to which an individual "may be eligible for Medicare benefits." Moreover, the EHH checklist plainly allows qualification for Medicare based on a B-read as the "Minimum Medical Evidence Required." The administrating officer of the ATSDR's ACA-mandated Early Detection Screening program also did not agree with the District Court's interpretation of the ACA and after-the-fact diagnostic requirements:

49

Q     "So is ATSDR's funding of CARD predicated upon CARD following American Thoracic Society guidelines in diagnosing patients?

A   "No.

***

Q   "What are the ways that an individual can be eligible for Medicare through the EHH designation criteria but not be clinically diagnosed with an ARD by CARD?

MR. DUERK: "Objection. Form. Foundation. No prior disclosure. Calls for legal conclusion.

THE WITNESS: "Three ways: '(1) A positive chest x-ray B-read, (2) A positive CT read by an outside radiologist,' and '(3) A documented diagnosis of an asbestos related disease cancer,' and they're listed out on page 1.

***

Q   "How long have you known that CARD submits EHH forms to the Social Security Administration based solely upon a positive outside read?

A   "So I would say since the grant was initially stood up. I mean, those are criteria that are in the original NOFO.

Q   "So that is something that the ATSDR intended CARD to do from the beginning?

A   "Yes.

Theodore Larson testimony, ER-157; ER-160; ER-161–162. Critically and as explained above, however, to the extent any ambiguity might exist, the District Court was required, but failed, to give the appropriate *Chevron* deference to ATSDR's interpretation.

It is an unrefuted fact that CARD relied on ATSDR's intent and explanations for the EHH form.  It is an undisputed fact that CARD flagged its B-reader only and outside qualified physician only EHH checklist reports by (a) underlining the phrase "interpretation by a B reader qualified physician of a plain

50

x-ray," or the phrase "interpretation of computed tomographic radiograph of the chest by a qualified physician" and handwriting the word "only," ER-149; ER-16, as a means of conveying its compliance with the ATSDR understanding and directions described by ATSDR administrating officer Theodore Larson.



**Environmental Health Hazards Checklist**
Medicare Coverage for Individuals Exposed to Environmental Health Hazards

| Step 1: Identify the individual. |
|---|
| (Completed by the field office.) |

First Name – Middle Initial – Last Name   *Cathie A. Sullivan*
Social Security Number ▮▮▮▮   Date of Birth ▮▮▮▮ /54

Step 2: Identify the asbestos-related condition(s) and its date of diagnosis.
(Completed by the provider.)
Check the box next to the diagnosed impairment(s) and print the date of diagnosis.

| Impairment | Diagnosis Code | Minimum Medical Evidence Required |
|---|---|---|
| ☐ Asbestosis | 5010 | Interpretation by a B reader qualified physician of a plain chest x-ray or interpretation of computed tomographic radiograph of the chest by a qualified physician |
| ☒ Pleural thickening Pleural plaques | 5010 | Interpretation by a B reader qualified physician of a plain chest x-ray or interpretation of computed tomographic radiograph of the chest by a qualified physician |

ER-16.

As CARD's administrative director Hernandez testified, they did this because:

> Q: What did you do when you had a positive B-read or a positive CT-read and no diagnosis by a CARD physician?
> A: Me and the case managers would underline the sentence that said, "B reader qualified physician of a plain chest X-ray," and we would add the word "only" so that it was very transparent that this was the mode we were using for this, for checking the impairment box.
> Q: So you did this even though there was no diagnosis by a CARD physician?

51

A: Correct. It was not required on the minimum –

ER-149. This <u>manifestly candid</u> reporting was not just based on its own interpretation of the law, but on the administering agency's interpretations and directions:

> Q: Okay. And in this context, do you understand that you
> read one part of the Affordable Care Act, a very large law,
> and <u>made a legal interpretation that you then acted upon</u> that
> may affect other individuals, these people being CARD
> patients? Correct?
> A: I would say that <u>it wasn't just the law. It was also</u>
> <u>the EHH documents created by the federal government that were</u>
> <u>translating policy into practice.</u>
> Q: Okay. And you've never reached out to anybody to see if
> your interpretation of these laws was correct? Right?
> A: Correct. <u>I relied on the agency's ability to translate</u>
> <u>it into practice through the EHH.</u>

Tanis Hernandez testimony, ER-144.

Under the Ninth Circuit's "harmless error" standard for jury instructions (*Caballero, supra*), Instruction F-20 requires reversal unless the error is more probably than not harmless. Instruction F-24 directed the jury to find error in CARD's and ATSDR's construction. The "may not rely" phrase in Instruction F-20 is material and critical because it directed the jury that it could not consider the evidence of CARD's reliance on the ATSDR construction and directions. This critical evidence supported CARD's lack of scienter to submit a false claim. Instruction F-20 was therefore a reversible error.

*D. The District Court improperly precluded highly relevant and probative testimony about CARD's intent and reasonable interpretation of the ACA.*

The District Court precluded CARD from calling U.S. Senator Max Baucus to testify in CARD's case-in-chief. The Court also precluded witnesses from testifying about Senator Baucus's or his office's involvement in development of the language of the Libby provision of the ACA. As its stated basis for doing so, the Court stated its prejudicial effect outweighs the probative value.

Senator Baucus's testimony is directly relevant and incredibly probative to the one of the four required elements that must be proven in this *qui tam* case: CARD's scienter (a subjective standard). *See Schutte*, 143 S. Ct. at 1399-1401. The evidence goes directly to CARD's "good faith interpretation" of the ACA, which means CARD should not be subject to liability under the FCA. *Oliver*, 195 F.3d at 464. Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, substantially outweighing probative value" that may be excluded under Fed. R. Evid. 403. *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) (quoting *United States v. Mills*, 704 F.2d 1153, 1559 (11th Cir. 1983)).

Moreover, the Constitution guarantees CARD a fair trial through the Due Process clause, including the right to present a defense. *See, e.g., Washington v. Texas*, 388 U.S. 14, 18-19 (1967) ("The right to offer the testimony of witnesses…is

53

in plain terms the right present a defense. . . . This right is a fundamental element of due process of law."). While not a criminal defendant, CARD's Fifth Amendment right to due process is implicated in this *qui tam* action for damages stemming from allegedly fraudulent conduct. Exclusion of evidence in support of the defendant can be deemed to violate due process after consideration of "(1) the probative value of the evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense." *Fernandez v. Montgomery*, 182 F.Supp.3d 991, 1007 (N.D. Cal. 2016) (citing *Drayden v. White*, 232 F.3d 704, 711 (9th Cir.2000) (internal quotation marks omitted)). Dispositive to the inquiry is "whether the excluded evidence had probative value to the central issue in the case." *Id.* (citing *Walters v. McCormick*, 122 F.3d 1172, 1177 (9th Cir.1997)).

Senator Baucus was deposed twice in this case: first in July 2022 as a discovery deposition, and again in May 2023 as trial perpetuation deposition. Senator Baucus's testimony establishes that he communicated with CARD on a regular basis as part of his role in drafting the ACA provisions related to Libby. ER-183 (including "I spent a lot of time in Libby, visited Libby many, many times on that issue, my staff maybe over a hundred times on that issue. It's what you do to help Libby receive justice because of all the asbestos-related illnesses and

diseases in Libby."); ER-181 (including "I've had an infinite number of conversations with [CARD's Director] Dr. Black with many people in Libby with many government officials. Nothing has been more important – nothing has been more important to me during my 36 years in the United States Senate than finding justice for the people of Libby.").

Senator Baucus testified to his intent in drafting the relevant language, after his numerous discussions with CARD physicians, which creates a clear inference that both (a) his intent and interpretation of the relevant provisions of the Act is identical to CARD's understanding in submitting these claims based on an outside reads only, and (b) CARD operated under a good faith interpretation endorsed by Senator Baucus, the drafter and primary proponent of the provisions[13]:

> THE WITNESS: Well, the intent here is to make sure that any person in Libby related to Libby asbestos who has asbestos-related disease is covered. That's the purpose. And as I was helping people in Libby when doing all this, it became apparent to me that it's difficult to read a lot of these chest x-rays because the disease is so varied, and different individuals have different variations of the disease. So I want to make sure that is -- everybody is covered. One doctor may miss a person who should be covered, and another doctor will find it. I want to be as inclusive as possible. So the point of all this is to assure that even the B Readers do not make, quote, diagnoses, **but if a B Reader finds a positive reading with the CT scan or x-ray, that that's sufficient to allow the patient to be qualified. So the main point being here that there's various ways that a positive determination can be made. One's a diagnosis at CARD, and another is a positive reading by a**

---

[13] This operation and interpretation was understood and replicated, then implemented and communicated to CARD by ATSDR/HHS. *See* Sec. II(B) and IV(C) above.

**B Reader. Even though the B Reader does not technically diagnose, if the B Reader finds a positive result, then that's sufficient to qualify for Medicare coverage.**

ER-183 (BNSF objections omitted); *see also* ER-185.

> Q. So why did you include the provision about allowing B Readers and outside readers to have interpretations qualify as diagnoses?
> THE WITNESS: Because we wanted to make sure that everybody who had the disease was covered. That meant the statute to be read in an inclusive way. And inclusion would mean not only a diagnosis determined by the CARD clinic, **but also if a B Reader were to find a positive indication of asbestos-related disease, that that would be enough to allow that person to be covered under Medicare.** So I wanted to make sure that if a case was missed at CARD, by the CARD clinic, that it would be picked up by someone else, by another doctor. We're talking about doctors here, radiologists who would look at CT scans and -- of the patient. And if that doctor finds a positive indication of asbestos-related disease, that that would be sufficient. I wanted to make sure that the statute was sufficiently inclusive and people would not be missed because of a missed diagnosis.

ER-185 (BNSF objection omitted).

Here, the proffered testimony by Senator Baucus is directly relevant to and incredibly probative of CARD's <u>subjective belief</u> that it was not committing fraud at the time it submitted the EHH Checklists for B-reads only and CARD's reasonable interpretation of the ACA. That excluded testimony was essential corroborating evidence to the central issue in the case and a required element for a finding of a false claim: CARD's scienter. Its exclusion had a material effect at trial—and at bottom, its probative value is not substantially outweighed by any prejudice. *See*

*generally United States v. Morales*, 108 F.3d 1031, 1040-41 (9th Cir. 1997) (citing

*United States v. Crosby*, 75 F.3d 1343, 1349 (9th Cir. 1996)).

## CONCLUSION

Because CARD staff could not have had the requisite scienter to submit

false claims, and because materiality cannot be shown, CARD respectfully asks

this Court to rule as a matter of law that it did not violate the False Claims Act in

its interpretations of the Libby provisions of the Affordable Care Act. In the

alternative, CARD asks this Court to overrule the District Court's evidentiary and

legal rulings below.

Respectfully submitted this 29th day of November, 2023.


 _/s/ Timothy M. Bechtold_____
BECHTOLD LAW FIRM, PLLC
*Attorney for Defendant – Appellant CARD*

57

## STATEMENT OF RELATED CASES

Plaintiffs-Appellees are not aware of any known related cases pending in the Ninth Circuit Court of Appeals that (a) arise out of the same or consolidated cases in the district court or agency; (b) that were previously heard in this Court which concern the case being briefed; (c) that raise the same or closely related issues; or (d) involve the same transaction or event.

DATED this 29th day of November, 2023.


_/s/ Timothy M. Bechtold_____
BECHTOLD LAW FIRM, PLLC
*Attorney for Defendant – Appellant CARD*

58

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 23-35507_____

I am the attorney or self-represented party.

**This brief contains** 13421_____ **words,** including 566_____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/Timothy M. Bechtold_____ **Date** 11-29-2023_____
*(use "*s/[typed name]*" to sign electronically-filed documents)*

59

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the

Court for the United States Court of Appeals for the Ninth Circuit by using the

appellate CM/ECF system. Participants in the case who are registered CM/ECF

users will be served on the appellate CM/ECF system

DATED this 29th day of November, 2023.


_/s/ Timothy M. Bechtold_____
BECHTOLD LAW FIRM, PLLC
*Attorney for Defendant – Appellant CARD*

60

**ADDENDUM**

**42 U.S.C. § 1181A**

**MEDICARE COVERAGE FOR INDIVIDUALS EXPOSED TO ENVIRONMENTAL HEALTH HAZARDS**

SEC. 1881A. **[**42 U.S.C. 1395rr–1**]** (a) DEEMING OF INDIVIDUALS AS ELIGIBLE FOR MEDICARE BENEFITS.—

(1) IN GENERAL.—For purposes of eligibility for benefits under this title, an individual determined under subsection (c) to be an environmental exposure affected individual described in subsection (e)(2) shall be deemed to meet the conditions specified in section 226(a).

(2) DISCRETIONARY DEEMING.—For purposes of eligibility for benefits under this title, the Secretary may deem an individual determined under subsection (c) to be an environmental exposure affected individual described in subsection (e)(3) to meet the conditions specified in section 226(a).

(3) EFFECTIVE DATE OF COVERAGE.—An Individual who is deemed eligible for benefits under this title under paragraph (1) or (2) shall be—

(A) entitled to benefits under the program under Part A as of the date of such deeming; and

(B) eligible to enroll in the program under Part B beginning with the month in which such deeming occurs.

(b) PILOT PROGRAM FOR CARE OF CERTAIN INDIVIDUALS RESIDING IN EMERGENCY DECLARATION AREAS.—

(1) PROGRAM; PURPOSE.—

(A) PRIMARY PILOT PROGRAM.—The Secretary shall establish a pilot program in accordance with this subsection to provide innovative approaches to furnishing comprehensive, coordinated, and cost-effective care under this title to individuals described in paragraph (2)(A).

(B) OPTIONAL PILOT PROGRAMS.—The Secretary may establish a separate pilot program, in accordance with this subsection, with respect to each geographic area subject to an emergency declaration (other than the declaration of June 17, 2009), in order to furnish such comprehensive, coordinated and cost-effective care to individuals described in subparagraph (2)(B) who reside in each such area.

(2) INDIVIDUAL DESCRIBED.—For purposes of paragraph (1), an individual described in this paragraph is an individual who enrolls in part B, submits to

the Secretary an application to participate in the applicable pilot program under this subsection, and—

    (A) is an environmental exposure affected individual described in subsection (e)(2) who resides in or around the geographic area subject to an emergency declaration made as of June 17, 2009; or

    (B) is an environmental exposure affected individual described in subsection (e)(3) who—

        (i) is deemed under subsection (a)(2); and

        (ii) meets such other criteria or conditions for participation in a pilot program under paragraph (1)(B) as the Secretary specifies.

    (3) FLEXIBLE BENEFITS AND SERVICES.—A pilot program under this subsection may provide for the furnishing of benefits, items, or services not otherwise covered or authorized under this title, if the Secretary determines that furnishing such benefits, items, or services will further the purposes of such pilot program (as described in paragraph (1)).

    (4) INNOVATIVE REIMBURSEMENT METHODOLOGIES.—For purposes of the pilot program under this subsection, the Secretary—

    (A) shall develop and implement appropriate methodologies to reimburse providers for furnishing benefits, items, or services for which payment is not otherwise covered or authorized under this title, if such benefits, items, or services are furnished pursuant to paragraph (3); and

    (B) may develop and implement innovative approaches to reimbursing providers for any benefits, items, or services furnished under this subsection.

    (5) LIMITATION.—Consistent with section 1862(b), no payment shall be made under the pilot program under this subsection with respect to benefits, items, or services furnished to an environmental exposure affected individual (as defined in subsection (e)) to the extent that such individual is eligible to receive such benefits, items, or services through any other public or private benefits plan or legal agreement.

    (6) WAIVER AUTHORITY.—The Secretary may waive such provisions of this title and title XI as are necessary to carry out pilot programs under this subsection.

    (7) FUNDING.—For purposes of carrying out pilot programs under this subsection, the Secretary shall provide for the transfer, from the Federal Hospital Insurance Trust Fund under section 1817 and the Federal Supplementary Medical Insurance Trust Fund under section 1841, in such proportion as the Secretary determines appropriate, of such sums as the

Secretary determines necessary, to the Centers for Medicare & Medicaid Services Program Management Account.

(8) WAIVER OF BUDGET NEUTRALITY.—The Secretary shall not require that pilot programs under this subsection be budget neutral with respect to expenditures under this title.

(c) DETERMINATIONS.—

(1) BY THE COMMISSIONER OF SOCIAL SECURITY.—For purposes of this section, the Commissioner of Social Security, in consultation with the Secretary, and using the cost allocation method prescribed in section 201(g), shall determine whether individuals are environmental exposure affected individuals.

(2) BY THE SECRETARY.—The Secretary shall determine eligibility for pilot programs under subsection (b).

(d) EMERGENCY DECLARATION DEFINED.—For purposes of this section, the term "emergency declaration" means a declaration of a public health emergency under section 104(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980.

(e) ENVIRONMENTAL EXPOSURE AFFECTED INDIVIDUAL DEFINED.—

(1) IN GENERAL.—For purposes of this section, the term "environmental exposure affected individual" means—

(A) an individual described in paragraph (2); and

(B) an individual described in paragraph (3).

(2) INDIVIDUAL DESCRIBED.—

(A) IN GENERAL.—An individual described in this paragraph is any individual who—

(i) is diagnosed with 1 or more conditions described in subparagraph (B);

(ii) as demonstrated in such manner as the Secretary determines appropriate, has been present for an aggregate total of 6 months in the geographic area subject to an emergency declaration specified in subsection (b)(2)(A), during a period ending—

(I) not less than 10 years prior to such diagnosis; and

(II) prior to the implementation of all the remedial and removal actions specified in the Record of Decision for Operating Unit 4 and the Record of Decision for Operating Unit 7;

(iii) files an application for benefits under this title (or has an application filed on behalf of the individual), including pursuant to this section; and

(iv) is determined under this section to meet the criteria in this subparagraph.

(B) CONDITIONS DESCRIBED.—For purposes of subparagraph (A), the following conditions are described in this subparagraph:

(i) Asbestosis, pleural thickening, or pleural plaques as established by—

(I) interpretation by a "B Reader" qualified physician of a plain chest x-ray or interpretation of a computed tomographic radiograph of the chest by a qualified physician, as determined by the Secretary; or

(II) such other diagnostic standards as the Secretary specifies, except that this clause shall not apply to pleural thickening or pleural plaques unless there are symptoms or conditions requiring medical treatment as a result of these diagnoses.

(ii) Mesothelioma, or malignancies of the lung, colon, rectum, larynx, stomach, esophagus, pharynx, or ovary, as established by—

(I) pathologic examination of biopsy tissue;

(II) cytology from bronchioalveolar lavage; or

(III) such other diagnostic standards as the Secretary specifies.

(iii) Any other diagnosis which the Secretary, in consultation with the Commissioner of Social Security, determines is an asbestos-related medical condition, as established by such diagnostic standards as the Secretary specifies.

(3) OTHER INDIVIDUAL DESCRIBED.—An individual described in this paragraph is any individual who—

(A) is not an individual described in paragraph (2);

(B) is diagnosed with a medical condition caused by the exposure of the individual to a public health hazard to which an emergency declaration applies, based on such medical conditions, diagnostic standards, and other criteria as the Secretary specifies;

(C) as demonstrated in such manner as the Secretary determines appropriate, has been present for an aggregate total of 6 months in the geographic area subject to the emergency declaration involved, during a period determined appropriate by the Secretary;

(D) files an application for benefits under this title (or has an application filed on behalf of the individual), including pursuant to this section; and

(E) is determined under this section to meet the criteria in this paragraph.