**Case No. 23-35507**

_____

IN THE UNITED STATES CIRCUIT COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

CENTER FOR ASBESTOS RELATED DISEASE, INC.,

Appellant,

vs.

UNITED STATES OF AMERICA, EX REL. BNSF RAILWAY COMPANY,

Appellee.

_____

On Appeal from the United States District Court for the District of Montana

_____

**APPELLEE'S ANSWERING BRIEF**

_____

Dale Schowengerdt
LANDMARK LAW PLLC
7 West 6th Ave., Ste. 518
Helena, Montana 59601
T: 406-457-5496
dale@landmarklawpllc.com


Chad M. Knight
KNIGHT NICASTRO MACKAY
1401 Walnut St., Ste. 200
Boulder, Colorado 80302
T: 303-815-5869
knight@knightnicastro.com

W. Adam Duerk
Seamus Molloy
MCFARLAN MOLLOY & DUERK
283 W. Front Street, Ste. 203
Missoula, Montana 59802
T: 406-546-0881
duerk@missoulalawyers.com


Anthony M. Nicastro
KNIGHT NICASTRO MACKAY
27 Shiloh Rd., Ste. 10
Billings, MT 59106
T: 406-545-2031
nicastro@knightnicastro.com

### CORPORATE DISCLOSURE STATEMENT

BNSF Railway Company is an indirect subsidiary of Berkshire Hathaway

Inc. The relevant ownership structure is as follows:

(1) BNSF Railway Company (a Delaware corporation) is a wholly owned subsidiary of Burlington Northern Santa Fe, LLC (a Delaware limited liability company).

(2) Berkshire Hathaway Inc., a Delaware corporation, is the sole member of Burlington Northern Santa Fe, LLC.

*/s/ Dale Schowengerdt*
Dale Schowengerdt
LANDMARK LAW PLLC
7 West 6th Ave., Ste. 518
Helena, Montana 59601
T: 406-457-5496
dale@landmarklawpllc.com


*Counsel for Appellee BNSF Railway Company*

i

**Table of Contents**

CORPORATE DISCLOSURE STATEMENT ........................................................ I

TABLE OF AUTHORITIES ........................................................ VI

ISSUES PRESENTED ........................................................ 1

ADDENDUM ........................................................ 1

STATEMENT OF THE CASE ........................................................ 2

I.    Libby's Asbestos Crisis and the Center for Asbestos Related Disease. ........ 2

II.    Diagnosing Asbestos-Related Disease. ........................................................ 4

III.    BNSF learns of CARD's fraud. ........................................................ 6

IV.    BNSF brings a *qui tam* action against CARD. ........................................................ 9

    A.   CARD diagnosed hundreds of patients with asbestos-related disease without any supporting radiological evidence and submitted Medicare claims for these patients. ........................................................ 9

    B.   Dr. Black diagnosed many other patients despite outside radiologists' conclusions that these patients' CT scans and x-rays showed no radiological evidence of asbestos-related conditions. ................. 11

    C.   CARD submitted Medicare claims for 112 "B-Read-only" patients its own providers had refused to diagnose. ........................................................ 12

    D.   Dr. Black prescribed unjustifiably high doses of opioids to many patients who had no outside radiologist's read indicating asbestos-related disease. And CARD billed Medicare for these opioids. .................... 16

    E.   CARD diagnosed CARD staff, board, and family members without supporting radiological evidence. ........................................................ 16

    F.   Nonphysicians at CARD frequently "diagnosed" patients. .................. 17

V.    After hearing extensive testimony about hundreds of fraudulent claims in several categories, the jury returned a verdict for BNSF .................... 17

SUMMARY OF ARGUMENT ........................................................ 18

I. Summary Judgment/Judgment as a Matter of Law. .............................. 18

II. Instruction No. F-24 .............................................................. 19

III. Instruction No. F-23 ............................................................ 20

IV. CARD's other arguments. ................................................... 20

ARGUMENT ............................................................................... 21

I.    This Court cannot review the district court's denial of CARD's summary judgment and Rule 50(a) motions. But even if it could, the court correctly ........................................................................ 22

A.    Under *Dupree v. Younger*, this Court cannot review the district court's denial of CARD's motion for summary judgment. .......................... 22

B.    The evidence amply supported the district court's conclusion that there were disputed issues of fact and CARD was not entitled to judgment as a matter of law. .......................................................... 24

1.  The evidence showed that CARD made hundreds of false statements .............................................................................. 24

2.  The evidence amply supported that CARD acted with the requisite scienter. ............................................................................. 25

a.  CARD knowingly submitted false claims for 112 "B-Read Only" Patients. ....................................................................... 26

b.  CARD submitted Medicare claims for patients when it knew these patients did not have asbestos-related disease—or, at a minimum, recklessly disregarded the truth or falsity of these patients' diagnoses .............................................................. 29

c.  CARD knowingly prescribed Medicare-funded opioids for patients whom it knew did not need them. ............................................ 30

3.  The summary judgment evidence showed that CARD's false statements were material. .................................................................. 31

4. BNSF brought this action within the FCA's statute of limitations. ..................................................................32

C. Under *Unitherm*, this Court cannot review the district court's denial of a Rule 50(a) motion that CARD failed to renew in a post-verdict, Rule 50(b) motion. ........................................34

II. The district court properly instructed the jury on the meaning of "diagnosis" in Subparagraph B of the EHH provision. .....................................35

A. Jury Instruction No. F-24 ......................................................35

B. Instruction No. F-24 properly construed the term "diagnosis" within the meaning of the ACA's EHH provision. ......................................39

C. This Court should not afford *Chevron* deference to the testimony of one ATSDR employee who did not administer the EHH provision, was not interpreting the provision for the agency, and expressly stated he was not interpreting the statute at trial. .................................. 42

1. *Chevron* does not apply to the unambiguous EHH provision. ............... 42

2. Even if the EHH provision is ambiguous, the Court should not give *Chevron* to the three purported interpretations CARD identifies. ......43

a. The Notice of Funding Opportunity language supports the district court's interpretation of the EHH provision. .......................... 44

b. Ted Larson's view of the EHH provision's meaning should not receive *Chevron* deference. ...................................45

c. The EHH Checklist is consistent with the district court's interpretation of the EHH provision. .................................. 48

D. If Instruction No. F-24 was erroneous, it was harmless. ........................49

III. Instruction No. F-23 properly applied the FCA's definition of "false claim" to the EHH Provision. And it was certainly not a plain error. ...............50

IV. The district court's other challenged instructions and evidentiary rulings were supported by the law and fully allowed CARD to present its scienter arguments to the jury. ...........................................55

iv

A.   The jury instructions did not prevent the jury from considering CARD's subjective beliefs about whether its claims were false. ...................55

B.   Instruction F-20 properly stated controlling Supreme Court and Ninth Circuit precedent and did not prevent the jury from considering CARD's scienter arguments. ....................................................... 60

C.   The district court properly excluded the testimony of Senator Max Baucus. ................................................................................................62

CONCLUSION...............................................................................................64

CERTIFICATE OF COMPLIANCE .................................................................66

ADDENDUM ...................................................................................................67

TABLE OF AUTHORITIES

## Cases

*Altera Corp. v. Clear Logic, Inc.*,

    424 F.3d 1079 (9th Cir. 2005) ....................................................56

*BNSF Ry. Co. v. Asbestos Claims Court*,

    2020 MT 59, 459 P.3d 857 (MT 2020) ...........................................2

*C.B. v. City of Sonora*,

    769 F.3d 1005 (9th Cir. 2014) ............................................. 57, 61

*Cf. Fournier v. Sebelius*,

    718 F.3d 1110 (9th Cir. 2013) ...................................................52

*Christensen v. Harris Cnty.*,

    529 U.S. 576 (2000) ..................................................................52

*City of Arlington v. F.C.C.*,

    569 U.S. 290 (2013) .................................................................47

*City of Los Angeles v. Barr*,

    941 F.3d 931 (9th Cir. 2019)............................................... 41, 44

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,

    139 S. Ct. 1507 (2019) ...................................................... 35, 36

*Dupree v. Younger*,

    598 U.S. 729 (2023)....................................................... 19, 24, 26

*FDA v. Brown & Williamson Tobacco Corp.*,

    529 U.S. 120 (2000) ..................................................................45

*Godecke v. KineticConcepts, Inc.*,

    937 F.3d 1201 (9th Cir. 2019) ........................................... 31, 69

*Griffin v. Oceanic Contractors, Inc.*,

    458 U.S. 564 (1982) ............................................................. 47

*Hangarter v. Provident Life and Acc. Ins. Co.*,

    373 F.3d 998 (9th Cir. 2004) ............................................... 72

*Heckler v. Cmty. Health Servs. of Crawford County, Inc.*,

    467 U.S. 51 (1984) ...................................................... 28, 68

*Martin v. Occupational Safety and Health Review Comm'n*,

    499 U.S. (1991) ................................................................ 53

*Neder v. United States*,

    527 U.S. 1 (1999) ............................................................. 23

*Nitco Holding Corp. v. Boujikian*,

    491 F.3d 1086 (9th Cir. 2007) ............................................ 38

*Peralta v. Dillard*,

    744 F.3d 1076 (9th Cir. 2014) ............................................ 43

*SEC v. McCarthy*,

    322 F.3d 650 (9th Cir. 2003) .............................................. 45

*Skidmore v. Led Zeppelin*,

    952 F.3d 1051 (9th Cir. 2020) ............................................ 43

*Sprint/United Mgmt. Co. v. Mendelsohn*,

    552 U.S. 379 (2008) .......................................................... 71

*Swinton v. Potomac Corp.*,

    270 F.3d 794 (9th Cir. 2001) .............................................. 59

*United States ex rel. Hagood v. Sonoma Cnty. Water Agency*,

    929 F.2d 1416 (9th Cir. 1991) ............................................ 68

vii

*United States ex rel. Hendrow v. Univ. of Phoenix*,

    461 F.3d 1166 (9th Cir. 2006) ...................................................... 23, 25

*United States ex rel. Purcell v. MWI Corp.*,

    254 F. Supp. 2d 69 (D.D.C. 2003) ............................................... 25, 35

*United States ex rel. Rose v. Stephens Inst.*,

    909 F.3d 1012 (9th Cir. 2018) ............................................................ 25

*United States ex rel. Schutte v. SuperValu Inc.*,

    598 U.S. 739 (2023) ................................................................... passim

*United States ex. Re. Oliver v. Parsons Co.*,

    195 F.3d 457 (9th Cir. 1999) ............................................... 63, 64, 70

*United States v. Corinthian Colleges*,

    655 F.3d 984 (9th Cir. 2011) .............................................................. 60

*United States v. Jicarilla Apache Nation*,

    564 U.S. 162 (2011) ............................................................................ 46

*United States v. Neifert-White Co.*,

    390 U.S. 228 (1968) ............................................................................ 22

*Unitherm Food Sys., Inc. v. Swift-Ekrich, Inc.*,

    546 U.S. 394 (2006) ..................................................................... 20, 38

*Univ. Health Servs., Inc. v. United States*,

579 U.S. 176, 182 (2016) .......................................................................... 58

*Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*,

    353 F.3d 1051 (9th Cir. 2003) ......................................................... 43, 48

*Williams v. Renal Care Group, Inc.*,

    696 F.3d 518 (6th Cir. 2012) .......................................................... 28, 63

*Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*,

   953 F.3d 1108 (9th Cir. 2020) ......................................................passim

*Zhang v. Am. Gem Seafoods, Inc.*,

   339 F.3d 1020 (9th Cir. 2003) ...........................................................56

## Other Authorities

28 C.F.R. § 85.3 .................................................................................. 19

31 U.S.C. § 3729 ............................................................................passim

31 U.S.C. § 3730 ................................................................................. 9

31 U.S.C. § 3731 ............................................................................ 35, 36

31 U.S.C. §3731............................................................................ 25, 35

42 U.S.C. § 1395rr-1 ...................................................................2, 29, 40

Fed R. Civ. P. 51 ................................................................................ 57

**ISSUES PRESENTED**

I.  May this Court review the district court's ruling on factual issues in denying summary judgment and, even if it determines it can, did the district court correctly conclude that there were material factual disputes?

II.  Did the district court properly instruct the jury on the meaning of "diagnosis" in the Affordable Care Act's Environmental Health Hazards provision based on its common, ordinary, and contemporary meaning?

III.  Did the district court properly instruct the jury on what constitutes a false claim under the FCA in the context of the Environmental Health Hazards provision?

IV.  Did the district court's instructions and evidentiary rulings preclude the jury from considering CARD's subjective beliefs about the falsity of its practices?

**ADDENDUM**

All relevant statutory authorities appear in the Addendum to this brief.

1

## STATEMENT OF THE CASE

**I.    Libby's Asbestos Crisis and the Center for Asbestos Related Disease.**

In the 1920s, the Zonolite Company began mining asbestos-containing vermiculite six miles outside of Libby, Montana. W.R. Grace bought the company in 1963 and shipped vermiculite far and wide. W.R. Grace later discovered (and belatedly disclosed) that the vermiculite contained toxic asbestos. The mine closed in 1990. The EPA started investigating exposure claims in 1999 and began an aggressive cleanup of Libby and the surrounding area soon after.[1] *BNSF Ry. Co. v. Asbestos Claims Court*, 2020 MT 59, ¶ 2, 459 P.3d 857, 864 (MT 2020).

When Congress passed the Affordable Care Act in 2010, it included a special "environmental health hazards" provision aimed at assisting people who became sick after exposure to Libby asbestos. *See* 42 U.S.C. § 1395rr-1 ("the EHH provision."). Under the EHH provision, a person—regardless of age—can qualify for lifetime Medicare benefits and additional "Pilot Program" benefits[2] if she (1) is

---

[1] *See also* Libby Asbestos Site, *Cleanup Activities*, United States Environmental Protection Agency, at https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.cleanup&id=0801744.

[2] Pilot Program benefits include services that Medicare does not cover but a physician certifies to be medically necessary, like in-home care, lawn care, and gym fees. 3-SER-772.

diagnosed with an asbestos-related disease; and (2) was present in Lincoln County, Montana for prescribed time, 10 years or more before her diagnosis. *See* 42 U.S.C. 1395rr-l(e)(2)(A)-(B).

The Center for Asbestos Related Disease ("CARD") was formed in 2000 to screen, diagnose, treat, and monitor patients exposed to Libby amphibole asbestos. ER-86. Since the passage of the ACA, CARD has told the government that it has diagnosed thousands of patients with asbestos-related disease. Based on these diagnoses, CARD signed thousands of patients up for lifetime Medicare benefits through the special EHH provision and billed Medicare for their treatment.

But there was a problem with CARD's representations to the government. They were not true. A pharmacist working in Libby since 1999 summed it up: "all you needed to do is go in to the CARD Clinic and cough, and you would get Medicare." 1-SER-217.

For years, outside radiologists encountered patients with a CARD diagnosis who showed no signs of asbestos-related disease. These repeated discrepancies led one board-certified radiologist to ask his colleague, "Am I a moron? Am I missing something here?" But his colleague had noticed the same thing. 2-SER-472–73. After investigating, this radiologist concluded that he was not "a moron"—the diagnoses CARD purportedly found "just w[ere]n't there." 2-SER-473.

3

Dr. Brad Black acted as CARD's medical director from the clinic's inception. Dr. Black, a pediatrician, claimed a *sui generis* ability to spot asbestos-related disease where no one else could. Dr. Black frequently "over read" the interpretations of outside radiologists to find a diagnosis that everyone else said wasn't there. Dr. Black also claimed to discover a novel condition called "lamellar pleural thickening," which (he said) signified a form of asbestos-related disease unique to Libby patients. ER-90-91. No one else had heard of "lamellar pleural thickening" or could identify it. 2-SER-501. Dr. Black dismissed these discrepancies with an aphorism: "What the mind does not know, the eye does not see." ER-91.

## II.    Diagnosing Asbestos-Related Disease.

In 2004, the American Thoracic Society (ATS) established three well-settled criteria for diagnosing asbestos-related disease:

> 1.    Evidence of structural pathology consistent with asbestos related disease as observed by imaging (chest x-ray or CT scan) or histology (microscopic examination);
>
> 2.    Evidence of causation by asbestos as documented by the occupational and environmental history, markers of exposure (usually pleural plaques), recovery of asbestos bodies or other means; and
>
> 3.    Exclusion of alternative plausible causes for the findings.

ER-89-90. CARD's physicians acknowledged that satisfaction of all three criteria are "mandatory" for diagnosing asbestos-related disease. 1-SER-10–11, 1-SER-82.

CARD does not employ any radiologists. ER-90. It contracted with an expert panel of outside radiologists to review patients' x-rays and CT scans, which comprised five NIOSH-certified B-Readers—highly qualified radiologists who specialize in identifying signs of lung disease caused by exposure to certain dusts, including asbestos. ER-91; 2-SER-350–55.

When CARD diagnosed a patient with an asbestos-related disease and determined that the patient wished to obtain Medicare benefits, the clinic submitted an "Environmental Health Hazards Checklist" (EHH Checklist) and faxed it to the Social Security field office in Kalispell, Montana. ER-89; ER-97. The EHH Checklist directed the CARD physician to identify the patient's "asbestos-related condition and its date of diagnosis" and whether the patient was present in Lincoln County for the duration required under the statute. ER-16. The EHH Checklist contained a signature box for the "Physician's Signature," printed name, and date. *Id.* The Checklist made clear that only a "physician" may diagnose the patient with asbestos-related disease. *Id.* The Checklist had a box for physicians to check if a patient did not have a qualifying diagnosis of asbestos-related disease. *Id.*

5

## III. BNSF learns of CARD's fraud.

As the Libby asbestos crisis unfolded, Libby residents began suing W.R. Grace for their injuries. After W.R. Grace went bankrupt, thousands of plaintiffs, including many CARD patients, turned their derivative suits against the State of Montana and companies operating in Libby, like BNSF Railway Company, for second-hand exposure to Grace's vermiculate mining and processing.[3]

In 2018 and 2019, while defending asbestos lawsuits, BNSF discovered that CARD physicians and staff had engaged in systemic fraud that led it to wrongfully "diagnose" hundreds, if not thousands, of patients with asbestos-related disease who did not have such a condition. After "diagnosing" these individuals, CARD lied to the government that these patients were eligible for lifetime Medicare benefits under the EHH provision.

CARD's fraud took several forms. Sometimes, CARD diagnosed patients without any radiological evidence indicating the presence of asbestos-related

---

[3] CARD asserts that the Montana Supreme Court concluded that BNSF was strictly liable. Aplt. Br., 5, n.2. Not so. The Montana Supreme Court recognized that BNSF was federally mandated to carry processed vermiculite from Grace's facilities as a common carrier. The Court adopted the common carrier exception to strict liability because "it would be unjust to subject a common carrier to strict liability for any danger done by a material the carrier is required to transport by law." *BNSF Ry. Co. v. Asbestos Claims Court*, 2020 MT 59, 459 P.3d 857, 873-74.

disease. ER-92, ER-94. For many other patients, Dr. Black "over-read" outside radiologists' interpretations that found no signs of asbestos-related disease and diagnosed asbestos-related disease based on his own findings. ER-92. And other times, CARD physicians had seen and expressly refused to diagnose patients, but nevertheless told the government it had "diagnosed" these patients and submitted them for lifetime Medicare. *See, e.g.*, 1-SER-80–81, 1-SER-113. CARD's justification for this group of falsehoods was that even though these patients had no diagnosable condition, an outside B-Reader had found an abnormality on their chest x-ray which *could* indicate asbestos-related disease. *See, e.g.*, 1-SER-12–14, 1-SER-114. But CARD knew that a B-Reader *never* diagnoses. ER-91, ER-94.

Across these groups, hundreds (if not thousands) of patients received lifetime Medicare benefits based on CARD's certification to the government that they were "diagnosed" with asbestos-related disease. *See* ER-97.

One expert witness summarized CARD's practice this way: "[according to CARD], if the outside reader says that there's an abnormality, then the outside reader is right, even if [CARD] saw nothing. And if [the CARD physicians] see something but the outside readers who are all specialists say there's nothing, then it's still – it's always positive, only." 1-SER-240.

Dr. Black also prescribed dangerously high doses of opioids like fentanyl for patients to patients without any radiological evidence of asbestos-related disease. 1-SER-73, 1-SER-196–97, 2-SER324–25, 3-SER-630, 3-SER-645–50. He did this even though opioids are rarely, if ever, appropriate for treating patients who *actually* have asbestos-related disease. S1-SER-212, 2-SER-322–23, 2-SER-484–88. CARD submitted Medicare reimbursements for these patients' opioid prescriptions. ER-97-98.

CARD's dishonesty wasted millions of taxpayer dollars. It also devastated the Libby patients CARD was supposed to help. Some CARD patients lived with psychological harm after CARD incorrectly told them that they had a terminal disease. 2-SER-517.  One patient suffered suicidal ideation after CARD diagnosed him with asbestos-related disease in 2013. 1-SER-246–47. But seven later outside radiological reads of this patient's CT scans—including a read by radiologists at the Mayo Clinic—found no evidence of asbestos-related disease. 1-SER-239–45. Another refused to treat his heart problems because Dr. Black had convinced him that he had asbestos-related disease, and his lungs, not his heart, were the problem. 1-SER-231–32. This patient died of heart disease. 2-SER-330–31.

**IV.** **BNSF brings a *qui tam* action against CARD.**

After BNSF learned about CARD's fraudulent practices, it brought a *qui tam* action under 31 U.S.C. § 3730, alleging that CARD violated the False Claims Act ("FCA"), § 3729. *See generally* 3-SER-800. Among other things, BNSF alleged that CARD submitted false claims and statements through EHH forms to the Social Security Administration and through billing Medicare for opioid and other drug prescriptions that were not medically necessary (and, in fact, were harmful). 3-SER-838–44.

During a twelve-day jury trial, BNSF presented extensive evidence that showed CARD had knowingly submitted hundreds, if not thousands, of false claims. 1-SER-76. Key trial evidence is summarized below.

**A. CARD diagnosed hundreds of patients with asbestos-related disease without any supporting radiological evidence and submitted Medicare claims for these patients.**

The jury heard that CARD "diagnosed" and submitted Medicare claims forms for at least 333 patients[4] who had no x-ray or CT scan read by a radiologist indicating structural pathologies consistent with asbestos-related disease. *See* 1-SER-73; 3-SER-631–38. Such structural evidence is the first "mandatory" element

---

[4] The jury heard that this number was as high as 1,369. 1-SER-73.

of an asbestos-related disease diagnosis; without it, there could be no valid

diagnosis. 2-SER-495; ER-89. Even Dr. Black admitted that if a patient does not

have a structural abnormality on an x-ray, the patient cannot have a diagnosis of an

asbestos-related disease. 1-SER-171.

Among this group were hundreds of patients CARD diagnosed with

"lamellar plural thickening." The jury heard repeated testimony that other

pulmonologists, B- reader certified radiologists, or medical providers who testified

in this case had ever heard of or read about "lamellar pleural thickening" in

medical literature…outside Dr. Black's publications. *See* ER-91; 2-SER-470–72, 2-

SER-544–45, 2-SER-551–52.  Only Dr. Black, a pediatrician, had ever diagnosed it.

1-SER-168-69; 2-SER-500–02 (Libby pulmonologist who had read "tens of

thousands" of x-rays and CT scans testifying that he nor anyone he knew

diagnosed lamellar pleural thickening or thought it was a real impairment).

CARD physicians have published academic literature on "lamellar pleural

thickening," and some of these articles were paid for by Plaintiffs' attorneys. 1-

SER-148–54. Experts testified that CARD's "lamellar pleural thickening" articles

were not published in high-quality journals and were based on flawed data and

methods. 2-SER-396. As one radiologist testified, CARD's "scholarship"

represented that "lamellar pleural thickening is extremely difficult for most

10

physicians to see, which is sort of like the emperor's new clothing." 2-SER-501. "Lamellar pleural thinking" was *so* difficult to see, in fact, that "in the local medical community, Dr. Black is the *only person who can see*" it. *Id.* (emphasis added).

The jury heard from one physician who worked for CARD for a short time but resigned from CARD because of Dr. Black's diagnostic practices. 2-SER-343–44. As he put it, he first began to wonder if Dr. Black was like Galileo and the rest of the medical community was like the Church. 2-SER-343. But based on the weight of evidence from radiologists, academics in Libby, and experts across the country, this physician was forced to conclude that "Dr. Black is no Galileo." *Id.* He resigned from the CARD clinic as a result, despite his personal relationship with Dr. Black. 2-SER-343–44.

Another doctor testified that while working at CARD she quickly developed concerns about CARD's practices of diagnosing patients without evidence of asbestos-related disease. 2-SER-504, 2-SER-536–39.

**B. Dr. Black diagnosed many other patients despite outside radiologists' conclusions that these patients' CT scans and x-rays showed no radiological evidence of asbestos-related conditions.**

The jury heard extensive evidence about Dr. Black's practice of "over-reading" thoracic radiologists, including NIOSH-certified B-readers. *See, e.g.,* 1-SER-72; 3-

11

SER-629. "Over-reading" meant that CARD "would read something as abnormal where all the [other] radiologists that ever read the person's studies" found "no evidence of asbestos related disease." 1-SER-251. Dr. Black diagnosed patients with asbestos-related disease "whose CT scans were not found to have abnormalities by thoracic radiologists on the B-reader panel." ER-92. Dr. Black likewise "over-read" local radiologists, finding asbestos-related disease after the radiologists found no sign of the disease. 1-SER-72, 3-SER-629; *see also, e.g.*, 1-SER-251, 2-SER-494–98, 2-SER-507–08, 2-SER-554–60, 2-SER-566–76, 2-SER-578–81.

A CARD receptionist testified that patients would come to the clinic asking why outside x-rays and CT scans contradicted CARD's representation that they had asbestos-related disease. 1-SER-224–25. Dr. Black assured her that "the way that the Libby amphibole asbestos fibers affect people is medically different than any other asbestos fibers that had been studied previously. There was really no precedent for finding what they were looking for, essentially." *Id.*

## C. CARD submitted Medicare claims for 112 "B-Read-only" patients its own providers had refused to diagnose.

The jury also heard extensive evidence that CARD submitted EHH checklists for 112 "B-Read only" patients. *See, e.g.*, 1-SER-109–25. CARD physicians evaluated each of these patients and refused to diagnose them after determining

they did not have an asbestos-related disease. *Id.* But when a B-Reader panel found an abnormality on these patients' chest x-rays, CARD sent a letter to these patients informing them that they had not been diagnosed with asbestos-related disease but were somehow still eligible for EHH Medicare. 1-SER-122.

CARD then sent EHH checklists to the Social Security Administration (SSA) certifying that CARD *had diagnosed* these patients with asbestos-related disease, even though it knew this was false. 1-SER-11–19, 1-SER-109–25. Understandably, patients in this class were confused: CARD had told them they had no asbestos-related disease but still qualified for a special Medicare program designed for people diagnosed with asbestos-related disease. 1-SER-125–127.

CARD knew, and conceded at trial, that a B-Reader *never* diagnoses a patient. ER-91-95. B-Readers can establish the *first* element of an ATS diagnosis (evidence of structural pathology) but can never establish the other two elements (evidence of exposure and differential diagnosis). 2-SER-377–78. And because "B-reading is not an exact science," 2-SER-368, B-Readers sometimes detect findings of an abnormality completely unrelated to asbestos-related disease. 2-SER-381. For instance, B-Readers noted an abnormality for one CARD patient who had a fractured rib, not asbestos-related disease. 1-SER-18–19, 1-SER-109–10, 1-SER-118–23. CARD submitted an EHH checklist for lifetime Medicare for this patient. *Id.*

13

CARD relied on a B-Reader's finding as the sole basis for lifetime Medicare for over a hundred patients that CARD itself had refused to diagnose. 1-SER-109–26, 3-SER-626–28.

The SSA had told CARD that a patient must be diagnosed to receive EHH Medicare. 3-SER-613, 3-SER-619. CARD's website likewise made clear that a person needed a diagnosis to qualify. 3-SER-614–15. When trying to explain why they continually submitted claims for undiagnosed patients, CARD staff couldn't keep their story straight. Dr. Black claimed that someone from the SSA had met with CARD administrator Tanis Hernandez and "taught" her to submit claims for undiagnosed patients. 1-SER-027, 1-SER-129–33, 1-SER-136–37. He later admitted this "didn't happen." 1-SER-139. Ms. Hernandez didn't recall this meeting and testified that "[n]o one has ever instructed me to fill out a form for a person who did not have a disease." 2-SER-383–88, 2-SER-400–402. Hernandez claimed instead that she, Dr. Black, and executive director Tracy McNew landed on the B-read-only practice after reading the EHH provision and concluding that the statute contemplated Medicare benefits for undiagnosed patients based solely on a B-reader's finding of an abnormality. 2-SER-418–21, 2-SER-460–63. Hernandez said no attorney assisted CARD in reaching this conclusion. 2-SER-435, 2-SER-437–38.

14

And for over a decade, CARD never asked the SSA if its interpretation was correct. *See, e.g.* 2-SER-413–14, 2-SER-423–27, 2-SER-200–01.

In 2023, CARD finally disclosed to SSA that it "does not consider [patients] diagnosed based on an interpretation by a B reader" but still frequently certified that these individuals had been diagnosed and were eligible for Medicare. 3-SER659–63. Based on this disclosure, the SSA responded that it would be "unable to approve EHH Medicare claims involving the B reader at this time." 3-SER-659. CARD accused SSA of having "changed its position" and asked for "formal documentation of this change." 3-SER-663. SSA shut this assertion down. It had never changed its practice: a patient needed a diagnosis, just like SSA had said all along. 3-SER-662. During discovery, SSA's 30(b)(6) deponent testified that no one from SSA ever instructed CARD to fill out EHH forms for patients who did not have a diagnosis. 1-SER-207–08. SSA's 30(b)(6) deponent was blunt: she characterized the practice of knowingly submitting claims for undiagnosed patients as "fraud." 1-SER-287–88, 2-SER-315–16.

Despite all this, at trial CARD's current medical director Dr. Morrissette testified that she planned to *continue* CARD's practice of submitting Medicare claims for undiagnosed patients based solely on a B-reader's finding of an abnormality. 1-SER-78–84.

15

**D. Dr. Black prescribed unjustifiably high doses of opioids to many patients who had no outside radiologist's read indicating asbestos-related disease. And CARD billed Medicare for these opioids.**

Dr. Black was one of the highest opioid prescribers in Libby, Montana, even though he exclusively treated asbestos-related disease and opioids are rarely appropriate for asbestos-related conditions, except for perhaps end-stage asbestosis or mesothelioma. 1-SER-212, 2-SER-322–23, 2-SER-482–86. Dr. Black prescribed opioids like fentanyl for patients with no supporting radiological reads indicating the presence of asbestos-related disease. 1-SER-73, 2-SER324–25; 3-SER-630, 3-SER-645–50. Dr. Black prescribed opioids in dosages that doubled patients' risk of death. 1-SER-196–97. Medicare paid for many CARD patients' opioids because CARD had certified these patients as eligible for EHH Medicare. 1-SER-174–76.

**E. CARD diagnosed CARD staff, board, and family members without supporting radiological evidence.**

Dr. Black diagnosed himself with an asbestos-related disease and received Medicare after a CARD nurse practitioner signed and submitted an EHH checklist for him. 1-SER-181–82. The outside B-Reader panel unanimously found no indications of asbestos-related disease on Dr. Black's chest x-rays. 1-SER-174–75. Dr. Black conceded at trial that his "diagnosis" hadn't restricted his daily activities in any way—he continued to travel internationally and climb mountains. 1-SER-

16

192–93. Other CARD staff, board members, and CARD family members were diagnosed with asbestos-related disease, all without any corroboration from a radiologist's read of an x-ray or CT scan. 1-SER-187.

### F. Nonphysicians at CARD frequently "diagnosed" patients.

While the EHH Checklist required a *physician*'s signature and diagnosis, many patients at CARD were diagnosed by physician assistants and nurse practitioners, not physicians. 2-SER-472; 2-SER481-83. Nonphysicians at CARD also frequently used a literal "rubber stamp" with Dr. Black's signature to certify EHH Checklists for submission to the government, even though the EHH Checklist expressly required a physician to sign off on a diagnosis. 1-SER-113; 1-SER-187-88. The jury heard that "most of the" EHH Checklists submitted by CARD were signed via "rubber stamp." 1-SER-113; 1-SER-188.

## V. After hearing extensive testimony about hundreds of fraudulent claims in several categories, the jury returned a verdict for BNSF.

After hearing the evidence, the jury returned a verdict finding that CARD committed 337 violations of the False Claims Act and awarded the United States $1,081,265.00 in damages. ER-28-29. The district court amended the judgment to include treble damages as required by 31 U.S.C. § 3729(a)(1), and a penalty of $2,582,228 under 28 C.F.R. § 85.3(a), (d). ER-6-7. The district court amended the

judgment to a total of $5,826,023. In rejecting CARD's Eighth Amendment Excessive Fines Clause claim, the court recognized that CARD's widespread fraud undermined public confidence in the administration of Medicare. ER-11. The court also noted that the actual damages were "potentially far greater" than the $1,081,265 because of the difficulty in proving and calculating damages. *Id.* CARD timely appealed.

## SUMMARY OF ARGUMENT

As to Issue I, CARD seems to challenge the district court's denial of its motions for summary judgment and judgment as a matter of law as to all theories of fraud in this case. *See* Appellant's Br. 15-19 ("Aplt. Br."). The rest of CARD's appeal (Issues II, III, and IV) challenges the jury's verdict—and the district court's jury instructions and evidentiary rulings— only in relation to the 112 B-Read-only patients. *See, e.g.*, Aplt. Br. 22.

**I. Summary Judgment/Judgment as a Matter of Law.** CARD argues it was entitled to summary judgment on the issues of falsity, scienter, materiality, and the statute of limitations. But under *Dupree v. Younger*, 598 U.S. 729 (2023), this Court lacks power to review the district court's order denying CARD summary judgment on these fact-bound questions. And even if this Court *could* review the district court's denial of summary judgment, BNSF presented ample evidence to preclude

18

summary judgment. CARD also argues that the district court erred in denying its

Rule 50(a) motions on these issues, but CARD waived this argument by failing to

renew these motions in a post-verdict Rule 50(b) motion. *Unitherm Food Sys., Inc. v.*

*Swift-Ekrich, Inc.*, 546 U.S. 394, 401–04 (2006).

**II. Instruction No. F-24.** CARD argues that Instruction No. F-24 misstated

the law and required the jury to find it liable for its B-read-only practice. Instruction

No. F-24 told the jury (1) that a "diagnosis" under the EHH provision must meet

the ATS criteria; and (2) a B-Reader's finding is not sufficient by itself to

constitute a diagnosis. This instruction properly gave "diagnosis" its common,

ordinary, contemporary meaning. At trial, CARD repeatedly conceded that a

diagnosis of asbestos-related disease must satisfy the ATS criteria, and that B-

readers do not diagnose. Many interpretive canons underscore why the district

court's interpretation of "diagnosis" was correct. CARD also invokes *Chevron*. But

CARD's so-called "agency interpretations" either support the district court's

interpretation or are not entitled to any deference. Moreover, any alleged error in

Instruction No. F-24 would be harmless. CARD concedes that, at most, No. F-24

applied to 112 of the more than 1,000 false claims BNSF presented to the jury. The

jury found CARD liable for 337 violations. Nothing in the jury's verdict shows

19

whether the 112 claims CARD challenges were among the 337 violations the jury found.

**III. Instruction No. F-23.** CARD contends that Instruction No. F-23 compelled the jury to find that CARD acted with the required scienter to be liable under the FCA when it submitted claims for the B-read-only patients. But Instruction No. F-23 properly instructed the jury on what constitutes a "false claim" under the FCA; it said nothing about scienter. The district court issued other instructions that properly instructed the jury on the legal requirements for scienter under the FCA.

**IV. CARD's other arguments.** CARD argues (1) it could not have been liable under the subjective knowledge standard for scienter recognized in *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023); (2) Instruction No. F-20 erroneously told the jury not to consider the conduct of Government agents contrary to law; and (3) the district court abused its discretion by excluding the testimony of a former Senator who sponsored the EHH provision. CARD is wrong on all three counts. *SuperValu* shows why CARD cannot simply hide behind what it claims it subjectively believed the EHH provision requires. The jury correctly rejected CARD's claim it was acting in good faith. Instruction F-20 properly stated controlling Supreme Court and Ninth Circuit precedent. And the district court

properly excluded the Senator's irrelevant, confusing, and unfairly prejudicial testimony.

## ARGUMENT

Congress intended the False Claims Act, 31 U.S.C. § 3729 (FCA), to have a broad reach and cover all attempts to cause the government to pay false or fraudulent claims. *United States v. Neifert-White Co.*, 390 U.S. 228, 223 (1968). A corporation is liable under the FCA when it (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false claim," 31 U.S.C. § 3729(a)(1)(B). A "claim" includes direct requests for government payment as well as reimbursement requests made to the recipients of federal funds under a federal benefits program. 31 U.S.C. § 3729(b)(2)(A). A claim may be premised on misstatements "capable of influencing the decision of the decision-making body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999).

To prove liability under the FCA, the *qui tam* relator must show "(1) a false statement or fraudulent course of conduct, (2) made with the scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Hendrow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006).

21

To be liable, a person doesn't have to intend to defraud the government. 31 U.S.C. § 3729(b)(1)(B). Instead, a person must act with either (1) knowledge that the statement is false, (2) deliberate ignorance of the truth or falsity of the information, or (3) reckless disregard of the truth or falsity of the statement. 31 U.S.C. § 3729(b)(1)(i)–(iii).

**I.** **This Court cannot review the district court's denial of CARD's summary judgment and Rule 50(a) motions. But even if it could, the court correctly denied CARD judgment as a matter of law based on extensive evidence of fraud.[5]**

**A. Under *Dupree v. Younger*, this Court cannot review the district court's denial of CARD's motion for summary judgment.**

CARD first argues that the district court erred in denying its motion for summary judgment as to four issues: whether (1) CARD made false statements; (2) CARD had the requisite scienter under the FCA; (3) CARD's false claims were material under the FCA; and (4) BNSF's action was brought within the FCA's statute of limitations period. This Court lacks power to review the district court's denial of summary judgment on these fact-dependent issues.

Because "[f]act-dependent appeals must be appraised in light of the complete trial record," appellate courts may only review a district court's

---

[5] Unlike with Issues II, III, and IV, which challenge only the B-Read-only claims, CARD's Issue I appears to raise a broad challenge to *all* theories of fraud.

resolution of "purely legal issues" in denying summary judgment. *Dupree v. Younger*, 598 U.S. 729, 734–35 (2023). The case law shows that falsity, scienter, and materiality are fact-bound, context-specific issues. *See, e.g.*, *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012 1020 (9th Cir. 2018) (fact issues as to the falsity and materiality of defendant's false claims precluded summary judgment); *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1175 (9th Cir. 2006) (scienter depended on specific facts underlying defendants' alleged fraudulent conduct). Same with the statute of limitations: Which of the FCA's two limitations applies depends on when the relevant government official knew or should have known of the materiality facts underlying the action. *See* 31 U.S.C. §3731(b)(2). And determining what the responsible government official knew or should have known is "a complex factual determination to be made by [the district court]." *United States ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69, 78 (D.D.C. 2003) (quotation omitted).

　　None of the four summary judgment issues CARD asks this Court to review is "purely legal." Thus, this Court cannot review the district court's denial of summary judgment on these fact-sensitive claims. *Dupree*, 598 U.S. at 735.

**B. The evidence amply supported the district court's conclusion that there were disputed issues of fact and CARD was not entitled to judgment as a matter of law.**

Even if this Court could review the district court's denial of CARD's summary judgment motion, the district court correctly concluded that fact questions precluded summary judgment for CARD.

**1. The evidence showed that CARD made hundreds of false statements.**

Courts interpret the FCA broadly "in keeping with Congress's intention to reach all types of fraud, without qualification that might result in financial loss to the Government." *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1116 (9th Cir. 2020) For this reason, "the Supreme Court … has cautioned courts against adopting a circumscribed view of what it means for a claim to be false or fraudulent." *Id.* (quotation marks and citation omitted). Among other things, a claim is false when "the entity seeking payment [falsely] certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted." *Rose*, 909 F.3d at 1017 (quotation marks and citation omitted).

CARD broadly asserts that CARD's "diagnostic opinions" were "honestly held [and] therefore cannot be false statements under the FCA." Aplt. Br. 16. But

24

the evidence told a different story. It showed that CARD systematically certified patients as eligible for EHH benefits based on false statements about the existence of diagnoses that, "in accordance with accepted standards of medical practice …[, did] not exist." *Holzner*, 2022 WL at *1. The evidence overwhelmingly supported the district court's conclusion there were, at a minimum, material disputes of fact precluding summary judgment on the issue of falsity. *See generally* 3-SER-718 (BNSF's disputed facts).

### 2. The evidence amply supported that CARD acted with the requisite scienter.

BNSF likewise presented overwhelming evidence at summary judgment showing that CARD acted with the requisite scienter. Under the FCA, a person acts knowingly if he acts "in deliberate ignorance" or "in reckless disregard" of the truth or falsity of a claim. 31 U.S.C. § 3729(b). Congress amended the definition of "knowingly" in 1986 to extend the FCA's reach to "the ostrich type situation where an individual … fail[s] to make simple inquiries which would alert him that false claims are being submitted." S. Rep. No. 99-345, at 21 (1986), 1986 U.S.C.C.A.N. 5266, 5286. The point of the amendment was to reach "that defendant who has buried his head in the sand and failed to make some inquiry into

the claim's validity." *U.S. ex rel. Williams v. Renal Care Group, Inc.*, 696 F.3d 518, 530 (6th Cir. 2012) (cleaned up).

### a. CARD knowingly submitted false claims for 112 "B-Read Only" Patients.

CARD claims that its medical opinions were "honestly held" and, thus, could not have been "knowing." But "[p]rotection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law[.]" *Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 63 (1984). Thus, defendants who participate in Medicare "have a duty to familiarize themselves with the legal requirements for payment" and act knowingly when they fail to do so. *United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001) (citing *Heckler*, 467 U.S. at 63).

As noted, the EHH provision conditions Medicare eligibility on a patient's diagnosis of asbestos-related disease. 42 U.S.C. § 1395rr-1(2)(e). But CARD submitted 112 lifetime Medicare claims for patients *without* a diagnosis based solely on the fact that a B-Reader had found some abnormality on these patients' chest x-rays. CARD refused to diagnose each of these "B-Read only" patients with asbestos-related disease because they did not have it. CARD knew, and stipulated before summary judgment, that B-Readers don't diagnose. ER-91-95. A B-Reader's

26

finding of an "abnormality" does not mean that the outside reader "has diagnosed the patient with [asbestos-related disease]." *Id*. CARD admitted that such a finding merely signifies that the patient's CT "showed signs that *might* be 'consistent with' ARD." ER-92 (emphasis added).

CARD argued it submitted these patently false claims based on an honest misreading of the ACA's EHH provision. But the evidence showed that CARD's misreading was not honest. CARD's own website noted that eligibility for Medicare requires a diagnosis. 3-SER-615. CARD sent a letter to many B-Read only patients informing them that they were "Medicare eligible, even though they do not have a diagnosis of asbestos-related disease." 1-SER-25, ¶ 90. Yet CARD claimed it believed that the EHH provision contemplated Medicare for patients that CARD itself had refused to diagnose.

SSA's program and operations manual systems (POMS)—a manual guiding claims technicians with the requirements for processing claims—also told CARD everything it needed to know. The POMS explained that the "purpose of the EHH Checklist is to obtain medical information from the claimant's medical source regarding the claimant's *diagnosis* and presence in Lincoln County, Montana." 3-SER-603 (emphasis added). SSA official used the EHH Checklist to "determine if the claimant's condition meets the medical requirement." 3-SER-603-05. POMS

clearly stated clear that Medicare is extended to "certain individuals exposed to environmental health hazards (EHH) and **diagnosed with a medical condition caused by such exposure**." 3-SER-600 (emphasis added). Despite knowing that a B-Read or other radiological scan can never diagnose whether an abnormality was caused by asbestos exposure, CARD nevertheless submitted 112 claims for patients without a diagnosis. 3-SER-628-29.

SSA officials' communications with CARD likewise made clear that a diagnosis was required. For example, in 2019, an SSA claims expert emailed CARD stating, "This guy called and said he has NOT been diagnosed with an asbestos-related condition……but said you told him to call us." 3-SER-613. When a CARD staffer responded that the patient was not diagnosed, but had a B-Read noting an abnormality, the SSA's claims expert responded "If a claimant has been diagnosed with one of the impairments on that list, they qualify. So, to us, *either they are diagnosed, or they aren't.*"3-SER-613 (emphasis added).

At bottom, CARD showed "ostrich type ... deliberate ignorance" when it consciously "buried [its] head in the sand and failed to make simple inquiries" to the SSA about the validity of its B-read-only practice. *Godecke v. KineticConcepts, Inc.*, 937 F.3d 1201, 1212 (9th Cir. 2019) (quotation marks omitted). SER###. Checking what Medicare required wouldn't have been hard. All CARD had to do

was send *one email* to SSA. Or read the POMS. But CARD never did this. CARD's "submit first, ask questions never" approach was "knowing" within the meaning of the FCA. This summary judgment evidence raised serious questions of fact about CARD's scienter, which the jury ultimately resolved against CARD.

### b. CARD submitted Medicare claims for patients when it knew these patients did not have asbestos-related disease—or, at a minimum, recklessly disregarded the truth or falsity of these patients' diagnoses.

BNSF also presented evidence that CARD submitted hundreds of other patients for Medicare who did not meet the mandatory criteria for a diagnosis. In some cases, CARD and Dr. Black certified patients for Medicare coverage on EHH forms when *no* outside X-rays or CT scans were obtained. 3-SER-762-63, ¶156. In many other cases, CARD and Dr. Black certified patients for Medicare when outside B-Readers and radiologists examined patients but *found no signs* of asbestos-related disease. 3-SER-762, ¶ 157. Many of these diagnoses relied on Dr. Black's claimed unique ability to "see" "lamellar pleural thickening"—a condition no one else could seem to spot. 3-SER-760-61. All told, CARD submitted Medicare claims for close to 1,000 patients without a corresponding outside read from a radiologist. 3-SER-785-87. Some of these uncorroborated "diagnoses"—with corresponding lifetime Medicare

benefits— involved CARD clinic staff, board members, and family members. 3-SER-763-64.

### c. CARD knowingly prescribed Medicare-funded opioids for patients whom it knew did not need them.

BNSF also presented evidence at summary judgment that CARD prescribed Medicare-funded opioids to patients who didn't need them—and were even harmed by them. Defendants act with the required scienter if they know a treatment is not medically necessary, or act in deliberate ignorance or reckless disregard of whether the treatment was medically necessary. *Winter*, 953 F.3d at 1114.

CARD patients who were enrolled in Medicare had their prescription drugs covered by Medicare. 3-SER-765. Dr. Black and CARD repeatedly prescribed opioids like fentanyl for patients even when *all* outside radiologists and expert peer-review CT readers unanimously found no sign of asbestos-related disease. 3-SER-766, ¶182. CARD failed to keep any documents showing the medical necessity of these prescriptions and, thus, knowingly skirted the Medicare requirements. 3-SER-767; 3-SER-783. Some of these patients—who had no radiological findings indicating asbestos-related disease—received prescription amounts that drastically exceeded the daily morphine milligram equivalent of 50MME's per day—an

amount at which the risk of death by overdose doubles. 3-SER-783. Sadly, at least one patient died after he overdosed from CARD-prescribed opioids.3-SER-767.

At bottom, BNSF presented ample evidence at summary judgment showing CARD acted knowingly.

### 3. The summary judgment evidence showed that CARD's false statements were material.

Finally, the evidence at summary judgment showed that CARD's false claims were "material." Under the FCA, a record or statement in support of a claim is "material" if it has "a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). "[M]ateriality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," i.e., the government. *Escobar*, 136 S.Ct. at 2002. "[P]roof of materiality can include … evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Rose*, 909 F.3d at 1019.

The summary judgment evidence showed that SSA repeatedly told CARD that it would not approve a claim for a patient without an ARD diagnosis. POMS—which was publicly available—made clear that SSA used the EHH checklist "to

obtain medical information from the claimant's medical source regarding the claimant's diagnosis and presence in Lincoln County, Montana." 3-SER-603. SSA's emails to CARD also made clear that the agency relied on would not approve claims for undiagnosed patients. *See* 3-SER-613.

### 4. BNSF brought this action within the FCA's statute of limitations.

CARD also asserts that the district court erred in rejecting its summary judgment argument that BNSF's action was barred by FCA's statute of limitations. This is also a fact-dependent issue, so CARD may not appeal the district court's rejection of its statute of limitations argument at summary judgment. *See United States ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69, 78 (D.D.C. 2003); *see also* 31 U.S.C. §3731(b)(2). And, in any event, the facts here again precluded summary judgment in CARD's favor.

The FCA contains two limitations periods that apply to "a civil action brought under section 3730." 31 U.S.C. § 3731(b); *see also Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1510, 1512 (2019) Under the first period, the action must be brought within six years after the alleged statutory violation occurred. *Id.* § 3731(b)(1). Under the second period, the action must be brought within three years after "when facts material to the right of action are known or reasonably should have been known by the official of the United States

32

charged with responsibility to act in the circumstances," but not more than ten years after the alleged violation occurred. *Id.* § 3731(b)(2). "Whichever period provides the later date serves as the limitations period." *Cochise*, 139 S. Ct. at 1510; *see also* § 3731 (b).

Here, the district court correctly found that the three-year period of §3731(b)(2) applied and began to run—at the earliest—in 2018. ER-229. The district court found that the government knew about the facts "material" to this case in 2018, when the HHS Office of Inspector General opened an investigation into CARD's conduct based on BNSF's *qui tam referral. Id.* BNSF filed this action on March 6, 2019—well before the three-year limitations period expired and within ten years of the earliest violation by CARD. 31 U.S.C. § 3731(b)(2). BNSF's claims are not time-barred. And the district court did not err in so holding.

CARD argued at summary judgment that the three-year began to run in 2015, when HHS OIG began an investigation based on local physicians' complaints that Dr. Black was over-diagnosing. ER-227. But CARD presented no facts showing that the *2015* investigation put the government on notice of the material allegations in *this* case. ER-229. The district court correctly observed that CARD didn't present enough facts to demonstrate that the 2015 complaint to the HHS OIG and subsequent investigation provided "the official of the United States charged with

responsibility to act" with "facts material to the right of action" to start the time clock. ER-228-229.

In conclusion, this Court lacks power under *Dupree* to review the district court's denial of summary judgment on these fact-sensitive issues. But should this Court determine that CARD's summary judgment claims are "purely legal," there was ample evidence precluding summary judgment for CARD as to falsity, scienter, materiality, and the statute of limitations.

### C.  Under *Unitherm*, this Court cannot review the district court's denial of a Rule 50(a) motion that CARD failed to renew in a post-verdict, Rule 50(b) motion.

As a fallback, CARD asks this court to review the district court's denial of its two Rule 50(a) motions for judgment as a matter of law. *See* Aplt. Br. 15-16. But appellate courts cannot review the denial of a Rule 50(a) motion when the party who made that motion does not renew it in a post-verdict, Rule 50(b) motion. *Unitherm Food Sys., Inc. v. Swift-Ekrich, Inc.*, 546 U.S. 394, 401–404 (2006). That is exactly what happened here. CARD filed two *pre-verdict* Rule 50(a) motions below. *See* 1-SER-233-34; 3-SER-789. But it never renewed these motions through a *post-verdict* Rule 50(b) motion. Under *Unitherm*, "a party procedurally defaults a civil appeal based on the alleged insufficiency of the evidence … if it fails to file a post-verdict motion for judgment notwithstanding the verdict" under Rule 50(b). *Nitco*

34

*Holding Corp. v. Boujikian*, 491 F.3d 1086, 1088 (9th Cir. 2007). CARD waived its

challenge to the sufficiency of the evidence because it failed to renew its pre-verdict

Rule 50(a) motion by filing a post-verdict Rule 50(b) motion. *Unitherm.*, 546 U.S. at

401, 404.

## II. The district court properly instructed the jury on the meaning of "diagnosis" in Subparagraph B of the EHH provision.

CARD next takes issue with several of the district court's jury instructions at

trial.[6] CARD first argues that jury instruction No. F-24, which construed the term

"diagnosis" within the meaning of the EHH provision, was erroneous. CARD is

incorrect.

### A. Jury Instruction No. F-24

The meaning of "diagnosis" was a key dispute at trial. CARD had submitted

112 undiagnosed patients for lifetime Medicare solely because a B-Reader had

found some abnormality on these patients' chest x-rays. CARD itself had examined

each of these patients and refused to diagnose them with asbestos-related disease.

And CARD knew that these abnormalities weren't proof of asbestos-related

disease—they could result from things like rib fractures, smoking, and auto-

---

[6] On each of the following jury instruction arguments, CARD challenges only how those instructions impacted the jury's verdict as to the 112 "B-Read only" claims. *See, e.g.*, Aplt.Br.22.

immune disorders. ER-10. But CARD *thought* it found a loophole in the EHH

provision that would allow it to submit undiagnosed patients for EHH Medicare

based solely on a B-Reader's finding of an abnormality on a patient's x-ray. So,

CARD claimed, through a bit of legal alchemy, a B-Reader's finding of such an

abnormality was enough to turn even a healthy patient into a sick one ... at least for

purposes of Medicare.

　　Unfortunately for CARD, the plain text of the EHH provision did not

support CARD's perceived loophole. Only "environmental exposure affected

individual[s]" are eligible for benefits under the EHH provision. 42 U.S.C. § 1395

(a). As relevant here, an "environmental exposure affected individual" is an

individual who (1) "is ***diagnosed*** with 1 or more conditions described in

subparagraph (B)[.]" 42 U.S.C. § 1395rr1(e)(2) (emphasis added).  *Id.*

Subparagraph B, in turn, lists the following conditions for which the individual

must be diagnosed: "Asbestosis, pleural thickening, or pleural plaques as

established by ... interpretation by a 'B-Reader' qualified physician of a plain chest

x-ray or interpretation of a computed tomographic radiograph of the chest by a

qualified physician, as determined by the Secretary[.]" *Id.* § 1395rr-

1(e)(2)(B)(i)(II). The provision does not define "diagnosed" or "diagnosis."

CARD claimed it read this provision to mean that an "interpretation by a 'B-Reader' qualified physician of a plain chest x-ray" was enough, by itself, to constitute a "diagnosis" of asbestos-related disease. And, thus, (CARD's argument went) it was fine to submit lifetime Medicare claims for undiagnosed individuals so long as a B-Reader found something abnormal on their chest x-ray.

But the district court disagreed with how CARD interpreted the statute. It looked to this Court's caselaw, which told it to interpret "diagnosis" according to "its ordinary, contemporary, common meaning," *City of Los Angeles v. Barr*, 941 F.3d 931, 940 (9th Cir. 2019) (citation omitted). What was the "ordinary, contemporary, and common meaning" of "diagnosis" in the asbestos-related disease context? The undisputed trial evidence answered this question. Everyone, including CARD, agreed that a diagnosis of asbestos-related disease must satisfy all three of the ATS criteria: there must be (1) evidence of structural pathology consistent with asbestos-related disease as observed by imaging (chest x-ray or CT scan) or histology; (2) exposure history; and (3) exclusion of alternative plausible causes for the findings. ER-89-90; 1-SER-10-11; 1-SER-82. It was also undisputed that B-Readers cannot establish the latter two criteria, because they do not receive any information about the patient's exposure history, medical history, social history, or even the patient's name—they receive only patients' de-identified chest x-rays

37

and return envelopes. 1-SER-13-14, ¶¶ 41-42. In fact, B-Readers' code of ethics bars

them from diagnosing a patient based solely on an interpretation of a patient's x-ray

or CT scan. 1-SER-13. Based on this, CARD admitted that B-Readers do not

diagnose patients. 1-SER-14.

With all this in mind, the district court concluded that the "common,

ordinary, and contemporary" meaning of the term "diagnosis" required all three

ATS criteria. ER-121-30. The district court also found that a B-Reader

interpretation, while sufficient to satisfy criterion 1, could not satisfy the other two

criteria. *Id.* The district court instructed the jury to this effect in instruction No. F-

24, which read as follows:

> For purposes of the Affordable Care Act, there is no distinction between a
> 'diagnosis' and a 'clinical diagnosis.' A 'diagnosis' is a determination of the
> nature of a disease, injury, or congenital defect from its signs and symptoms.
> A diagnosis under the ACA requires a diagnosis by a qualified physician. An
> abnormality noted on a chest x-ray by a 'B-Reader' qualified physician … is
> not, by itself, a diagnosis. In accordance with the American Thoracic Society
> Guidelines and the ACA, a diagnosis of asbestosis, pleural thickening, or
> pleural plaques requires:
>
> 1. evidence of structural pathology consistent with asbestos related
>    disease as established by:
>    a.  an interpretation of a plain chest x-ray by a 'B-Reader' qualified
>        physician; or
>    b.  interpretation of a computed tomographic radiograph of the chest by
>        a qualified physician;
> 2. evidence of exposure to asbestos; and

      3.  exclusion of other plausible conditions.

The Secretary of the Department of Health and Human Services determines whether a physician is a 'qualified physician' under the ACA."

3-SER-702.

## B. Instruction No. F-24 properly construed the term "diagnosis" within the meaning of the ACA's EHH provision.

CARD argues that instruction No. F-24 misstated the law. This court reviews "the issued instructions as a whole," *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1065 (9th Cir. 2020) to assess if they were "supported by the evidence, fairly and adequately cover the issues presented, correctly state the law, and [were not] misleading." *Peralta v. Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014) (en banc).

"Canons of statutory construction help give meaning to a statute's words." *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1060 (9th Cir. 2003). Several canons show why the district court's interpretation of "diagnosis" in Instruction No. F-24 was the right one.

First, the district court was correct that the EHH provision does not define "diagnosed." So it applied this Court's direct command to give such an undefined term its "ordinary contemporary, common meaning." *City of Los Angeles*, 941 F.3d at 940. It was undisputed at trial that such a diagnosis must meet all three ATS criteria. ER 89-90; 1-SER-10-11. Along with this, the parties agreed at trial that a B-

39

Reader does not diagnose. ER-91-95; 1-SER-12-14. It would be odd indeed to give "diagnose" a meaning that even CARD agreed below it cannot have.

Second, reading the statute CARD's way ignores the contextual relationship between subparagraphs A and B. CARD isolates the phrase "established by" to argue the two methods listed in Subparagraph B by which a condition may be "established" represent methods sufficient for "diagnosing" someone with an asbestos-related disease. But courts must read specific words "with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Subparagraph A says an individual must be "diagnosed" with a condition set out in Subparagraph B. 42 U.S.C. § 13955rr-1(2)(e)(A). Subparagraph B describes (1) what those conditions are; and (2) what the minimum medical evidence can "establish[]" them. 42 U.S.C. §1395rr-1(2)(e)(B) Subparagraph B does not define how those conditions may be "diagnosed." If it did, it would say so.

Third, CARD's argument conflates the phrase "as established by" in subparagraph B with the term "diagnosed" in subparagraph A. But "diagnosed with" and "as established by" are different phrases. And "it is a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for

40

those words." *SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003). The EHH

provision's plain language does not eliminate two of the three universally-accepted

criteria necessary to diagnose asbestos-related disease. Rather, Subparagraph B

provides the minimum medical evidence required to establish the *first criterion*:

evidence of structural pathology consistent with asbestos-related disease.

Fourth, and relatedly, reading "established by" to mean the same thing as

"diagnosed" would render the use of "diagnosed" in subparagraph A superfluous.

*See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011). CARD wants

the Court to interpret "established by" to be redundant of "diagnosed." The

district court's interpretation gave meaning to *both* "diagnosed" and "established

by" by recognizing that Subparagraph A requires a three-part diagnosis and

Subparagraph B provides one *component* of the medical evidence required for such

diagnosis.

Fifth, it would be absurd to construe a provision requiring that someone be

"diagnosed with" certain asbestos-related disease to allow lifetime Medicare

benefits for someone who indisputably does *not* have such a disease. But that

absurd result is precisely what CARD wants—and relied on for years. Congress

enacted the EHH provision to help people in Libby diagnosed with asbestos-related

disease. The district court's interpretation was consistent with that intent. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982).

For all these reasons, the district court correctly interpreted the plain language of the EHH provision and properly instructed the jury on what that provision meant.

### C. This Court should not afford *Chevron* deference to the testimony of one ATSDR employee who did not administer the EHH provision, was not interpreting the provision for the agency, and expressly stated he was not interpreting the statute at trial.

CARD next argues that this Court should give *Chevron* deference to purported agency provisions which (CARD says) override the statute's contemporary meaning.

### 1. *Chevron* does not apply to the unambiguous EHH provision.

First, the EHH provision was not ambiguous, so *Chevron* analysis is not necessary. When a court, "applying the ordinary tools of statutory construction" determines that Congress's intent is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *City of Arlington v. F.C.C.*, 569 U.S. 290, 296 (2013). CARD presumes that the EHH provision is ambiguous because "diagnosed" is not defined. But this is untrue. That the EHH provision has undefined terms does not

make it ambiguous. In *The Wilderness Society v. U.S. Fish & Wildlife Service*, this Court declined to give *Chevron* deference to an agency's interpretation of the undefined statutory terms "commercial enterprise" and "within." 353 F.3d 1051, 1061–62 (9th Cir. 2003). Looking to dictionary definitions, the statute's purpose, and the statute's structure, the Court gave those terms their "ordinary, contemporary, common meaning," concluded that Congress's intent was clear, and declined to give USFW's interpretation *Chevron* deference. *Id.* at 1060–62. So too here: The EHH provision's use of "diagnose" is not ambiguous merely because it is undefined. As explained, the normal tools of statutory construction show that the meaning of "diagnosed" is clear.

> **2. Even if the EHH provision is ambiguous, the Court should not give *Chevron* to the three purported interpretations CARD identifies.**

Even if the statute is viewed as ambiguous, *Chevron* deference does not automatically follow. CARD identifies three purported agency interpretations of the relevant EHH provision to which, it claims, this Court should afford *Chevron* deference: (1) the language in a grant notice; (2) an ATSDR employee's personal interpretation of the EHH provision; and (3) the EHH checklist used by SSA.

### a. The Notice of Funding Opportunity language supports the district court's interpretation of the EHH provision.

First, CARD asks this Court to give *Chevron* deference to a Notice of Funding Opportunity (NOFO) for a grant program for an Early Detection Screening Program administered by the ATSDR. Aplt Br. 29–30. The NOFO states, in relevant part, that "Persons with positive screening results may be eligible for Medicare benefits" and later states that "The screening candidate will be deemed positive if one of the following conditions is present: i. Asbestosis, pleural thickening, or pleural plaques as established by 1. Interpretation by a single 'B-Reader' qualified physician of a plain chest x-ray or 2. Interpretation of a computed tomography of the chest by a qualified physician." ER-34. CARD contends that the NOFO's language supports its interpretation of the EHH provision and is entitled to *Chevron* deference. Aplt. Br. 29-31. But the NOFO is *consistent* with how the district court interpreted the EHH provision. It states that someone with a "positive screening result" "*may be eligible* for Medicare benefits." ER-31 (emphasis added). This is perfectly consistent with jury instruction No. F-24. As noted, the district court interpreted the term "diagnose" to require "1. evidence of structural pathology consistent with asbestos related disease as established by a. an interpretation of a plain chest x-ray by a 'B-Reader'; or b. interpretation of a

44

computed tomographic radiograph of the chest by a qualified physician; 2. Evidence of exposure to asbestos; and 3. Exclusion of other plausible conditions." 3-SER-702 (jury instruction No. F-24). In other words, someone with indicia of asbestos-related disease—as established by a B-Reader interpretation—*may* eligible for Medicare, provided the other two ATS criteria are satisfied. The NOFO said the same: someone with a positive screening result "*may be*" eligible for Medicare. ER-31.

### b. Ted Larson's view of the EHH provision's meaning should not receive *Chevron* deference.

CARD primarily relies on the trial testimony of the ATSDR screening program's administrator, Ted Larson. Mr. Larson shares CARD's view of the EHH provision. Larson expanded beyond what the NOFO said, testifying that "either a diagnosis by CARD or a B-reader's positive interpretation" not only could, but "*would* qualify a person for Medicare benefits[.]" ER-158–59 (emphasis added). This opinion is not entitled to *Chevron* deference.

"*Chevron* deference … is not accorded merely because the statute is ambiguous and an administrative official is involved." *Gonzales*, 546 U.S. at 258. Courts give *Chevron* deference only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that

the agency interpretation claiming deference was promulgated in the exercise of that authority." *Id.* at 255 (2006) (quotation omitted). For several reasons, Larson's individual opinion was not promulgated under Congressionally delegated authority and is therefore not entitled to *Chevron* deference.

To start, the ATSDR is responsible for overseeing a separate program from the EHH Medicare program at issue in this case. The ACA's EHH provision creates two basic programs: one for screening, the other for Medicare benefits. Larson's agency, ATSDR, is responsible for the *screening* component. 1-SER-92-94. But Social Security is tasked with administering the Medicare benefits side of the EHH provisions. 1-SER-262. And, consistent with the EHH provision's plain language, the SSA made clear that someone must be diagnosed to receive Medicare. *See* 3-SER-600, 603; 1-SER-281-88; 2-SER-300-302; 3-SER-311-12; 3-SER-659-63. Indeed, the SSA believes that a medical provider commits "fraud" if he knowingly certifies an undiagnosed patient as eligible for EHH Medicare. 1-SER-287-88; 2-SER-310-11.

Beyond this, Larson was not offering an official agency interpretation of the ACA's EHH provision. Larson made clear in his testimony that he was not testifying at trial "to provide legal interpretations of what the Affordable Care Act says." 1-SER-96-97.

46

Moreover, Larson's personal interpretation is not a formal rule promulgated through notice and comment. *Cf. Mead*, 533 U.S. at 230–31 (the "overwhelming number of" *Chevron* cases involve deference to rules promulgated through "notice-and-comment rulemaking or formal adjudication."). Nor is it an interpretive rule, a formal statement from HHS, or an opinion letter. *Cf. Fournier v. Sebelius*, 718 F.3d 1110, 1121–22 (9th Cir. 2013). Nor was it formed after "careful consideration" by the agency. *Id.* at 1120-21. Larson's ad hoc opinion was even less formal than "interpretation[s] contained in policy statements, agency manuals, and enforcement guidelines" which lack the force of law and "do not warrant *Chevron*-style deference." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000). By all appearances, Larson arrived at this opinion on his own. But *Chevron* deference does not kick in merely because an "administrative official is involved." *Gonzales*, 546 U.S. at 258.

And, Larson was not qualified to determine what constitutes a diagnosis of asbestos-related disease. Courts "presume that Congress intended to invest interpretive power in the administrative actor in the best position to develop these attributes." *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. at, 153 (1991) (citations omitted). Larson is not a doctor and never diagnosed a patient in his career. 1-SER-87-88. Nothing in the EHH's text suggests that Congress

47

intended "to cede medical judgments" about what constitutes an asbestos-related disease diagnosis to an administrative employee "who lacks medical expertise." *Gonzales*, 546 U.S. at 921.

Larson's personal opinion, which was contrary to the SSA's, was not an exercise of rulemaking power through Congressionally delegated authority. It was just his opinion. Thus, it is not entitled to *Chevron* deference.[7]

### c. The EHH Checklist is consistent with the district court's interpretation of the EHH provision.

Third, CARD notes the EHH Checklist form indicates that "Interpretation by a B-Reader qualified physician of a plain chest x-ray" is listed as one form of the "Minimum Medical Evidence" for a diagnosis of an asbestos-related condition. CARD argues that the Checklist's mention of a B-Reader interpretation as the "Minimum Medical Evidence" for supporting a diagnosis bolsters its view that a B-Reader interpretation by itself is a "diagnosis." But this is incorrect. The SSA, not HHS, oversees, and interprets the EHH Checklist. 1-SER-266-67; 3-SER-600. SSA's 30(b)(6) deponent made clear that "while the minimum medical evidence required" on the EHH Checklist "is that there is a scan read by a B-Reader or a

---

[7] CARD does not argue that this Court should accord *Skidmore* deference to Larson's opinion.

qualified CT-reading physician … *it's not the scan itself that is the diagnosis of asbestos-related diseas*e. The scan can be the *basis* for a diagnosis made by the provider when it comes to the EHH form." 1-SER-273 (emphasis added). CARD knew that a B-Reader's interpretation is not a diagnosis. And the SSA made clear that a provider who submits a Medicare claim for an undiagnosed patient is committing "fraud." 1-SER-287-88. This position tracks how the court interpreted the EHH provision in Instruction No. F-24.

At bottom, none of the purported "agency interpretations" CARD identifies changes the plain meaning of "diagnose" under the EHH provision.

### D. If Instruction No. F-24 was erroneous, it was harmless.

Finally, even if this Court concludes that Instruction F-24 was erroneous, the instruction was harmless. BNSF presented evidence of over 1,000 claims of fraud to the jury. 1-SER-76. The jury returned a verdict finding CARD liable for 337 for those claims. Yet CARD challenges only the 112 "B-Reader only" claims. Aplt. Br. 6. CARD "believes the jury verdict on appeal" arises from this class. *See* Aplt. Br. 6. But the jury's verdict form did not specify what claims comprised its verdict. And CARD makes no attempt—other than its *ipse dixit*—to prove that the 112 "B-Read only" claims were included in the 337 claims the jury found.

Moreover, the district court properly instructed the jury on the elements of an FCA claim and the controlling caselaw. *See infra* § III.B. During closing argument, CARD mightily tried to convince the jury that its view of the EHH provision was correct, or at least honestly held. 1-SER-44-45. But the jury was free to weigh the credibility of CARD's claim. If the jury's verdict included the 112 B-Read-only patients, this would show that the jury considered and rejected CARD's arguments—not that the Court precluded the jury from considering those arguments. This court will not "reverse the judgment if the alleged error in the jury instructions is harmless." *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1087 (9th Cir. 2005) (citation omitted).

## III. Instruction No. F-23 properly applied the FCA's definition of "false claim" to the EHH Provision. And it was certainly not a plain error.

CARD next argues that jury instruction No. F-23 compelled the jury to find that CARD acted with scienter as to the B-read-only class. *See* Aplt. Br. 42–45. But CARD did not properly object to this instruction, so this Court reviews only for plain error. And issuing Instruction No. F-23 was not error, let alone plain error.

"[T]o preserve objections against jury instructions, a party must state distinctly the matter objected to and the grounds of the objection." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir. 2003) (cleaned up); *see also* Fed. R. Civ.

P. 51(c)(1). CARD failed to preserve its objection to Instruction F-23. On appeal, CARD contends that Instruction. No. F-23 compelled the jury to find CARD liable without considering its scienter. But CARD did not raise this argument below, much less state it "distinctly." *See* ER-120-121 (CARD's sole objection to Instruction No. F-23). Thus, this Court reviews only for plain error. *C.B. v. City of Sonora*, 769 F.3d 1005, 1016–17 (9th Cir. 2014); Fed. R. Civ. P. 51(d)(2).

Plain error exists when (1) there was an error; (2) the alleged error was obvious; and (3) the alleged error affected substantial rights. *C.B.*, 769 F.3d at 1017–18. And "in the civil context, … plain error should encompass only those errors that reach the pinnacle of fault envisioned" by the plain error standard. *C.B.*, 769 F.3d at 1018 (cleaned up). CARD hasn't come close to clearing this high bar.

Instruction F-23 read as follows:

> To be eligible for Medicare as an Environmental Exposure Affected Individual, a person must satisfy both of the following requirements:
>
> 1. be diagnosed with one or more of the following impairments:
>    A. Asbestosis;
>    B. pleural thickening;
>    C. pleural plaques;
>    D. Mesothelioma; or
>    E. Malignancies of the lung, colon, rectum, larynx, stomach, esophagus, pharynx, or ovary;
>       AND

> 2. Demonstrate presence in Lincoln County Montana, for a total of at least 6 months during a period ending not less than 10 years prior to his or her diagnosis.
>
> Certification of a person as eligible for Medicare coverage under the Environmental Health Hazard provision of the Affordable Care Act for a person who does not satisfy these requirements is a false claim.

3-SER-701.

This instruction properly stated the law on what constitutes a false claim in the context of the EHH provision. Certifying a patient as Medicare-eligible is a "claim" under the FCA. *See Univ. Health Servs., Inc. v. United States*, 579 U.S. 176, 182 (2016). And falsity, under the FCA, includes both "representations by omission" and "express falsehoods." *See id.* at 186–87. Certifying someone as Medicare-eligible who did not meet the EHH provision's eligibility criteria is, thus, a false claim.

CARD argues that instruction No. F-23 commanded the jury to find that CARD acted "knowingly" as to the B-Reader only class of patients. *See* Aplt. Br. 42–43. This argument conflates the FCA's requirements of falsity and scienter. Falsity "is a necessary, but not sufficient, requirement for FCA liability—after alleging a false statement, a plaintiff must still establish scienter." *Winter*, 953 F.3d at 1118 F-23 was an instruction on falsity—certifying a person for Medicare who *did not* meet the provision's requirements for eligibility was a "false claim." By

instructing the jury on what a "false claim" was, the district court wasn't saying anything about whether that false claim was made with scienter.

Moreover, this Court reviews jury "instructions as a whole" and avoids "looking at any one jury instruction in isolation." *Swinton v. Potomac Corp.*, 270 F.3d 794, 807 (9th Cir. 2001) (citation and internal quotation marks omitted). And the entire body of jury instructions makes plain that No. F-23 did not compel the jury to find CARD acted "knowingly." The district court instructed the jury that CARD was liable only if BNSF had proven each of the required FCA elements of FCA, including scienter. 3-SER-691 (Instruction No. F-14). The district court then thoroughly instructed the jury on the ways scienter may be shown under the FCA, pulling language directly from controlling precedent. *Compare* 3-SER-697 (instruction No. F-20) *with United States v. Corinthian Colleges*, 655 F.3d 984, 996 (9th Cir. 2011); *compare* 3-SER-695 (Instruction No. F-18); *with Winter*, 953 F.3d at 1117–18 *compare* 3-SER-696 (Instruction No. F-19); with *Winter*, 953 F.3d at 1116-19. Read as a whole, the jury instructions foreclose CARD's assertion that the jury was required to presume that CARD acted with the requisite scienter. During closing argument, CARD argued at length that it did not act knowingly and relied on the district court's jury instructions while doing so. *See generally* 1-SER-44-45. Nothing in Instruction No. F-23 affected CARD's substantial rights and caused a

miscarriage of justice. *C.B.*, 769 F.3d at 1017–19. No. F-23 was not error, much less plain error.

To its F-23 challenge, CARD also ties in its beef with Instruction No. F-24. It claims F-24—which instructed the jury that a B-Reader's finding "is not, by itself, a diagnosis"—coupled with F-23, ordered the jury to find that CARD committed *per se* FCA violations as to the B-Reader-only class. That is wrong. As explained above, Instruction No. F-24 properly interpreted the meaning of "diagnosis" under the EHH provision. And it is false to claim that someone is diagnosed when, in fact, they are not. A statute "is ultimately the subject of judicial interpretation, and it is [defendant's] compliance" with the statute, "as interpreted by [the] court, that determines whether [defendant's] practices resulted in the submission of a 'false claim.'" *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 463 (9th Cir. 1999). And while CARD argues that it made these untrue certifications based on a "good faith" interpretation of the ACA, that's a *scienter* argument—not an argument about *falsity*. *See, e.g.*, *Winter*, 953 F.3d at 1118; *Oliver*, 195 F.3d at 464.

Instruction No. F-23 was a proper statement of the FCA's falsity requirements, not an obvious error at the "pinnacle of fault." *C.B.*, 769 F.3d at 1018.

IV.   **The district court's other challenged instructions and evidentiary rulings were supported by the law and fully allowed CARD to present its scienter arguments to the jury.**[8]

CARD also presses several arguments about rulings by the district court that, according to CARD, restricted the jury's ability to consider CARD's scienter.

CARD first argues that the district court's instructions precluded the jury from considering CARD's subjective beliefs about the truth or falsity of its B-Reader-only claims. Then, CARD takes issue with a jury instruction telling the jury CARD could not rely on the conduct of government agents contrary to law. Finally, CARD claims the district court erred by excluding the testimony of Senator Max Baucus. Each of these claims fails.

A.   **The jury instructions did not prevent the jury from considering CARD's subjective beliefs about whether its claims were false.**

"The FCA's scienter element refers" to a defendant's "knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749 (2023). CARD's central argument boils down to a claim that it interpreted the EHH provision—"in good faith"—to allow someone to receive Medicare even if they

---

[8] As with Issues II and III, CARD challenges the effect of these instructions and rulings only as to the 112 B-Read-only patients.

didn't have a diagnosis of asbestos-related disease. Perhaps that interpretation was wrong (the argument goes), but CARD was trying its best.

But much evidence showed CARD was not trying its best—or trying at all. As explained, CARD submitted claims for undiagnosed "B-Read-only" patients for over a decade. CARD first said the SSA taught it to do this, but later admitted this wasn't true. Then CARD said that it decided on this practice after it interpreted the language of the EHH provision—without the advice of a lawyer—to allow benefits for an undiagnosed patient if a B-Reader found some abnormality on that patient's x-ray or CT scan. *See Renal Care Grp.*, 696 F.3d at 531 (seeking the advice of legal counsel on Medicare requirements can show that an FCA defendant acted without scienter). But CARD never asked the SSA if this interpretation was correct. And when the SSA finally was asked to opine on this practice, it stated that it was "fraud."

CARD cites *Oliver*, 195 F.3d at 464, for its argument that a good faith, honestly held interpretation of a statute undermines its liability. CARD misses the point this Court made in *Oliver*. First, the Court noted that even a "reasonable interpretation" of a statute does not preclude finding that it is a false claim. Determining a statutory requirement's meaning and whether a defendant's act could be a false claim "is ultimately the subject of judicial interpretation." *Id.* at

463-64. That is precisely what the district court did here, interpreting the EHH provision to, reasonably, conclude that lifetime Medicare benefits for an asbestos-related disease required a *diagnosis* of an asbestos-related disease. ER-121-30.

Second, *Oliver* recognized that while good faith interpretations and "innocent mistakes and negligence are not offenses under the Act," a defendant also cannot act in deliberate ignorance or reckless disregard of the truth by failing to inquire or burying his head in the sand. *Id.* 464-65 (quotation omitted). In *Oliver*, as here, there was evidence that's precisely what the defendant did. And this Court concluded whether the defendants acted knowingly, or "in good faith," was an issue for the jury to determine. *Id.* at 464. Here, the district court instructed the jury precisely in line with *Oliver*. *See* ER-99 ("Innocent mistakes, mere negligent misrepresentations, and differences in interpretations will not suffice to create liability. A defendant who relies on a good faith interpretation of a regulation is not subject to liability under the Act, even if that interpretation is objectively unreasonable."). The jury just didn't buy CARD's claim that it was acting in good faith.

Citing *Supervalu*, CARD also says that it couldn't have known that a B-Reader's interpretation wasn't sufficient for a diagnosis—and, thus, that its B-Reader-only claims were false—before the district court interpreted the EHH

provision in this lawsuit. Aplt. Br. 47-48. But *SuperValu* precludes CARD's argument that a party working with uninterpreted statutory language can never knowingly submit false claims.

In *SuperValu*, a *qui tam* relator sued pharmacies for allegedly lying about their "usual and customary prices" when submitting Medicare claims. 598 U.S. at 743–46. The pharmacies sold to customers at a steep discount, submitted Medicare reimbursement claims at the regular price, and pocketed the difference. *Id.* at 745–46. Like CARD, the *SuperValu* defendants argued they were not liable because they "could not have known what the phrase 'usual and customary' actually meant" and, at worst, took a reasonable guess. *Id.* at 753. But the Supreme Court rejected the pharmacies' efforts to hide behind purported uncertainty about the meaning of the terms "usual and customary." While these "terms, in isolation, may have been somewhat ambiguous, that ambiguity d[id] not preclude respondents from having learned their correct meaning—or, at least, becoming aware of a substantial likelihood of the terms' correct meaning." *Id.* at 753.

So too here. While CARD now claims that it did not have the value of the district court's interpretation of the EHH provision, CARD knew enough when it submitted the claims. CARD physicians certified that the B-Read only patients had a "diagnosis" of certain asbestos-related disease. But CARD (1) knew that B-

58

Readers do not diagnose; (2) knew that the B-Read only patients were not
diagnosed with asbestos-related disease; and (3) submitted claims that nevertheless
stated that the patients were, in fact, diagnosed with asbestos-related disease. ER-
91-95; 1-SER-11-19; 1-SER-109-25; 2-SER-377-78; *see Winter*, 953 F.3d at 1117.
("Opinions are not, and have never been, completely insulated from scrutiny.")
(cleaned up). So, like the *SuperValu* defendants, CARD knew more than enough to
be aware that its claims were false—or at least to be aware "of an unjustifiably high
risk" that its claims were false. *Id.* at 754. Yet while CARD was "aware of a
substantial risk that [its] statements [were] false," it "intentionally avoid[ed] taking
steps to confirm" the "truth or falsity" of its B-Read-only claims. *SuperValu*, 598
U.S. at 751. The mere act of submitting Medicare claims for undiagnosed patients
should have led CARD to check with the SSA. But CARD never did. S*ee* 2-SER-
439.

Moreover, CARD cannot duck behind the mere fact that it was interpreting a
statute. *SuperValu* held that "statements involving some legal analysis remain
actionable if they carry with them by implication an assertion about facts that justify
the speaker's statement." 598 U.S. at 756 (cleaned up).  CARD's statements were
like this: CARD falsely said it was "diagnosing" a patient based on its view of the
EHH provision. CARD knew at least enough to be "aware of a substantial risk"

59

that its "statements"—and their undergirding legal interpretations—"were false," but "intentionally avoid[ed] taking steps to confirm" their "truth or falsity." *Id.* at 751. Under *SuperValu*, CARD cannot use its "opinions" as a get-out-of-jail-free card.

**B. Instruction F-20 properly stated controlling Supreme Court and Ninth Circuit precedent and did not prevent the jury from considering CARD's scienter arguments.**

CARD also argues instruction F-20 was erroneous. Instruction F-20 told the jury, "In evaluating a defendant's knowledge, you may consider that parties who seek public funds are expected to know the law and may not rely on the conduct of Government agents contrary to law." ER-100.

Jury instructions must accurately reflect the law. *Led Zeppelin*, 952 F.3d at 1065. F-20 accurately recited the Supreme Court's holding in *Heckler* that "[p]rotection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law" and "those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law." 467 U.S. at 63; *accord United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416 (9th Cir. 1991) (quoting *Heckler*, 467 U.S. at 63).

CARD also contends that F-20 precluded the jury from considering how reliance on various government actors could have impacted its scienter. But, as noted above, *supra* § III, the district court properly instructed the jury on the FCA's scienter requirements. Following these instructions, the jury was free to make credibility determinations about whether CARD's B-read-only practice was "honestly held." And there were good reasons for the jury to conclude that CARD acted knowingly.

CARD never asked the SSA—the government actor to whom it submitted Medicare claims for years—for input on its B-Read-only practice. CARD instead adopted a practice of "ostrich type ... deliberate ignorance" in which CARD consciously "buried [its] head in the sand and failed to make simple inquiries." *Godecke v. KineticConcepts, Inc.*, 937 F.3d 1201, 1212 (9th Cir. 2019) (quotation marks omitted). When SSA finally learned about CARD's practice, it said that practice was "fraud." 1-SER-287-88; 2-SER-310-11.

CARD points out that, on some of the EHH checklists, it wrote "only" in ink next to the box that stated the "minimum medical evidence" for the diagnosis was a B-Reader's interpretation. CARD insists that writing "only" on the EHH checklist was a "manifestly candid" way of obtaining the SSA's imprimatur on its submission of checklists for undiagnosed patients. Aplt.Br.52. But CARD concedes

61

that on each of these forms, it also certified that it had *diagnosed* the patient. *See* Aplt. Br. 52. And the EHH checklist—like the statute—clearly required a physician-certified "diagnosis." ER-16. CARD knew that B-Read-only patients had no such diagnosis. CARD never told the SSA that, by writing "only" on the checklist, CARD really meant that the certification of a patient's diagnosis on the EHH checklist was untrue. The SSA could easily have thought that "only" meant that the B-Reader's interpretation was the "only" minimum medical evidence showing a diagnosis.

At bottom, as this Court held in *Oliver*, whether CARD acted "knowingly" was a question for the jury. 195 F.3d at 464. CARD tried to tell a story at trial about its "honestly held beliefs." The jury simply didn't buy it.

## C. The district court properly excluded the testimony of Senator Max Baucus.

CARD also claims the district court erred in excluding the testimony of former Senator and ambassador Max Baucus. Senator Baucus sponsored the EHH provision and was to testify about his intent in doing so. Notably, during his first deposition, Senator Baucus agreed that the EHH provision requires a person to have a diagnosis of asbestos-related disease to qualify for Medicare. ER-104. But he changed his tune during his trial perpetuation deposition and claimed—just like

CARD—that a diagnosis was *not* required if a B-Reader found an abnormality on a patient's x-ray. Senator Baucus reached this second opinion despite testifying that he did not know what a "B-Reader" was or how EHH Medicare claims were diagnosed, documented, or processed. ER-104-105.

The district court excluded Senator Baucus's testimony before trial. ER-105–06. The court reasoned that Senator Baucus's opinions were "incorrect, confusing; and, most importantly, invade[d] the province of the Court to determine as a matter of law what constitutes a diagnosis in this case." ER-105. The Senator's testimony also carried a high risk of unfairly prejudicing the jury "because of who he is—a congressman, a senator, a former ambassador[.]" ER-106. CARD argues that this ruling exceeded the district court's latitude, and even rose to the level of a due process violation. Nonsense.

Federal Rule of Evidence 403 gives courts discretion to exclude otherwise relevant evidence "if its probative value is substantially outweighed by a danger of … unfair prejudice, consuming the issues, [or] misleading the jury." District courts have "wide discretion" to determine the admissibility of evidence, and "[t]his is particularly true with respect to Rule 403 since it requires an on-the-spot balancing of probative value and prejudice." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) (cleaned up).

63

Here, the district court properly exercised its wide discretion. Senator Baucus's various opinions on the meaning of the EHH provision were neither relevant or helpful to the jury. CARD wanted the Senator to testify about what the EHH provision meant. But "instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (citation and internal quotation marks omitted). And while CARD claims that Senator Baucus subtly blessed its no-diagnosis-needed interpretation of the ACA, Senator Baucus testified to no such thing. Senator Baucus testified (the second time, at least) this was *his personal* view of the statute, but he never testified that he communicated this opinion to CARD. *See* 2-582-83; ER-177-178. Senator Baucus also admitted he was not a doctor, did not know what B-readers did, and lacked any knowledge about CARD's diagnostic and claims submission practices. *See* 2-SER-591-97. The district court appropriately exercised its discretion in excluding this irrelevant, confusing, and unfairly prejudicial testimony.

## CONCLUSION

For these reasons, this Court should affirm the district court's denial of summary judgment and affirm the jury's well-supported verdict.

*/s/ Dale Schowengerdt*

64

Dale Schowengerdt
LANDMARK LAW PLLC
7 West 6th Ave., Ste. 518
Helena, Montana 59601
T: 406-457-5496
dale@landmarklawpllc.com

W. Adam Duerk
Seamus Molloy
MCFARLAN MOLLOY & DUERK
283 W. Front Street, Ste. 203
Missoula, Montana 59802
T: 406-546-0881
duerk@missoulalawyers.com

Chad M. Knight
Anthony M. Nicastro
KNIGHT NICASTRO MACKAY
1401 Walnut St., Ste. 200
Boulder, Colorado 80302
T: 303-815-5869
knight@knightnicastro.com

Anthony M. Nicastro
KNIGHT NICASTRO MACKAY
27 Shiloh Rd., Ste. 10
Billings, MT 59106
T: 406-545-2031
nicastro@knightnicastro.com

*Counsel for Appellee BNSF Railway Company*

# CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)**     23-35507

 

     I am the attorney or self-represented party.

     **This brief contains**     **13,596**     **words,** including     0     words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

     I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

     [ ] it is a joint brief submitted by separately represented parties.

     [ ] a party or parties are filing a single brief in response to multiple briefs.

     [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

 

**Signature**   *Dale Schowengerdt*                    **Date**   3/29/24

*(use "*s/[typed name]*" to sign electronically-filed documents)*

ADDENDUM

| Statute | Page |
|---|---|
| 31 U.S.C. § 3729, False Claims Act | 69 |
| 31 U.S.C. § 3731, False Claims Procedure | 73 |
| 42 U.S.C. § 1395rr-l, Medicare Coverage for Individuals Exposed to Environmental Health Hazards | 75 |

31 U.S.C. § 3729

False claims

**(a) Liability for certain acts.--**

**(1) In general.**--Subject to paragraph (2), any person who--

**(A)** knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

**(B)** knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

**(C)** conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

**(D)** has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

**(E)** is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

**(F)** knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

**(G)** knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410[1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

**(2) Reduced damages.**--If the court finds that--

**(A)** the person committing the violation of this subsection furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information;

**(B)** such person fully cooperated with any Government investigation of such violation; and

**(C)** at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation,

the court may assess not less than 2 times the amount of damages which the Government sustains because of the act of that person.

**(3) Costs of civil actions.**--A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

**(b) Definitions.**--For purposes of this section--

**(1)** the terms "knowing" and "knowingly" --

**(A)** mean that a person, with respect to information--

**(i)** has actual knowledge of the information;

**(ii)** acts in deliberate ignorance of the truth or falsity of the information; or

**(iii)** acts in reckless disregard of the truth or falsity of the information; and

**(B)** require no proof of specific intent to defraud;

**(2)** the term "claim"--

**(A)** means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

**(i)** is presented to an officer, employee, or agent of the United States; or

**(ii)** is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government′s behalf or to advance a Government program or interest, and if the United States Government--

**(I)** provides or has provided any portion of the money or property requested or demanded; or

**(II)** will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

**(B)** does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual′s use of the money or property;

**(3)** the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

**(4)** the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

70

**(c) Exemption from disclosure.**--Any information furnished pursuant to subsection (a)(2) shall be exempt from disclosure under section 552 of title 5.

**(d) Exclusion.**--This section does not apply to claims, records, or statements made under the Internal Revenue Code of 1986.

31 U.S.C. § 3731

False claims procedure

**(a)** A subpena requiring the attendance of a witness at a trial or hearing conducted under section 3730 of this title may be served at any place in the United States.

**(b)** A civil action under section 3730 may not be brought--

**(1)** more than 6 years after the date on which the violation of section 3729 is committed, or

**(2)** more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,

whichever occurs last.

**(c)** If the Government elects to intervene and proceed with an action brought under 3730(b),[1] the Government may file its own complaint or amend the complaint of a person who has brought an action under section 3730(b) to clarify or add detail to the claims in which the Government is intervening and to add any additional claims with respect to which the Government contends it is entitled to relief. For statute of limitations purposes, any such Government pleading shall relate back to the filing date of the complaint of the person who originally brought the action, to the extent that the claim of the Government arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint of that person.

**(d)** In any action brought under section 3730, the United States shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence.

**(e)** Notwithstanding any other provision of law, the Federal Rules of Criminal Procedure, or the Federal Rules of Evidence, a final judgment rendered in favor of the United States in any criminal proceeding charging fraud or false statements, whether upon a verdict after trial or upon a plea of guilty or nolo contendere, shall estop the defendant from denying the essential elements of the offense in any action which involves the same transaction as in the criminal proceeding and which is brought under subsection (a) or (b) of section 3730.

42 U.S.C. § 1395rr-1

Medicare coverage for individuals exposed to environmental health hazards

Effective: March 23, 2010

**(a) Deeming of individuals as eligible for medicare benefits**

**(1) In general**

For purposes of eligibility for benefits under this subchapter, an individual determined under subsection (c) to be an environmental exposure affected individual described in subsection (e)(2) shall be deemed to meet the conditions specified in section 426(a) of this title.

**(2) Discretionary deeming**

For purposes of eligibility for benefits under this subchapter, the Secretary may deem an individual determined under subsection (c) to be an environmental exposure affected individual described in subsection (e)(3) to meet the conditions specified in section 426(a) of this title.

**(3) Effective date of coverage**

An Individual[1] who is deemed eligible for benefits under this subchapter under paragraph (1) or (2) shall be--

**(A)** entitled to benefits under the program under Part[1] A as of the date of such deeming; and

**(B)** eligible to enroll in the program under Part[1] B beginning with the month in which such deeming occurs.

**(b) Pilot program for care of certain individuals residing in emergency declaration areas**

**(1) Program; purpose**

**(A) Primary pilot program**

The Secretary shall establish a pilot program in accordance with this subsection to provide innovative approaches to furnishing comprehensive, coordinated, and cost-effective care under this subchapter to individuals described in paragraph (2)(A).

**(B) Optional pilot programs**

The Secretary may establish a separate pilot program, in accordance with this subsection, with respect to each geographic area subject to an emergency declaration (other than the declaration of June 17, 2009), in order to furnish such comprehensive, coordinated and cost-effective care to individuals described in subparagraph (2)(B) who reside in each such area.

**(2) Individual described**

For purposes of paragraph (1), an individual described in this paragraph is an individual who enrolls in part B, submits to the Secretary an application to participate in the applicable pilot program under this subsection, and--

**(A)** is an environmental exposure affected individual described in subsection (e)(2) who resides in or around the geographic area subject to an emergency declaration made as of June 17, 2009; or

**(B)** is an environmental exposure affected individual described in subsection (e)(3) who--

**(i)** is deemed under subsection (a)(2); and

**(ii)** meets such other criteria or conditions for participation in a pilot program under paragraph (1)(B) as the Secretary specifies.

**(3) Flexible benefits and services**

A pilot program under this subsection may provide for the furnishing of benefits, items, or services not otherwise covered or authorized under this subchapter, if the

75

Secretary determines that furnishing such benefits, items, or services will further the purposes of such pilot program (as described in paragraph (1)).

**(4) Innovative reimbursement methodologies**

For purposes of the pilot program under this subsection, the Secretary--

**(A)** shall develop and implement appropriate methodologies to reimburse providers for furnishing benefits, items, or services for which payment is not otherwise covered or authorized under this subchapter, if such benefits, items, or services are furnished pursuant to paragraph (3); and

**(B)** may develop and implement innovative approaches to reimbursing providers for any benefits, items, or services furnished under this subsection.

**(5) Limitation**

Consistent with section 1395y(b) of this title, no payment shall be made under the pilot program under this subsection with respect to benefits, items, or services furnished to an environmental exposure affected individual (as defined in subsection (e)) to the extent that such individual is eligible to receive such benefits, items, or services through any other public or private benefits plan or legal agreement.

**(6) Waiver authority**

The Secretary may waive such provisions of this subchapter and subchapter XI as are necessary to carry out pilot programs under this subsection.

**(7) Funding**

For purposes of carrying out pilot programs under this subsection, the Secretary shall provide for the transfer, from the Federal Hospital Insurance Trust Fund under section 1395i of this title and the Federal Supplementary Medical Insurance Trust Fund under section 1395t of this title, in such proportion as the Secretary determines appropriate, of such sums as the Secretary determines necessary, to the Centers for Medicare & Medicaid Services Program Management Account.

76

**(8) Waiver of budget neutrality**

The Secretary shall not require that pilot programs under this subsection be budget neutral with respect to expenditures under this subchapter.

## (c) Determinations

**(1) By the Commissioner of Social Security**

For purposes of this section, the Commissioner of Social Security, in consultation with the Secretary, and using the cost allocation method prescribed in section 401(g) of this title, shall determine whether individuals are environmental exposure affected individuals.

**(2) By the Secretary**

The Secretary shall determine eligibility for pilot programs under subsection (b).

## (d) Emergency declaration defined

For purposes of this section, the term "emergency declaration" means a declaration of a public health emergency under section 9604(a) of this title.

## (e) Environmental exposure affected individual defined

**(1) In general**

For purposes of this section, the term "environmental exposure affected individual" means--

  **(A)** an individual described in paragraph (2); and

  **(B)** an individual described in paragraph (3).

**(2) Individual described**

**(A) In general**

An individual described in this paragraph is any individual who--

   **(i)** is diagnosed with 1 or more conditions described in subparagraph (B);

   **(ii)** as demonstrated in such manner as the Secretary determines appropriate, has been present for an aggregate total of 6 months in the geographic area subject to an emergency declaration specified in subsection (b)(2)(A), during a period ending--

      **(I)** not less than 10 years prior to such diagnosis; and

      **(II)** prior to the implementation of all the remedial and removal actions specified in the Record of Decision for Operating Unit 4 and the Record of Decision for Operating Unit 7;

   **(iii)** files an application for benefits under this subchapter (or has an application filed on behalf of the individual), including pursuant to this section; and

   **(iv)** is determined under this section to meet the criteria in this subparagraph.

**(B) Conditions described**

For purposes of subparagraph (A), the following conditions are described in this subparagraph:

   **(i)** Asbestosis, pleural thickening, or pleural plaques as established by--

      **(I)** interpretation by a "B Reader" qualified physician of a plain chest x-ray or interpretation of a computed tomographic radiograph of the chest by a qualified physician, as determined by the Secretary; or

      **(II)** such other diagnostic standards as the Secretary specifies,

except that this clause shall not apply to pleural thickening or pleural plaques unless there are symptoms or conditions requiring medical treatment as a result of these diagnoses.

**(ii)** Mesothelioma, or malignancies of the lung, colon, rectum, larynx, stomach, esophagus, pharynx, or ovary, as established by--

  **(I)** pathologic examination of biopsy tissue;

  **(II)** cytology from bronchioalveolar lavage; or

  **(III)** such other diagnostic standards as the Secretary specifies.

**(iii)** Any other diagnosis which the Secretary, in consultation with the Commissioner of Social Security, determines is an asbestos-related medical condition, as established by such diagnostic standards as the Secretary specifies.

## (3) Other individual described

An individual described in this paragraph is any individual who--

  **(A)** is not an individual described in paragraph (2);

  **(B)** is diagnosed with a medical condition caused by the exposure of the individual to a public health hazard to which an emergency declaration applies, based on such medical conditions, diagnostic standards, and other criteria as the Secretary specifies;

  **(C)** as demonstrated in such manner as the Secretary determines appropriate, has been present for an aggregate total of 6 months in the geographic area subject to the emergency declaration involved, during a period determined appropriate by the Secretary;

  **(D)** files an application for benefits under this subchapter (or has an application filed on behalf of the individual), including pursuant to this section; and

**(E)** is determined under this section to meet the criteria in this paragraph.