**No. 23-35507**

_____

_____

IN THE UNITED STATES CIRCUIT COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

**UNITED STATES OF AMERICA, EX REL. BNSF RAILWAY COMPANY,**

Plaintiff – Appellee,

**v.**

**CENTER FOR ASBESTOS RELATED DISEASE, INC.,**

Defendant – Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
_____

**APPELLANT'S REPLY BRIEF**
_____

Timothy Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
406-721-1435
tim@bechtoldlaw.net
*Attorney for Defendant – Appellant CARD*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... iii

INTRODUCTION .................................................................................1

ARGUMENT .......................................................................................2

A. This Court must make a *de novo* determination of whether a condition diagnosed through statutorily prescribed means of a "B-read" diagnosis is an environmental health "condition" regardless of any "clinical diagnosis."……………………………………………………………...3

    1. The statute expressly states how diagnoses are established for purposes of identifying "environmental exposure affected individuals."……………………………………………………….4

    2. Clinical findings are neither required nor useful to identify conditions that are radiologically demonstrated…………………………………6

    3. This Court's interpretation of the statute should be reached with *Chevron* deference to the federal agencies' interpretation, including as manifest in the agencies' directions and forms given to CARD……...8

    4. Critically, current federal agency interpretation of the statutory language in question is directly opposite the interpretation that BNSF seeks to impose, and instead implements the same interpretation and practice on which CARD relied, with federal agencies' direction, since the ACA's adoption………...……...……...……...…..……..11

B. Jury instructions F-23 and F-24 peremptorily required the jury to find that CARD's certificates of diagnosed conditions were *per se* false…………..13

C. The Court's instructions prevented the jury's consideration of CARD's defense that it was following the interpretation of the ACA directed by the federal agencies……………………………………………………16

CONCLUSION ..................................................................................19

CERTIFICATE OF COMPLIANCE.......................................................20

CERTIFICATE OF SERVICE .............................................................21

*ii*

## TABLE OF AUTHORITIES

**CASES**

*Caballero v. City of Concord*, 956 F.2d 204, 206–07 (9th Cir. 1992)...………15, 19

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)………………………………………………………….....8, 10, 13

*United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 464 (9th Cir.1999)………………………………………………..17, 18, 19

*Villegas-Valenzuela v. I.N.S.*, 103 F.3d 805, 809 (9th Cir. 1996)…………………4

**STATUTES**

31 U.S.C. §3729(b)………………………………………………………16

42 U.S.C. § 1395rr-1………………………………………………...4, 19

42 U.S.C. § 1395rr-1(e)………………………………………………….4

42 U.S.C. § 1395rr-1(e)(2)……………………………………………7, 8

42 U.S.C. § 1395rr-1(e)(2)(B)………………………………….....8, 10

42 U.S.C. § 1397h……………………………………………………….4

42 U.S.C. § 1397h(c)(3)……………………………………………..10

Section 1881A(e)(2)(B)……………………………………………5, 6, 8

Section 1881A(e)……………………………………………………….3, 9

**INTRODUCTION**

At the trial in this case, BNSF alleged 2,016 unique CARD patients gave rise to 2,016 (or more) allegations of fraudulent conduct by CARD. After hearing evidence and argument on those allegations, the jury only found 337 instances of fraud, or less than 17%. BNSF devotes nearly half of its response brief to this Court making irrelevant character attacks on CARD. CARD will not respond to those here, other than to observe those are the same character attacks BNSF made to the jury in its efforts to allege over 2,016 instances of fraudulent conduct by CARD. The jury flatly rejected BNSF's attempted character assassination.

With respect to the 337 allegations of fraud the jury did find, those were found because the district court erroneously instructed the jury that CARD committed fraud if CARD did not comply with the district court's after-the-fact additional requirements for a diagnosis of an asbestos-related disease not contained in the statute. That error, and other related error, is the focus of CARD's appeal and of this brief. The judgment in this case must be reversed because (a) as a matter of law, CARD was correct to apply the federal agencies' interpretation that "B-read only" interpretation met the statutory diagnosis criteria, (b) the jury instructions required or allowed the jury to conclude that presenting a "B-read only" interpretation was, *per se,* a false claim, or (c) the jury instructions allowed

1

or required the jury to conclude that CARD's reliance on the agencies'

interpretation could not defeat the scienter element.

## ARGUMENT

The central issue in this appeal is whether CARD's certification that an

environmental health condition established by "B-read only" interpretation

constitutes a *per se* "false claim" within the meaning of the False Claims Act.

Three district court <u>legal</u> rulings highlight this central issue:

(a)     The district court ruled that the ACA defines a condition established

by B-read only as not an environmental health "condition" unless there has also

been a clinical diagnosis concluding that asbestos was the <u>cause</u> of the condition.

Jury Instruction F-24 constitutes the most significant of these erroneous rulings

because it plainly <u>inserted</u> additional terms and qualifications not present within

the ACA, and contradicted the <u>actual</u> terms of the ACA as peremptory ruling that a

condition established by B-read only is <u>not</u> diagnosed.  *See generally* Appellant's

Opening Brief, pp.22-27.

(b)     The district court ruled CARD's certification that an environmental

health "condition" has been established by "B-read only" is a *per se* false claim.  In

Jury Instruction F-23, the Court incorporated an erroneous meaning of what it

means to be diagnosed <u>pursuant to the ACA</u> (Jury Instruction F-24), ER-101, ER-

102, and foreclosed the jury from its own necessary determinations in this case

whether CARD's certification of B-read only claims was reasonable, made with the necessary scienter, and therefore qualified as "false claims." *See generally* Appellant's Opening Brief, pp.26-27; 42-45.

(c)     The district court ruled that CARD "<u>may not rely</u>" on the Government agencies' interpretation of how a diagnosis of an environmental health condition is established if that interpretation is different than the district court's own after-the-fact (and ultimately erroneous) interpretation of the statutory term diagnosis. *See, e.g.,* Jury Instruction F-20, ER-99. CARD's scienter was an essential element of this case, and the district court's legal rulings (and preclusion of evidence) prevented the jury from properly considering CARD's defense that it was following the ACA as understood and directed through its involvement with federal agencies. *See generally* Appellant's Opening Brief, pp.27-36, 46-57.

All of these rulings were made by the district court as a matter of law and are now appropriate for this Court's reversal.

**A.     This Court must make a *de novo* determination of whether a condition diagnosed through statutorily prescribed means of a "B-read" diagnosis is an environmental health "condition" regardless of any "clinical diagnosis."**

This case requires this Court to make, in a case of first impression, a *de novo* determination of the legal meaning of Section 1881A(e) of the Affordable Care Act (42 U.S.C. § 1395rr-1) which defines an "Environmental Exposure Affected Individual" qualifying for Medicare services – including Medicare services under

3

the Act's "Program for early detection of certain medical conditions related to environmental health hazards." ACA Section 2009 (42 U.S.C. § 1397h). *See Villegas-Valenzuela v. I.N.S.*, 103 F.3d 805, 809 (9th Cir. 1996) ("We review questions of statutory interpretation *de novo*").

BNSF's primary contention in its Answer brief is that this Court's *de novo* construction should construe the statutory words "diagnosis" and "diagnoses" to mean "clinical" diagnos(es). Here, CARD correctly demonstrates that to do so is (1) contrary to the statute's explicit provision for how an environmental health condition is "established"; (2) nonsensical and impossible for radiologically proven conditions that are not clinically diagnosed; and (3) contrary to the federal agencies' interpretation of the statute to which this Court should give deference. BNSF's arguments are flawed, and the district court's reliance on the same was error.

## 1. The statute expressly states how diagnoses are established for purposes of identifying "environmental exposure affected individuals."

BNSF's proposed construction of 42 U.S.C. §1395rr-1(e) and the District court's rulings insert the term "clinical"—which Congress did <u>not</u> use—to override the explicit provision for "establish[ing]" the diagnoses of environmental exposure affected individuals that Congress <u>did</u> use.[1]

---

[1] Beyond the error of substantively altering the terms of the statute, the proposed construction confuses the role of <u>clinical</u> evaluation for treatment with the definitional criteria intended to identify individuals meeting the statutory criteria for at-risk individuals in Libby. <u>Clinical</u> care is necessary when a disease process

4

BNSF argues that the statute's explicit method for identifying "conditions" – §1881(e)(2)(B) – has nothing to do with the meaning of the word "diagnosed," which word, BNSF says, is only in subsection (A). BNSF's argument is based on a false premise. Specifically, Congress spelled out in subsection (B) that radiologically-established conditions of plaques or thickening are "diagnoses" (subsection (B)(i)(II) "these diagnoses"), just as a mesothelioma established by pathological examination is one kind of "diagnosis" for purposes of the statute (subsection (B)(ii),(iii) "[a]ny other diagnosis"). Because subsection (B) uses the words "diagnosis" and "diagnoses" to refer to a pulmonary "condition" that is "established by" specific objective medical criteria, such a diagnosis is also a diagnosis within the meaning of that identical term when used in subsection (A).

In short, there is no reason and only error to add to the statute a requirement for clinical evaluation when the statute expressly states that a targeted "condition" that is "established" by specified criteria is a "diagnosis." Section 1881A(e)(2)(B).

## 2. Clinical findings are neither required nor useful to identify conditions that are radiologically demonstrated.

---

impairs a person, demands correlation of medical findings to those symptoms, and focuses on providing needed treatment. In contrast, identifying "environmental exposure affected individuals" is not focused on individuals' current clinical symptoms, but instead with ongoing medical monitoring necessitated by the underlying "environmental exposure" in Libby pursuant to ATSDR's role. Individuals at risk of the progressive conditions known to follow from such asbestos exposure may very well be *presently* asymptomatic yet still meet the statutory criteria of those that are intended to qualify.

5

BNSF circularly argues that all elements of a <u>clinical</u> diagnosis should be required because that is how asbestos-related conditions are <u>clinically</u> established. There are two fatal flaws in its argument.

First, the ACA does not purport to establish clinical or forensic diagnostic standards or medical care guidelines. Rather, the ACA is directed at selection criteria for individuals with conditions that make them at risk. Even without this particular purpose, BNSF's and the district court's inclusion of purportedly necessary guidelines into the statutorily bound terms of the ACA from an outside medical society is not appropriate. None of the entities administering the ACA— DHHS and ATSDR foremost—rely upon or incorporate those outside clinical standards in their own implementation of the ACA. BNSF is not at liberty to change statutory requirements and definitions for its own purposes in pursuing separate FCA relief.

Second, some of the qualifying "conditions" explicitly targeted by the statute are simply <u>not</u> "clinically" diagnosed. If a radiograph read by a qualified physician shows thickening of the pleura, the individual has "pleural thickening." Period. The anatomical fact of a pleural thickening defect is, <u>by definition</u>, one of the "conditions described" as such phrase is used in both subsections (A) and (B) of 42 U.S.C. §1395rr-1(e)(2). Not only does the statute definitively state how this condition is "established," but, as a simple matter of medical fact, the existence of

"thickening" or "plaques" on the pleura are definitively demonstrated by radiological imaging and measurement of those anatomical conditions.

BNSF argues that the establishment of causation must be <u>added</u> to the statute. Otherwise, BNSF argues, pleural abnormalities from a broken rib would be captured by overbroad selection criteria. While, for forensic purposes (like in the personal injury lawsuits in which BNSF is defendant), an established pleural abnormality does not mean that asbestos exposure <u>caused</u> the defect, the ACA does not delve into such forensic questions. Rather, the terms of the statute reveal bright line diagnostic criteria for the implementing agencies in recognition that asbestos disease is endemic in the heavily exposed Libby community. It must be seen by both the clarity of the statutory terms and the other elements of the ACA, including evidence excluded by the district court, reflecting the actual intent of these provisions, that this is a Congressional choice recognizing that clarity for the federal agencies and the need for medical monitoring outweigh the value of unravelling difficult causation disputes that are <u>separate</u> and common in personal injury litigation.

**3. This Court's interpretation of the statute should be reached with *Chevron* deference to the federal agencies' interpretation, including as manifest in the agencies' directions and forms given to CARD.**

The literal construction of the statute, including exclusive use of the expressly stated terms by which a "condition" is "established" (ACA §1881A

(e)(2)(B), 42 U.S.C. §1395rr-1(e)(2)(B)), is a construction fully endorsed and consistently used by the federal agency (ATSDR) implementing the "Program for Early Detection of Certain Medical Conditions Related to Environmental Health Hazards" and the federal agency (SSA) handling subsequent Medicare coverage.

When construing the statutory terms at issue in this case of first impression, this Court should give deference to these agencies because of (a) their expertise in the underlying science of the medical conditions at issue, and (b) the on-the-ground practicalities of application of the statutory programs in view of that science.

BNSF's contention that causal and clinical evaluations should be required for diagnosis of radiologically demonstrated conditions is fundamentally at odds with the agencies' interpretation. First, the form CARD is accused of falsely completing (Ex 2-1, ER-16) was directly prescribed by the ATSDR and used by SSA to determine Medicare qualification under the ACA. It does <u>not</u> have, in addition to a checklist of the "establish[ment]" criteria from subsection (B) of 42 U.S.C. §1395rr-1(e)(2), a place for certification that the individual's condition had been "<u>clinically</u> diagnosed" or that the individual's particular condition was necessarily asbestos <u>caused</u>. After the fact, or even allegedly implied, but specific and assumed criteria beyond the terms of the statute imposed onto the certification form or process has neither statutory nor practical foundation in how the ACA was, or should be, implemented.

8

Second, ATSDR's administrating officer Theodore Larson unequivocally testified why such additional certifications were not asked of CARD.

> Q "So if -- either a diagnosis by CARD or a B-reader's positive interpretation would qualify a person for Medicare benefits?
> MR. DUERK: "Objection. Form. Foundation.
> THE WITNESS: "Yes.
> BY MR. BECHTOLD:
> Q "And how do you know that?
> A "Again, it's specified in the NOFO and in the statute.
> ***
> Q "How long have you known that CARD submits EHH forms to the Social Security Administration based solely upon a positive outside read?
> A "So I would say since the grant was initially stood up. I mean, those are criteria that are in the original NOFO.
> Q "So that is something that the ATSDR intended CARD to do from the beginning?
> A "Yes.

Theodore Larson testimony, ER-158–159; ER-161–162 (emphasis added).

Third, the ATSDR, whose professional expertise is in epidemiology, recognizes in its justification for CARD's work in Libby (CARD NOFO "justification," ER-75), that "Radiographic imaging is one of the key elements of asbestos health and lung cancer screening [and are] beneficial for individuals at high risk for lung cancer."

BNSF argues that this Court should not give deference to the federal agencies under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), upon the contention that the statute "unambiguously" requires a clinical diagnosis. The argument that diagnosis unambiguously means <u>clinical</u>

9

diagnosis cannot be reconciled to the fact that the statute, in subsection (B), uses exactly the word "diagnosis" to describe the establishment of conditions by radiological findings only. *See* §1881A (e)(2)(B)(i)(II) ("these diagnoses"), & subsection (B)(ii),(iii) ("[a]ny other diagnosis"). If the word "diagnosis" in Subsection (A) unambiguously requires clinical evaluation, then Subsections (A) and (B) are irreconcilably contradictory.

Next BNSF tries to portray Larson and the ATSDR as playing merely tangential roles in CARD's reporting of environmental health conditions at issue. This contention cannot be reconciled to the facts that (a) the ATSDR and SSA both prescribed the use of the very forms by which CARD made reports (forms which do not require or provide a means to report any "clinical" findings), and (b) both the "conditions" and the criteria in the Medicare coverage section of these ACA provisions (42 U.S.C. §1395rr-1(e)(2)(B)) and the ACA's companion early detection program provisions (42 U.S.C. § 1397h(c)(3)) are identical.

**4. Critically, current federal agency interpretation of the statutory language in question is directly opposite the interpretation that BNSF seeks to impose, and instead implements the same interpretation and practice on which CARD relied, with federal agencies' direction, since the ACA's adoption.**

There can be no ambiguity regarding or challenge to whether the SSA considers a "B-read only" as sufficient "diagnosis" for establishing a qualifying "condition." Specifically, when a Libby resident made application for Medicare

10

coverage for a condition diagnosed by "outside read only" (JR-13[2]) via the exact same "Environmental Health Hazard Checklist" form at issue in this appeal, *compare* JR-13, *with* Ex 2-1, ER-16, the applicant appealed the local SSA office's rejection of the application. That appeal (JR-3-JR-6) was based on exactly the same contention presented by CARD in this case: a statutory construction <u>endorsed by the ATSDR</u>, that an outside "only" read established the disease for purposes of the ACA statute at issue.

That appeal made clear that SSA relied on an "outside-read only" designation in the absence of additional clinical diagnosis, and that such appeal presented the contention that the statutory standard was nevertheless <u>met</u> by the outside reader's finding:

> CARD does <u>not</u> consider a positive outside read a <u>clinical</u> diagnosis; however, the ACA defines a positive screening in this way as does SSA's EHH checklist and CARD's grant . . . CARD calls this situation a <u>non-clinical diagnosis</u>."

JR-5 (emphasis added).

---

[2] CARD requests that this Court take judicial notice of the final administrative ruling of the Social Security Administration dated November 25, 2023, pursuant to the procedure in the Ninth Circuit Appellate Practice Guide at 68, ("Requests for judicial notice and responses thereto are reviewed by the panel that will consider the merits of a case. The parties may refer to the materials the request addresses with the understanding that the Court may strike such references and related arguments if it denies the request"). The SSA's appellate ruling and rationale of the appeal are attached to CARD's Motion for Judicial Notice filed concurrently with this brief, with personal identifiers redacted to comply with FRAP 25(a)(5).

The SSA final ruling agreed with CARD and the appellant in that SSA proceeding. The SSA agreed in its final ruling that such a <u>non-clinical</u> diagnosis—established by outside radiological read—met the requirements of the statute as the administering federal agency construed and applied it:

> You are entitled to Medicare because <u>you are medically affected</u> from exposure to a public health hazard in an area subject to an emergency declaration.

JN2 (emphasis added).

BNSF's attempted construction – and the district court's reliance thereon – inserting "clinical" into the statute cannot be reconciled to the SSA's final administrative adjudication and ruling that CARD's submission of the exact same outside read "only" "Environmental Health Hazard Checklist" form <u>did</u> establish that the Libby applicant was "entitled to Medicare."

Similarly, the SSA's final administrative adjudication cannot be reconciled to the jury instructions in this case, which <u>required</u> the jury to find that submission of the exact same "Environmental Health Hazard Checklist" form (Ex 2-1, ER-16) was a false claim in the absence of a "clinical" diagnosis. *See* JN16.

In this Court's *de novo* ruling on the meaning of the statute, *Chevron* deference to the federal agencies' interpretation and application of the statute is correct and appropriate.

**B. Jury instructions F-23 and F-24 peremptorily required the jury to find that CARD's certificates of diagnosed conditions were *per se* false.**

CARD's opening brief demonstrated that jury instructions F-23 and F-24 are peremptory because they <u>required</u> the jury to find that CARD had made a false claim by submitting an Environmental Health Hazard Checklist form (Ex 2-1, ER-16) certifying that a covered condition had been diagnosed. Of course, the instructions are erroneous if, as demonstrated above, "clinical" findings have no place in "establishing" a pleural condition proven by radiologic image. But the instructions are <u>also</u> erroneously peremptory because they direct a finding of a false statement that CARD did not make: that pleural conditions <u>had</u> been "clinically" diagnosed – a statement that is not on the form CARD was directed to use.

BNSF argues that such peremptory direction is appropriate because, by submitting the forms, CARD is alleged to have inherently (and falsely, per the FCA) stated that the conditions had been <u>clinically</u> diagnosed (under the district court's construction of the statute). There is no evidence that CARD ever (over)stated that B-read only certificates were "clinical" diagnoses. On the contrary, the unrefuted evidence is that CARD submitted forms stating that the conditions had been established by "interpretation by a qualified B-reader . . . interpretation." This is beyond dispute. Indeed, the <u>unrefuted evidence is that CARD would expressly make its certification clear by inserting the word "only" on the form</u>. *See, e.g.*, Ex 2-1, ER-16.

13

Second, the undisputed evidence is that the Environmental Health Hazards Checklist forms (and the manner in which they were submitted, as directed by ATSDR) reflected that a "B-read only" submission should be submitted by CARD whenever the condition was established by B-read only. The peremptory jury instruction nonetheless erroneously required the jury to find that these submissions were "false" statements. The rationale for this instruction was based solely on the district court's erroneous legal conclusion, in the settling of instructions just moments before, that assigned "meaning to the unique provision of the Affordable Care Act" that "no court has previously had an opportunity to define." ER-125-126.

Even assuming that the district court's statutory insertion of "clinical" finding was correct, such that the agency and its form incorrectly failed to incorporate the "required" finding of "clinical" diagnosis, mere submission of the form by CARD or anyone else based on B-read only is not itself inherently "false," much less *per se* proof of scienter. That submission on the agency's inadequate form demonstrates only and exactly what CARD expressly stated on that form in such cases: a form that is silent regarding clinical findings was being submitted certifying that "only" an outside B-read diagnosis was being submitted.

Assuming arguendo that the ACA must be interpreted as requiring a "clinical diagnosis," the jury instructions still should have permitted the jury to

14

evaluate and find that CARD was not just submitting the form, but also was further underline(falsely) claiming that a "clinical" diagnosis of an asbestos caused condition had been made. However, here the jury was underline(compelled) by the district court's instructions to find that the submission of the ATSDR/SSA agencies' form was underline(necessarily) a false statement if there had been no clinical diagnosis—regardless of whether CARD had ever so stated, and even in those cases where CARD expressly conditioned and represented in its certificate the clarifying, added word "only" to reflect that lack of clinical diagnosis.

The standard for reversal based on erroneous instructions is established by *Caballero v. City of Concord*, 956 F.2d 204, 206-07 (9th Cir. 1992). Under that standard the district court's error in instructions F-23 and F-24 "requires reversal" even if the instruction only "may have" caused the jury to reach an incorrect result on the false claim charges for hundreds of "B-read only" submissions. In the instant case, that means reversal is required if instructions F-23 and F-24 compelled the jury to find a false claim underline(both) when CARD submitted the form without making a clinical finding, and when CARD did underline(not) report it had made a clinical finding.

Finally, BNSF asserts that CARD did not preserve its objection to instruction F-23. On the contrary, F-23 underline(became) objectionable when instruction F-24 defined "diagnosis" (as used in F-23) as "clinical" diagnosis. CARD's objection

15

to this result is preserved by ample objection and articulated rationale. *See* ER-121-ER-124.

### C. The Court's instructions prevented the jury's consideration of CARD's defense that it was following the interpretation of the ACA directed by the federal agencies.

The jury instructions not only peremptorily directed a finding that CARD's B-read only submissions were "false." The instructions also required the jury to reject CARD's defense to the separate scienter element of the False Claims Act.

Upon a direction (in instructions F-23 and F-24) that the jury must find the submission of "B-read only" forms to be a <u>false</u> statement, the jury was then required by the statute and should have been separately permitted to determine whether CARD knew ("reckless disregard") or should have known ("deliberate ignorance") that it was making a false statement. 31 U.S.C. § 3729(b).

CARD's strongest defense[3] to the scienter defense was that CARD had been directed by the ATSDR to fill out the forms as it did whenever there was only a B-

---

[3] CARD also contended that its physician and staff believed that the ACA provisions were comprehensively directed towards asbestos-exposed people in Libby without regard to whether the conditions had progressed to a level warranting a conclusion that they had fully developed asbestos disease. CARD witnesses testified they based this belief on the work they had engaged with U.S. Senator Baucus in formulating the purpose and goals of the legislation. This defense was largely destroyed by the district court's refusal to admit the corroborating testimony of Senator Baucus. This exclusion of Senator Baucus's testimony was separate error by the district court. *See generally* Appellant's Brief, pp.52-57. Suggestions by BNSF that such testimony was irrelevant and "unfairly

read x-ray finding of one of the qualifying conditions, and that this direction was

based on a governmental agency's interpretation of the statute.[4]

This Court has ruled that a defendant who relies on "a good faith

interpretation of a regulation is not subject to liability" under the False Claims Act.

*United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 464 (9th Cir.1999). The

record demonstrates ample evidentiary foundation for CARD's scienter defense:

> Q: Okay. And in this context, do you understand that you
> read one part of the Affordable Care Act, a very large law,
> and made a legal interpretation that you then acted upon that
> may affect other individuals, these people being CARD
> patients? Correct?
> A: I would say that it wasn't just the law. It was also
> the EHH documents created by the federal government that were
> translating policy into practice.
> Q: Okay. And you've never reached out to anybody to see if
> your interpretation of these laws was correct? Right?
> A: Correct. I relied on the agency's ability to translate
> it into practice through the EHH.

Tanis Hernandez testimony, ER-144 (emphasis added).

However, the jury was erroneously not allowed to weigh this undisputed

reliance for the purpose of evaluating what CARD knew or should have known

during its practice of submitting the federal agencies' forms in accordance with

and under the direction of those government agencies. Despite the good faith

actions taken by CARD, Jury Instruction F-20 essentially directed a verdict on

---

prejudicial" blatantly ignore the highly probative value of such evidence on the specific standalone element of CARD's scienter.

[4] Testimony of ATSDR's administrating officer Theodore Larson, ER-153 -162.

CARD's reliance defense to the scienter element of liability and undermined this Court's holding in *Parsons* on the elements of proof and associated defenses required under the FCA.

The district court found that the ATSDR's interpretation of the statute was wrong, and then instructed that the jury impart CARD with hindsight knowledge of the Court's *later* interpretation of the implied meaning (not express terms) of the statute. Jury Instruction F-20 specifically instructed the jury not to credit CARD with knowledge derived from – or recognize any "good faith interpretation" through – the agency's directions at the time of CARD's submissions. The district court instead imposed—on the jury, CARD, and federal agencies—its own 2023 first interpretation of what it considered "contrary to law":

> In evaluating a defendant's knowledge, you may consider that parties who seek public funds are expected to know the law and may not rely on the conduct of Government agents contrary to law.

ER-99. This cannot be reconciled with this Court's "good faith" scienter defense under the FCA pursuant to *Parsons*.

BNSF argues that such peremptory instruction was "harmless" because the jury was otherwise allowed to evaluate CARD's subjective beliefs. However, BNSF's argument falls well short of the legal standard. Instruction F-20 undeniably charged the jury to reject CARD's primary defense to scienter—an essential element of a claim under the FCA. *Cf. Caballero,* 956 F.2d at 206-07 (a

18

party was "not entitled to have disputed factual questions resolved in [its] favor because the jury's verdict <u>may have resulted</u> from a misapprehension of law").

## CONCLUSION

BNSF has not refuted that this case must be reversed if (a) in its *de novo* construction of Section 1881A(e) of the Affordable Care Act (42 U.S.C. §1395rr-1), this Court concludes that qualifying conditions (e.g. pleural plaques or pleural thickening) are "established" by outside B-reader radiological findings; (b) the district court's jury instructions F-23 and F-24 peremptorily required (or even permitted) the jury to find a false claim whenever a "B-read only" was reported on the ATSDR's form; or (c) the district court erroneously instructed that, with respect to scienter, CARD could not rely on the administering <u>agencies' construction</u>, and thereby charged CARD with hindsight knowledge of the <u>court's construction</u>  - a construction first announced during settling of jury instructions.

CARD respectfully asks the Court to reverse the rulings of the district court and find that CARD did not have the requisite scienter for liability under the False Claims Act, and further, to reverse the contrary district court rulings on admissible evidence and jury instructions.

DATED this 20th day of May, 2024.

/s/ Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
*Attorney for Defendant – Appellant CARD*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 23-35507_____

I am the attorney or self-represented party.

**This brief contains** 4523_____ **words,** including 0_____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** /s/Timothy M. Bechtold_____ **Date** 05-20-2024_____
*(use "s/[typed name]" to sign electronically-filed documents)*

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served on the appellate CM/ECF system.

DATED this 20th day of May, 2024.

/s/Timothy M. Bechtold

BECHTOLD LAW FIRM, PLLC

*Attorney for Defendant – Appellant CARD*

21